LETITIA JAMES
Attorney General for the State of New York
STEPHEN C. THOMPSON
Special Counsel
Rabia Muqaddam
Chief Counsel for Federal Initiatives
Patrick Gibson
Assistant Attorney General
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-6183
Email: Stephen.Thompson@ag.ny.gov

*Attorneys for the State of New York*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF NEW YORK, *et al.*, | Case No. 6:25-cv-02384-AA |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT** |
| RUSSELL T. VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau, *et al.*, | **EXPEDITED HEARING REQUESTED** |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES............................................................................................ iii

TABLE OF DECLARATIONS......................................................................................... x

MEMORANDUM OF LAW ............................................................................................ 2

FACTUAL BACKGROUND ........................................................................................... 3

I.    The CFPB and Dodd-Frank Act.......................................................................... 3

      A.    CFPB's Consumer Response System................................................... 5

      B.    The Home Mortgage Disclosure Act (HMDA) ................................... 6

II.   The Federal Reserve System............................................................................... 7

III.  The CFPB's Funding Structure ........................................................................ 10

IV.   Defendant Vought Attempts to Unlawfully Dismantle the CFPB....................11

V.    The Challenged Decisions: Defendant Vought's New Effort to Unlawfully
      Dismantle the CFPB by Starving it of Funding................................................ 13

ARGUMENT .................................................................................................................. 14

I.    Plaintiffs Have Standing .................................................................................. 15

II.   The Challenged Decisions Are Final Agency Actions...................................... 19

III.  Plaintiffs Prevail on the Merits of Their Claims ............................................. 21

      A.    The Challenged Decisions are not in accordance with law...................... 21

      B.    The Challenged Decisions unlawfully withhold agency action and are *ultra
            vires*................................................................................................................ 23

      C.    The Challenged Decisions violate the separation of powers. ................... 27

IV.   Plaintiffs Are Entitled to Relief........................................................................ 28

      A.    Plaintiffs are entitled to vacatur of the Challenged Decisions.................. 28

      B.    Plaintiffs are entitled to an order compelling Defendant Vought to request
            funding from the Federal Reserve.............................................................. 29

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

C.    Plaintiffs are entitled to a declaratory judgment. ...................................................... 29

D.    Plaintiffs are entitled to a permanent injunction. ...................................................... 30

CONCLUSION ......................................................................................................................... 32

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aetna Life Ins. Co. of Hartford. v. Haworth*,
  300 U.S. 227 (1937)..................................................................................................30

*Al Otro Lado v. Exec. Off. for Immigr. Rev.*,
  138 F.4th 1102 (9th Cir. 2025) ...............................................................................24

*Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*,
  786 F. Supp. 3d 647 (S.D.N.Y. 2025).....................................................................19

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)..................................................................................................31

*Bennett v. Spear*,
  520 U.S. 154 (1997).............................................................................................. 19-20

*Biodiversity Legal Found. v. Badgley*,
  309 F.3d 1166 (9th Cir. 2002) .................................................................................32

*Calvillo Manriquez v. Devos*,
  345 F.Supp.3d 1077 (N.D. Cal. 2018) ....................................................................31

*Carson Harbor Vil., Ltd. v. Unocal Corp.*,
  270 F.3d 863 (9th Cir. 2001) ...................................................................................21

*CFPB v. Purpose Fin., Inc.*,
  No. 7:24-cv-3206 (D.S.C. Oct. 3, 2024)..................................................................10

*City & Cnty. of S.F. v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) .................................................................................28

*Clinton v. City of New York*,
  524 U.S. 417 (1998)..................................................................................................28

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024).............................................................................4, 10-11, 25-26

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

*Consumer Fin. Prot. Bureau v. Common. Equity Group*,
  752 F. Supp. 3d 378 (D. Mass. 2025) ...................................................5

*Consumer Fin. Prot. Bureau v. Wen*,
  No. 25-55700, 2025 WL 2254521 (9th Cir. 2025) .................................4

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*,
  603 U.S. 799 (2024)............................................................................28

*Crawford & Co. v. Apfel*,
  235 F.3d 1298 (11th Cir. 2000) ..........................................................24

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ............................................................15

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ..............................................................15

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
  544 U.S. 280 (2005)............................................................................24

*FCC v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003)............................................................................21

*Harmon v. Thornburgh*,
  878 F.2d 484 (D.C. Cir. 1989)............................................................29

*Hells Canyon Pres. Council v. U.S. Forest Serv.*,
  593 F.3d 923 (9th Cir. 2010) ..............................................................25

*In re A Community Voice*,
  878 F.3d 779 (9th Cir. 2017) ..............................................................25

*Johnson v. DTBA, LLC*,
  424 F. Supp. 3d 657 (N.D. Cal. 2019) ................................................13

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016)............................................................................25

*Kleissler v. U.S. Forest Serv.*,
  157 F.3d 964 (3d Cir. 1998)................................................................24

*Leedom v. Kyne*,
  358 U.S. 184 (1958)............................................................................27

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

*Maryland v. King*,
   567 U.S. 1301 (2012) ................................................................................ 19

*Mausolf v. Babbitt*,
   85 F.3d 1295 (8th Cir. 1996) ..................................................................... 24

*Md. Cas. Co. v. Rosen*,
   445 F.2d 1012 (2d Cir. 1971) ..................................................................... 30

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ................................................................................... 31

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ..................................................................................... 15

*Nat. Res. Def. Council, Inc. v. Env't Prot. Agency*,
   961 F.3d 160 (2d Cir. 2020) ....................................................................... 19

*Nat'l Ass'n. of Wheat Growers v. Becerra*,
   468 F. Supp. 3d 1247 (E.D. Cal. 2020) ..................................................... 31

*Nat'l Cmty. Reinvest. Coal. v. Consumer Fin. Prot. Bureau*,
   No. 20-2074 (BAH), 2022 WL 4447293 (D.D.C. Sept. 23, 2022) ............ 6

*Nat'l Treasury Emps. Union v. Vought*,
   774 F. Supp. 3d 1 (D.D.C.) .................................................................. 11-12

*Nat'l Treasury Emps. Union v. Vought*,
   No. 25-0381 (ABJ), 2025 WL 3771192 (D.D.C. Dec. 30, 2025) ............ 10, 14, 21-23, 26

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
   434 U.S. 1345 (1977) ................................................................................. 19

*New York v. Trump*,
   769 F. Supp. 3d 119 (D.R.I. 2025) ............................................................ 28

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................................... 15

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ............................................................................... 24, 29

*Nuclear Regulatory Comm'n v. Texas*,
   605 U.S. 665 (2025) ................................................................................... 27

Page v -   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
           MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

*Or. Nat. Desert Ass'n v. Bushue,*
    644 F. Supp. 3d 813 (D. Or. 2022) ..................................................................15

*Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce,*
    128 F.4th 1089 (9th Cir. 2025) .......................................................................20

*Rhode Island v. Trump,*
    155 F.4th 35 (1st Cir. 2025)............................................................................18

*Saliba v. U.S. Sec. & Exch. Comm'n,*
    47 F.4th 961 (9th Cir. 2022) ..........................................................................20

*Sturgeon v. Frost,*
    577 U.S. 424 (2016).......................................................................................24

*Taylor v. United States,*
    181 F.3d 1017 (9th Cir. 1999) .......................................................................24

*Tenn. Valley Auth. v. Hill,*
    437 U.S. 153 (1978).......................................................................................32

*Texas v. Colony Ridge, Inc.,*
    No. H-24-0941 (S.D. Tex. Oct. 11, 2024) ....................................................11

*Trump v. United States,*
    603 U.S. 593 (2024).......................................................................................27

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025).....................................................................................8

*U.S. Postal Serv. v. Brennan,*
    579 F.2d 188 (2d Cir. 1978)...........................................................................24

*United States v. Oakland Cannabis Buyers' Co-op.,*
    532 U.S. 483 (2001).......................................................................................30

*United States v. Vance Crooked Arm,*
    788 F.3d 1065 (9th Cir. 2015) .......................................................................26

*United States v. Washington,*
    759 F.2d 1353 (9th Cir. 1985) .......................................................................30

*Vietnam Veterans of Am. v. Cent. Intel. Agency,*
    811 F.3d 1068 (9th Cir. 2016) .......................................................................29

Page vi -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
              MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

*Washington v. Trump*,
    145 F.4th 1013 (9th Cir. 2025) ..........................................................................31

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..............................................................................................15

*Woonasquatucket River Watershed Council v. USDA*,
    778 F. Supp. 3d 440 (D.R.I. 2025) ...................................................................20

*Youngstown Sheet & Tube Co. v. Sawyer*,
    103 F. Supp. 569 (D.D.C. 1952) ......................................................................31

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ..........................................................................................27

## CONSTITUTIONS AND FEDERAL STATUTES

U.S. Const.
    art. I, § 8, cl. 1 ..................................................................................................28
    art. I, § 9, cl. 7 ..................................................................................................28

5 U.S.C.
    § 703 .............................................................................................................29-30
    § 704 ...................................................................................................................19
    § 706 ...........................................................................15, 19, 24-25, 27-30, 33

7 U.S.C.
    § 26 .....................................................................................................................22

12 U.S.C.
    § 225a ...................................................................................................................8
    § 342 .....................................................................................................................8
    § 2801 ...................................................................................................................6
    § 2803 ...................................................................................................................7
    § 2809 .................................................................................................................18
    § 2809 ...................................................................................................................7
    § 5465 .................................................................................................................22
    § 5491 ...................................................................................................................4
    § 5492 .................................................................................................................23
    § 5493 .............................................................................................................4-6, 18
    § 5497 ...................................................10, 13-14, 21, 24-27, 29-30, 32-33
    § 5511 ........................................................................................................2, 22, 25
    § 5512 ...................................................................................................................7

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

28 U.S.C.
  § 2201.............................................................................................................29
  § 2412.............................................................................................................33

APA...............................................................................15, 19-21, 27-31, 33

Dodd-Frank Act,
  Pub. L. No. 111-203, 124 Stat. 1376-2223 ................................4-8, 10, 14, 21-22, 24

Emergency Economic Stabilization Act of 2008,
  Pub. L. No. 110-343, 122 Stat. 3765 .....................................................8

2025 Budget Reconciliation Act,
  Pub. L. No. 119-21, 139 Stat. 74 .........................................................11

Financial Services Regulatory Relief Act of 2006,
  Pub. L. No. 109-351, 120 Stat. 1966, ....................................................8

## FEDERAL REGULATIONS

12 C.F.R.
  § 1003.1............................................................................................7
  § 1003.4............................................................................................7
  § 1003.5...........................................................................................17

## RULES

Fed. R. Civ. P. 56 ...............................................................................15

Fed. R. Evid. 201 ................................................................................3

## OTHER AUTHORITIES

Consumer Fin. Protect. Bureau, *Home Mortgage Disclosure Act*, https://ffiec.cfpb.gov/
  (last visited Jan. 21, 2026) .............................................................. 17

Consumer Fin. Prot. Bureau, *The CFPB* (Dec. 12, 2024, at 15:22 ET),
  https://www.consumerfinance.gov/about-us/the-bureau/ ................................. 4

*Earned*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earned ............. 21

*Earnings*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earnings ........ 21

Jean-Charles Chebat, Moshe Davidow & Isabelle Codjovi, *Silent Voices: Why Some
  Dissatisfied Consumers Fail to Complain*, 7 J. Serv. Rsch. 328, 328 (2005).................. 17

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

S. Rep. No. 111-176 (2010) ..................................................................................... 10, 28

Page ix -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

## <u>TABLE OF DECLARATIONS</u>

| Plaintiff | Declaration | Short Citation |
|---|---|---|
| N/A | Declaration of Stephen C. Thompson in Support of Plaintiffs' Motion for Partial Summary Judgment | Thompson Decl. |
| N/A | Declaration of Erie Meyer in Support of Plaintiffs' Motion for Partial Summary Judgment | Meyer Decl. |
| Arizona | Declaration of Alyse Meislik in Support of Plaintiffs' Motion for Partial Summary Judgment | AZ-Meislik Decl. |
| California | First Declaration of Jacinto P. Fernandez, Jr. in Support of Plaintiffs' Motion for Partial Summary Judgment | CA-Fernandez CRS Decl. |
| California | Second Declaration of Jacinto P. Fernandez, Jr. in Support of Plaintiffs' Motion for Partial Summary Judgment | CA-Fernandez HMDA Decl. |
| Colorado | Declaration of Nathan Blake in Support of Plaintiffs' Motion for Partial Summary Judgment | CO-Blake Decl. |
| Connecticut | First Declaration of Joseph J. Chambers in Support of Plaintiffs' Motion for Partial Summary Judgment | CT-Chambers CRS Decl. |
| Connecticut | Second Declaration of Joseph J. Chambers in Support of Plaintiffs' Motion for Partial Summary Judgment | CT-Chambers HMDA Decl. |
| Hawai'i | Declaration of Christopher J.I. Leong in Support of Plaintiffs' Motion for Partial Summary Judgment | HI-Leong Decl. |
| Illinois | Declaration of Elizabeth Blackston in Support of Plaintiffs' Motion for Partial Summary Judgment | IL-Blackston Decl. |
| Illinois | Declaration of Angela Wagner in Support of Plaintiffs' Motion for Partial Summary Judgment | IL-Wagner Decl. |
| Maine | Declaration of Linda Conti in Support of Plaintiffs' Motion for Partial Summary Judgment | ME-Conti Decl. |
| Maryland | Declaration of Wilson M. Meeks in Support of Plaintiffs' Motion for Partial Summary Judgment | MD-Meeks Decl. |
| Maryland | Declaration of Jonathan M. Smith in Support of Plaintiffs' Motion for Partial Summary Judgment | MD-Smith Decl. |

Page x -    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
            MEMORANDUM OF LAW IN SUPPORT

| Plaintiff | Declaration | Short Citation |
|---|---|---|
| Massachusetts | Declaration of Irene Gutierrez in Support of Plaintiffs' Motion for Partial Summary Judgment | MA-Gutierrez Decl. |
| Massachusetts | Declaration of Arwen Thoman in Support of Plaintiffs' Motion for Partial Summary Judgment | MA-Thoman Decl. |
| Minnesota | Declaration of Nina Grove in Support of Plaintiffs' Motion for Partial Summary Judgment | MN-Grove Decl. |
| Nevada | Declaration of Mark J. Krueger in Support of Plaintiffs' Motion for Partial Summary Judgment | NV-Krueger Decl. |
| New Jersey | Declaration of Yolanda N. Melville in Support of Plaintiffs' Motion for Partial Summary Judgment | NJ-Melville Decl. |
| New Jersey | Declaration of Jennifer C. Micco in Support of Plaintiffs' Motion for Partial Summary Judgment | NJ-Micco Decl. |
| New York | Declaration of Christopher L. Filburn in Support of Plaintiffs' Motion for Partial Summary Judgment | NY-Filburn Decl. |
| New York | Declaration of Sara Hodges in Support of Plaintiffs' Motion for Partial Summary Judgment | NY-Hodges Decl. |
| North Carolina | Declaration of Phillip K. Woods in Support of Plaintiffs' Motion for Partial Summary Judgment | NC-Woods Decl. |
| New Mexico | Declaration of Evan Crocker in Support of Plaintiffs' Motion for Partial Summary Judgment | NM-Crocker Decl. |
| New Mexico | Declaration of Mark D. Sadowski in Support of Plaintiffs' Motion for Partial Summary Judgment | NM-Sadowski Decl. |
| Oregon | Declaration of Madeline Alvarado in Support of Plaintiffs' Motion for Partial Summary Judgment | OR-Alvarado Decl. |
| Rhode Island | Declaration of Meghan Spooner in Support of Plaintiffs' Motion for Partial Summary Judgment | RI-Spooner Decl. |
| Vermont | Declaration of Andre Souligny in Support of Plaintiffs' Motion for Partial Summary Judgment | VT-Souligny Decl. |
| Wisconsin | Declaration of Michael Lawton in Support of Plaintiffs' Motion for Partial Summary Judgment | WI-Lawton Decl. |

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

## **LR 7-1 CERTIFICATION**

Plaintiffs' counsel certify that the parties conferred on this motion and its briefing schedule via videoconference on January 16, 2026, with Brad Rosenberg, Charles Roberts, and Liam Holland, attorneys from the U.S. Department of Justice Federal Programs Branch who represent Defendants Russell Vought and the Consumer Financial Protection Bureau ("CFPB" or the "Bureau"). Plaintiffs conferred on the same via videoconference with Joshua Chadwick, counsel for Defendant Board of Governors of the Federal Reserve System, on January 20, 2026. In both cases, Plaintiffs' counsel outlined the arguments included in this brief. Defendants did not consent to Plaintiffs' requested relief.

## **MOTION**

Plaintiffs move under Rule 56 for entry of partial summary judgment in their favor on their claims for declaratory and injunctive relief on their First, Third, Fourth, Fifth, and Sixth Causes of Action. This motion is supported by the following memorandum of law and the declarations filed simultaneously with this motion.

Defendant Vought has determined, as Acting Director of the CFPB, to starve Defendant CFPB of funds because (1) he cannot request funds from the Defendant Federal Reserve at any time when the Federal Reserve's interest expenses exceed its income, and (2) on that basis, he will not request funding from the Board of Governors of the Federal Reserve System for fiscal year 2026. Thus, Defendant Vought did not request any funds from the Board of Governors as the enabling statute requires, depriving the agency of funding until January 9, 2026. That day, Defendant Vought requested funds pursuant to a district court order, requiring Defendant Vought to comply with an existing preliminary injunction that barred him from destroying the agency. Together, these decisions constitute final agency actions that will irreparably injure Plaintiffs. The decisions are contrary to law, are *ultra vires*, violate the separation of powers, and constitute unlawfully withheld agency action. Therefore, they must be set aside.

Plaintiffs request an expedited hearing of this motion to ensure that a decision can be made

Page 1 -   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
           MEMORANDUM OF LAW IN SUPPORT

before the current funding runs out on or around March 31, 2026. To prevent injury to Plaintiffs that will result if the CFPB is shuttered, Plaintiffs request that the Court set a hearing at its earliest availability after completion of briefing on February 25.

## MEMORANDUM OF LAW

The CFPB was established in the wake of the Great Recession to ensure "that all consumers have access to markets for consumer financial products and services and that [those] markets . . . are fair, transparent, and competitive." 12 U.S.C. § 5511. Congress set up the CFPB to be an independent agency within the Federal Reserve System ("Federal Reserve"), funding it outside of traditional Congressional appropriations to keep its focus on protecting consumers and the markets for consumer financial products, without the risk of fluctuations in funding from annual Congressional appropriations. For nearly fourteen years, the CFPB did that work. Throughout that time, the CFPB was funded through quarterly requests for funds from the CFPB Director to the Federal Reserve pursuant to the CFPB's enabling statute.

In February 2025, Defendant Russell Vought was appointed Acting Director of the CFPB and immediately began a campaign to shut down the CFPB without Congressional authorization by trying to fire the civil servants who worked there, canceling outstanding contracts, directing agency staff to cease their work, and dropping nearly two dozen active enforcement actions. Some of these efforts to dismantle the agency have been stymied by court rulings in another case, though those rulings are on appeal. But Defendant Vought's latest gambit goes even further: he now seeks to unilaterally de-fund the CFPB by refusing to request funding whenever the Federal Reserve's interest expenses exceed its income—in contravention of a statutory directive and based on a tortured and untenable legal theory. If successful, this unlawful effort to disable the CFPB will not only harm American consumers by sidelining the federal agency charged with implementing and enforcing federal consumer protection laws, it will undermine state-level consumer protection efforts. Federal law requires the CFPB to collect, maintain, and share with states—including Plaintiffs—important information regarding consumer complaints and other data. Plaintiffs in turn

Page 2 -    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
            MEMORANDUM OF LAW IN SUPPORT

rely on this information for their own investigative and enforcement efforts.

Given the effects of Defendant Vought's efforts to hobble the CFPB on Plaintiffs' consumer protection efforts, Plaintiffs brought this suit to vacate, enjoin, and declare unlawful two related decisions by Defendants CFPB and Vought that would starve the CFPB of any operating funds: (1) Defendant Vought's determination, as Acting Director, that he *cannot* request funds from the Federal Reserve at any time when the Federal Reserve's interest expenses exceed its income; and (2) Defendant Vought's decision not to request funds from the Federal Reserve for FY 2026 (the "Challenged Decisions"). *See* Thompson Decl. Ex. 1.[1]

On January 9, 2026, another court ordered Defendant Vought to fund the CFPB pursuant to that court's preliminary injunction preventing Defendant Vought from dismantling the agency, and Defendant Vought then made a request for funds for the fiscal quarter ending March 31, 2026, based on that order. However, nothing else about the parties' positions has changed, and the Challenged Decisions make it all but certain that, absent permanent court intervention, the CFPB will exhaust funding completely by the end of March 2026 or if the preliminary injunction is lifted, whichever comes later. The Challenged Decisions violate the Administrative Procedure Act ("APA") and are otherwise unlawful because they are contrary to law, *ultra vires*, violate the separation of powers, and constitute unlawfully withheld agency action, and therefore must be set aside. Plaintiffs are entitled to summary judgment on their First, Third, Fourth, Fifth, and Sixth Causes of Action. (ECF No. 1.)

## FACTUAL BACKGROUND

### I.    The CFPB and Dodd-Frank Act

In 2008, the United States mortgage market collapsed, resulting in the most severe financial recession since the Great Depression. More than $10 trillion in American household wealth was

---

[1] Plaintiffs have included *supra* at page x a table of the declarations cited in this memorandum of law and their short citation. Exhibits to the Thompson Declaration are appropriate for judicial notice under Federal Rule of Evidence 201, where the facts are "not subject to reasonable dispute" because those facts "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Page 3 -   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
           MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

wiped out. Millions of Americans lost their jobs, their life savings, their retirements, and their homes. Assessing the fallout, Congress concluded that one of the major causes of the collapse was the failure of fragmented federal banking regulators to address significant consumer protection issues that undermined the safety and soundness of the banking system. In response, in 2010, Congress established the CFPB to "regulate the offering and provision of consumer financial products or services." 12 U.S.C. § 5491(a). Congress transferred the administration of 18 existing federal consumer protection statutes to the CFPB and "charged the Bureau with enforcing consumer financial protection laws to ensure . . . 'that markets for consumer financial products and services are fair, transparent, and competitive.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd. (CFSA)*, 601 U.S. 416, 421 (2024) (quoting 12 U.S.C. § 5511(a)). Since 2011, the CFPB's work supervising and enforcing consumer protection laws has resulted in the return of more than $21 billion to an estimated 205 million Americans.[2]

Among its other statutory mandates, the CFPB aids Plaintiffs in their consumer protection work in their respective jurisdictions. The Dodd-Frank Act, which established the CFPB, tasks the CFPB with mandatory obligations to provide Plaintiffs with information, resources, and coordination in carrying out consumer protection work. Of paramount importance to Plaintiffs is the CFPB's statutory obligation to maintain a consumer complaint response system and to "share consumer complaint information with . . . State agencies." 12 U.S.C. § 5493(b)(3)(D). The CFPB is also responsible for administering the collection of demographic and geographic lending data under the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*, on which Plaintiffs rely to identify inequitable or discriminatory lending patterns. Plaintiffs have relied on the CFPB's resources and have collaborated with the CFPB in jointly carrying out consumer protection work, resulting in efficiencies, cost savings, and improved outcomes for consumers. *See*, *e.g.*, *Consumer Fin. Prot. Bureau v. Wen*, No. 25-55700, 2025 WL 2254521 (9th Cir. 2025) (joint enforcement

---

[2] Consumer Fin. Prot. Bureau, *The CFPB* (Dec. 12, 2024, at 15:22 ET), https://www.consumerfinance.gov/about-us/the-bureau/ [https://perma.cc/9UQM-QJ56].

Page 4 -    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

action brought by the CFPB, California, Minnesota, and North Carolina); *Consumer Fin. Prot. Bureau v. Common. Equity Group*, 752 F. Supp. 3d 378 (D. Mass. 2025) (joint enforcement action brough by the CFPB and Massachusetts); *see also* Thompson Decl. Ex. 2 (press release announcing settlement by Nationstar Mortgage with CFPB and all 50 states).

A.     **CFPB's Consumer Response System**

The Dodd-Frank Act requires the CFPB to create and maintain a system for collecting, tracking, sharing, and facilitating responses to consumer complaints across the spectrum of consumer financial products (the "Consumer Response System"). Congress directed that the Consumer Response System must include, among other things, a "single, toll-free telephone number, a website, and a database . . . to facilitate the centralized collection of, monitoring of, and response to consumer complaints regarding consumer financial products or services," 12 U.S.C. § 5493(b)(3)(A); "procedures to provide a timely response to consumers," *id.* § 5534(a); and a mechanism for sharing data with Plaintiffs, among others, *id.* § 5493(b)(3)(D). Covered persons subject to supervision and enforcement by the CFPB are required to file a timely response to consumer complaints that come in through this system. *Id.* § 5534(b).

The CFPB accepts complaints from consumers through its website, by telephone, and by mail. *See* Meyer Decl. ¶ 4; Thompson Decl. Ex. 3 at 5. Consumers who submit complaints online can attach supporting documentation to their complaint, such as, for example, proof that a consumer has made payment despite being treated by a company as delinquent in a debt collection or foreclosure matter. Meyer Decl. ¶¶ 4, 7; Thompson Decl. Ex. 3 at 6. The CFPB routes the complaints and supporting documentation directly to financial companies and aims to provide responses to consumers within 15 days. Thompson Decl. Ex. 3 at 6. Responses to such complaints can include explanations and, at times, monetary or non-monetary relief. *Id.* at 16.

Since the establishment of the Consumer Response System, the CFPB has collected millions of complaints from consumers across the country, many of which have been reviewed and used by states, including Plaintiffs, to enforce consumer protection laws. According to its 2024

Page 5 -   PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
              MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

Consumer Response Annual Report, the CFPB received over 3 million complaints via the statutorily mandated portal in 2024 alone. *See* Thompson Decl. Ex. 3. This includes 317,668 complaints from consumers in California; 208,305 complaints from consumers in New York; 115,158 complaints from consumers in New Jersey; 25,161 complaints from consumers in Connecticut; 19,082 complaints from consumers in Colorado; 83,033 complaints from consumers in Maryland; 20,226 complaints from consumers in Wisconsin; and 8,822 complaints from consumers in Oregon. *Id.* at 89–92.

The CFPB is required under 12 U.S.C. § 5493(b)(3)(D) to share consumer complaint information with Plaintiffs, subject to the standards applicable to Federal agencies for protection of the confidentiality of personally identifiable information and for data security and integrity. The CFPB has shared complaint information with many Plaintiffs through the Consumer Response Government Portal, which provides access to the complaint narrative, as well as the consumer's contact information, the subject of the complaint, and attachments uploaded by the consumer or the complaint subject. Meyer Decl. ¶¶ 5–8.

B.    **The Home Mortgage Disclosure Act (HMDA)**

The Dodd-Frank Act also amended the Home Mortgage Disclosure Act ("HMDA"). Congress enacted the HMDA in 1975 "on the belief that public knowledge of local banks' lending patterns could improve the banks' affirmative compliance with fair lending and anti-discrimination laws." *Nat'l Cmty. Reinvest. Coal. v. Consumer Fin. Prot. Bureau*, No. 20-2074 (BAH), 2022 WL 4447293, at *3 (D.D.C. Sept. 23, 2022). HMDA therefore acts as a "sunshine statute," the purpose of which is to provide the public "with sufficient information to enable them to determine whether depository institutions are filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located." 12 U.S.C. § 2801(b). "HMDA data also assist public officials in determining how to distribute "public sector investments . . . to improve the private investment environment." *Id.* The Federal Reserve has made clear that one purpose of HMDA is "[t]o assist in identifying possible discriminatory lending patterns and enforcing

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

antidiscrimination statutes." Home Mortgage Disclosure, 54 Fed. Reg. 51376, 51362, 51357 (Dec. 15, 1989) (originally codified at 12 C.F.R. § 203.1(b)(iii)) (presently codified at 12 C.F.R. § 1003.1(b)(1)(iii)).

The Dodd-Frank Act further amended HMDA by expanding the scope of information that depository institutions must collect and report, 12 U.S.C. § 2803, and transferring HMDA rulemaking and enforcement authority from the Federal Reserve to the CFPB. *See* 12 U.S.C. § 5512 (transferring rulemaking authority to CFPB); *id.* § 2804(a) (authorizing the CFPB to "prescribe such regulations as may be necessary to carry out the purposes" of the statute); *id.* § 5581(b)(1) (transferring consumer financial protections function from the Board of Governors to the CFPB); *id.* § 2804(d) (authorizing the CFPB to exercise "principal authority to examine and enforce compliance" with HMDA).[3] Under the Dodd-Frank amendments, covered financial institutions must collect and report various data points for covered loans, including but not limited to information about the loan itself, *id.* § 2803(b)(5) (requiring the collection of associated fees, interest rates, loan terms, collateral value, and "such other information as the Bureau may require") and the loan applicant, *id.* § 2803(b)(4) (requiring the collection of the applicant's income level, racial characteristics, age, and gender). *See also* 12 C.F.R. § 1003.4 (setting out the full list of information required to be collected and reported). The public data required by HMDA is compiled by the Federal Financial Institutions Examination Council ("FFIEC"), an interagency body composed of five different federal financial regulators, including the CFPB. 12 U.S.C. § 2809(a). The CFPB is statutorily required to "provide staff and data processing resources to the [FFIEC] to carry out" its compilation requirements. *Id.* § 2809(b).

## II.    The Federal Reserve System

Established by Congress in 1913, the Federal Reserve is the central bank of the United States and is composed of the Federal Reserve Board of Governors ("Board of Governors"), twelve

---

[3] *See also* Thompson Decl. Ex. 4 at 23 n.53 (identifying the relevant portions of the Dodd-Frank Act).

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

regional Federal Reserve banks ("Reserve Banks"), and the Federal Open Market Committee ("FOMC"). *See* Thompson Decl. Ex. 5. Although "parts of the Federal Reserve System share some characteristics with private-sector entities, the Federal Reserve was established to serve the public interest." *Id.*; *Trump v. Wilcox*, 145 S. Ct. 1415, 1417 (2025) (describing the Federal Reserve as "a uniquely structured, quasi-private entity"). The Federal Reserve pursues a dual statutory mandate to promote "maximum employment" and "stable prices," 12 U.S.C. § 225a, using various monetary policy tools, including its influence on short-term and long-term interest rates. *See* Thompson Decl. Ex. 6. Congress structured the Federal Reserve as an independent agency "to ensure that its decisions are based on facts and objective analysis and serve the best interests of all Americans." *Id.* Ex. 5 at 22. The Federal Reserve balances this independence with an "obligation for transparency" to ensure that it remains "accountable to Congress and the American people for its actions." *Id.*

The Federal Reserve primarily generates earnings from interest earned on securities that it holds, fees for services provided to depository institutions by Reserve Banks, and interest charged on loans. *See generally* 12 U.S.C. §§ 342–361. This income is used to pay "necessary expenses," *see id.* § 289(a)(1)(A), including operating expenses for the Board of Governors, *id.* § 243, dividends to member banks, *id.* § 289(a)(1), payments to credit surplus accounts at each Reserve Bank, *id.* § 289(a)(2), and the funds transferred to the CFPB under 12 U.S.C. § 5497(a). In 2006, four years before enacting the Dodd-Frank Act, Congress also gave the Reserve Banks the authority to pay "earnings on balances," or interest payments, to depository institutions that have balances deposited at Reserve Banks as an additional tool to implement monetary policy. *See* Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, §§ 201, 203, 120 Stat. 1966, 1968–69 (codified at 12 U.S.C. § 461(b)(12)) ("FSRRA") (granting this authority to the Federal Reserve); Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, § 128, 122 Stat. 3765, 3796 (accelerating the effective date for this authority). After these various expenditures, any remaining funds generated from the Federal Reserve's earnings are transferred

Page 8 -    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
             MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

to the general fund of the Department of the Treasury. *Id.* § 289(a)(3)(B); *id.* § 290.

As the Federal Reserve's purpose is to promote economic stability, not to make a profit, its monetary policy can sometimes lead to its total expenditures (including its transfer of funds to CFPB) exceeding its income. When this occurs, the Federal Reserve does not cease making expenditures because as a central bank, it can "operate with negative equity." *See* Thompson Decl. Ex. 7 at 270. ("[A] central bank differs from a private corporation in that its objective is not profit maximization . . . and it can therefore operate with negative equity."). Instead, it stops remitting funds to Treasury and records a "deferred asset" on its balance sheet, which represents "the amount of future net earnings to be realized before remittances to Treasury resume." *Id.* Ex. 8 at 32. This tends to occur during periods of tighter monetary policy, when the Federal Reserve increases interest rates to control inflation. *Id.* Ex. 9. When the Federal Reserve's income exceeds its expenditures again, "the deferred asset will be reduced and eventually extinguished," and remittances to Treasury will resume. *Id.* Ex. 8 at 32.

In the aftermath of the COVID-19 pandemic, the Federal Reserve raised interest rates, and as a result, in September 2022, most Reserve Banks' expenditures began to exceed their income. *Id.* Ex. 10 at 19. The Reserve Banks stopped remitting funds to Treasury and began recording a deferred asset on their balance sheets. *Id.* Far from an "unprecedented" scenario, *see Id.* Ex. 11 at 20), this was the predictable consequence of Congress's decision to give the Federal Reserve the authority to pay earnings on balances in 2006. *See* FSRRA §§ 201, 203.

Critically, the existence and size of the deferred asset "has no effect on the ability of the Federal Reserve to implement monetary policy or meet any of its financial obligations," Thompson Decl. Ex. 8 at 32, as "income is not a policy objective . . . , but rather an outcome of conducting policy to achieve its employment and price stability objectives." *Id.* Ex. 10 at 34; *see also id.* Ex. 7 at 270. As evidence of this unique responsibility to pursue economic stability, not profit maximization, the Federal Reserve does not use standard accounting procedures and terminology developed for private sector banks, instead employing its own "specialized accounting principles"

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

"appropriate for the nature and function of a central bank." *Id.* Ex. 12 at 90 (noting that although "[p]rofit motivated entities provide a cash flow statement to disclose their ability to generate future cash flows and thus the ability to meet their obligations[,] [t]his does not represent a risk to the Reserve Banks").

## III.    The CFPB's Funding Structure

The Dodd-Frank Act provides the CFPB with a permanent and sufficient funding source outside of the annual Congressional appropriations process. *See* S. Rep. No. 111-176 at 162–64 (2010) (describing that the Act "will ensure that the Bureau has the funds to perform its mission" and finding that "assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential"). The Dodd-Frank Act provides that, subject to a statutory cap and on an annual or quarterly basis, the Federal Reserve "Board of Governors shall transfer to the Bureau from the *combined earnings* of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1) (emphasis added). In 2024, the United States Supreme Court upheld the constitutionality of this funding mechanism, rejecting a challenge that it violated the Appropriations Clause. *See generally CFSA*, 601 U.S. 416.

Following the Supreme Court's decision, renewed attacks on the CFPB's funding structure from outside parties focused on the definition of "combined earnings" in the Dodd-Frank Act. Challengers argued that it meant "net excess earnings"—in other words, money left over after the Federal Reserve had paid other expenses. However, the CFPB consistently maintained, and courts to consider the issue agreed, that "combined earnings" means *all* earnings. *See Nat'l Treasury Emps. Union v. Vought (NTEU II),* No. 25-0381 (ABJ), 2025 WL 3771192, at *12 (D.D.C. Dec. 30, 2025) Opp. to Mot. Dismiss at 6, *CFPB v. Purpose Fin., Inc.*, No. 7:24-cv-3206 (D.S.C. Oct.

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

3, 2024), ECF No. 48.[4] Likewise, Jerome Powell, the Chair of the Federal Reserve, testified to the Senate Committee on Banking, Housing and Urban Affairs last year that the Federal Reserve is required to fund the CFPB even when the Federal Reserve is operating at a loss. *See* Powell testimony before Congress, Thompson Decl. ¶ 17, Ex. 13.

In July 2025, Congress reduced the CFPB's funding cap as part of its One Big Beautiful Bill Act, essentially lowering the limit of funding the CFPB can request from the Federal Reserve. 2025 Budget Reconciliation Act, Pub. L. No. 119-21, § 30001, 139 Stat. 74, 126. When analyzing the Act's reduction of the statutory cap, the Congressional Budget Office explained that it expected the Federal Reserve to continue to transfer money to the Bureau, despite its recognition of the Federal Reserve's recent "net losses." *See* Thompson Decl. Ex. 14 at 3–4.

## IV.     Defendant Vought Attempts to Unlawfully Dismantle the CFPB

Defendant Vought made his first attempt to dismantle the CFPB immediately upon his appointment as Acting Director on February 7, 2025. That day, Elon Musk—who, as a "Special Government Employee," was assisting Defendant Vought's efforts to shut down the CFPB— posted a tombstone emoji and the words "CFPB RIP" on his social media site X. Thompson Decl. Ex. 15. The next day, Defendant Vought sent a letter to the Federal Reserve Chair Jerome Powell requesting $0 to fund the CFPB's operations for the third quarter of fiscal year 2025, stating that the CFPB would rely on its reserve fund. *Id.* Ex. 16. Defendant Vought did not assert that he was legally barred from requesting funds, despite the Federal Reserve not running a profit at that time. On February 10, Defendant Vought sent an email to all CFPB staff ordering them to "stand down from performing any work task." *See Nat'l Treasury Emps. Union v. Vought (NTEU I),* 774 F. Supp. 3d 1, 44 (D.D.C.), *vacated and remanded*, 149 F.4th 762 (D.C. Cir.), *vacated and reh'g en banc granted*, No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025). He set up a "tip line"

---

[4] *See also* Mem. & Recommendation at 9, *Texas v. Colony Ridge, Inc.*, No. H-24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 (recommending denial of defendant's motion to dismiss, among other reasons, because the Supreme Court in *CFSA*, 601 U.S. 441 (2024), had "found that the CFPB is constitutionally funded" at a time when there were no net excess earnings and thus, under defendant's argument, could not have been constitutionally funded).

Page 11 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
              MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

for the public to report "being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order." Thompson Decl. Ex. 17. On February 10, 2025, when asked by a reporter about the efforts to eliminate the CFPB, President Trump referred to the agency in the past tense, stating that "we did the right thing" and "that was a very important thing to get rid of." *Id.* Ex. 18.

Defendant Vought then moved to fire nearly the entire CFPB workforce. Before he could finalize his plan to fire approximately 1,200 remaining employees on February 14, 2025, a CFPB employee union and other plaintiffs filed suit and sought a temporary restraining order ("TRO"). *NTEU I,* 774 F. Supp. 3d at 16–38. On February 14, the U.S. District Court for the District of Columbia held a hearing on the TRO application at which the court suggested, and the parties agreed, to enter into a consent order pausing the firings and dismantling of the agency while the court decided whether to enter a preliminary injunction. *Id.* at 60–61. On March 28, 2025, the district court entered a preliminary injunction enjoining the firings and dismantling of the agency. *Id.* at 84–85. The court found that Defendant Vought had "engaged in a hurried effort to dismantle and disable the agency entirely," and that defendants' representations to the court were "so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything." *Id.* at 11, 57.

In entering the preliminary injunction, the district court expressed particular concern about injuries caused by the "shutdown of the statutorily required consumer complaint system," which the court found to be "the heartbeat of the agency subscribed to by more than 70 stakeholders, Members of Congress, state regulators, and the only existing means within the federal government to resolve the over 350,000 consumer complaints per year." *Id.* at 71. The court found that if Defendant Vought succeeded in terminating the contracts that supported the consumer complaint database the system would "collapse." *Id.* at 79. As detailed in the Argument below, Plaintiffs substantially rely on the CFPB's Consumer Response System, which includes the complaint database.

Page 12 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
            MEMORANDUM OF LAW IN SUPPORT

On August 15, 2025, a divided panel of the United States Court of Appeals for the District of Columbia Circuit vacated the district court's preliminary injunction but stayed the issuance of the mandate during the plaintiffs' application for en banc review. On December 17, 2025, the full United States Court of Appeals for the District of Columbia Circuit granted the plaintiffs' application for en banc review and vacated the panel's August 15 judgment. Oral argument before the full Court of Appeals sitting en banc is currently scheduled for February 24, 2026.

## V.    The Challenged Decisions: Defendant Vought's New Effort to Unlawfully Dismantle the CFPB by Starving it of Funding

Despite being under an injunction preventing him from dismantling the CFPB, Defendant Vought stated in an October 15, 2025, interview that his team was working to "close down the agency" and estimated that he would "be successful probably within the next two or three months." *See* Thompson Decl. ¶ 22 at 1:21:47–1:23:00,[5] Ex. 19. Defendant Vought then implemented his new plan to do so by manufacturing the instant funding crisis.

On November 20, 2025, Defendant Vought wrote to President Trump and the Chair of the Senate Committee on Appropriations to provide CFPB's report required by 12 U.S.C. § 5497(e)(1)(B). In that report, Defendant Vought admitted that, at the very least, CFPB's "'funding need' for Fiscal Year 2026 is $279,566,358.82." Thompson Decl Ex. 1. But Defendant Vought stated that the normal mechanism for obtaining funding for CFPB—a request from CFPB to the Board of Governors for funding from the "combined earnings" of the Federal Reserve pursuant to 12 U.S.C. § 5497(a)(1)—was insufficient to cover CFPB's funding requirements. *Id.*

This was so because, as stated in the report, Defendant Vought has determined that "the amount currently available for [CFPB] to request" from the Federal Reserve "is legally $0." *Id.* In support of this conclusion, Defendant Vought cited an OLC memorandum "conclud[ing] that the

---

[5] Plaintiffs respectfully request that the Court take judicial notice of Defendant Vought's statements in a podcast episode that is available for public download, as the existence of the statement can be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned." *Johnson v. DTBA, LLC,* 424 F. Supp. 3d 657, 662 (N.D. Cal. 2019) (quoting *United States v. Perea-Rey,* 680 F.3d 1179, 1182 n.1 (9th Cir. 2012)).

Federal Reserve System has no combined earnings from which the Bureau can legally request funds at this time." *Id.* The OLC memorandum was requested by Defendant Vought, who "informed [OLC] that, upon further consideration . . . [t]he CFPB now believes its sources of funding—the combined earnings of the Federal Reserve—has been exhausted." Thompson Decl. Ex. 11 at 9. Thus, according to Defendant Vought, when the Federal Reserve is not "profitable," the CFPB may not request an operating budget.

Consistent with his report to Congress, Defendant Vought took no action to request funds from the Federal Reserve, prompting the plaintiffs in *NTEU* to move for clarification of the existing injunction, asking for a determination that defendants' failure to seek funding would violate the court's injunction preventing the dismantling of the CFPB. On December 30, 2025, the district court analyzed the meaning of the term "combined earnings" in the Dodd-Frank Act and ruled that defendants were obligated to seek funding because the term referred to revenue and not profits. The court rejected the defendants' argument that they could not seek funding when the Federal Reserve was not profitable, finding that the defendants' position was "contrary to the text and intent" of the term "combined earnings," and that the defendants were engaged in "an unsupported and transparent attempt to starve the CFPB of funding," which violated the injunction. *NTEU II*, 2025 WL 3771192, at *3, *17. Solely to comply with that court ruling—and while reiterating his disagreement with it—on January 9, 2026, Defendant Vought requested $145 million to fund the CFPB through the second quarter of fiscal year 2026, which ends March 31, 2026. *See* Thompson Decl. Ex. 20. Nowhere in the letter or elsewhere have Defendants Vought and CFPB renounced their position with respect to the definition of "combined earnings" in § 5497(a)(1). The district court injunction remains the subject of ongoing appellate proceedings.

## <u>ARGUMENT</u>

Plaintiffs are entitled to summary judgment on their claims that the Challenged Decisions are contrary to law; *ultra vires*; violate the separation of powers; and constitute unlawfully withheld agency action. In non-APA cases, summary judgment is appropriate when "there is no

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When reviewing the merits under the APA, however, the Court does not ask whether there is a genuine dispute of any material fact"; rather, the standards of review are prescribed by the APA itself. *See Or. Nat. Desert Ass'n v. Bushue*, 644 F. Supp. 3d 813, 822 (D. Or. 2022). Section 706 of the APA directs that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* § 706(2)(A).

Plaintiffs are also entitled to a permanent injunction. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679-82 (9th Cir. 2021) (injunction and vacatur are both appropriate remedies for APA violations). To obtain a permanent injunction, a plaintiff who prevails on the merits must demonstrate that it has suffered an irreparable injury, that the balance of equities tips in its favor, and that an injunction would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 32–33 (2008); *see also Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085, 1092 (9th Cir. 2014). Where the government is a party to a suit, the consideration of balance of equities and public interest merge. *Nken v. Holder*, 556 U.S. 418, 426, 435 (2009); *see also Drakes Bay Oyster Co.*, 747 F.3d at 1092. For the reasons discussed below, the Challenged Decisions should be enjoined and vacated.

## I.    Plaintiffs Have Standing

As an initial matter, Plaintiffs have Article III standing to seek relief. To demonstrate standing, a plaintiff must establish that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). As described below, the Challenged Decisions harm Plaintiffs by denying them access to information to which they are statutorily entitled and

Page 15 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

impairing their consumer protection activities—imposing operational burdens on Plaintiffs and undermining their ability to enforce their laws.

First, Plaintiffs will be harmed by losing access to the CFPB's Consumer Response System. Plaintiffs have regularly referred thousands of residents to the CFPB's Consumer Response System for a variety of reasons, including when the CFPB had a track record for being able to quickly connect consumers with relevant providers (such as education lenders, mortgage originators, or servicing companies). WI-Lawton Decl. ¶ 13; MA-Thoman Decl. ¶ 11; VT-Souligny Decl. ¶ 13; NJ-Micco Decl. ¶ 14; OR-Alvarado Decl. ¶ 9; CO-Blake Decl. ¶ 13; RI-Spooner Decl. ¶ 12; MD-Meeks Decl. ¶ 13; NY-Filburn Decl. ¶ 14. According to the CFPB's 2024 Consumer Response Annual Report, companies reported providing monetary relief totaling over $90 million directly to consumers in response to complaints in 2024—including tens of millions of dollars to consumers in Plaintiffs' jurisdictions. Thompson Decl. Ex. 3 at 93–96. Should Defendant Vought succeed in starving the CFPB of funding and the Consumer Response System shuts down, consumers will be unable to make complaints in the CFPB's Consumer Response System. Meyer Decl. ¶ 26. The CFPB uses a cloud-based service provider to facilitate complaint processing and must pay the service provider a fee based on the number of processed complaints. *Id.* ¶ 22. CFPB's inability to pay the cloud-based service provider will cause the system to shut down and consumers will be unable to lodge complaints. *Id.* ¶ 26.

The loss of new complaints will directly impair Plaintiffs' consumer protection activities. Plaintiffs will lose a critical source of information—to which they are statutorily entitled—for monitoring the marketplace and important trends, developing new investigations about common issues (such as incorrect credit reporting, improper use of credit reports, or improper debt collection), providing investigative leads for active enforcement actions, and assisting harmed consumers. WI-Lawton Decl. ¶ 10; CA-Fernandez CRS Decl. ¶¶ 6, 10; AZ-Meislik, Decl. ¶¶ 6, 10–11; CT-Chambers CRS Decl. ¶¶ 6, 10; NJ-Micco Decl. ¶¶ 6, 10, 13; IL-Blackston Decl. ¶¶ 5, 8; CO-Blake Decl. ¶ 10; ME-Conti Decl. ¶¶ 6, 10; RI-Spooner Decl. ¶ 5; MD-Meeks Decl. ¶¶ 6,

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

10; NY-Filburn Decl. ¶ 10; HI-Leong Decl. ¶¶ 8–9; NM-Crocker ¶¶ 11–14; NV-Krueger Decl. ¶¶ 5–6.

Many Plaintiffs will also lose access to material information regarding the millions of consumer complaints already in the database, including documentation provided by consumers and company responses. Meyer Decl. ¶¶ 23–24. Investigators will be unable to review attachments submitted by consumers and company response data, both of which greatly aid state consumer protection investigations. *Id*. Information in the database even concerns active enforcement actions and investigations by Plaintiffs. *See*, *e.g.*, NY-Filburn Decl. ¶ 11.[6]

Second, several Plaintiffs will be harmed by losing access to HMDA data. Consistent with its statutory obligations, the CFPB currently publishes and maintains data provided pursuant to HMDA from 2017 to present.[7] The data is available online on the HMDA Platform, a website created and maintained by the CFPB.[8] Data for a given calendar year must be reported by depository institutions to their appropriate Federal HMDA reporting agency by March of the following year and is typically published on the HMDA platform by summer. *See* 12 C.F.R. § 1003.5(a)(1); Thompson Decl. Ex. 21.

Several Plaintiffs can use, have used, or are currently using HMDA data that CFPB staff compile to support ongoing investigations and litigation. NJ-Melville Decl. ¶ 6; IL-Wagner Decl. ¶¶ 7–8; MA-Gutierrez Decl. ¶¶ 7–8; MD-Smith Decl. ¶¶ 6–8; CA-Fernandez Decl. ¶ 7. For

---

[6] Even more, many complaints that would have come in during the indefinite funding lapse will not come in later because it is highly unlikely that frustrated consumers will re-attempt to lodge the complaints in a system that does not appear to work. *See* Jean-Charles Chebat, Moshe Davidow & Isabelle Codjovi, *Silent Voices: Why Some Dissatisfied Consumers Fail to Complain*, 7 J. Serv. Rsch. 328, 328 (2005) (citing Steve Downton, *Measurements to Achieve Customer Focus* (2002)). Plaintiffs will lose the ability to use CFPB complaints and company responses that would have come in absent the shutdown to monitor trends and open new investigations.

[7] Historical data from 2007 to 2017 can be found on the CFPB's website at https://www.consumerfinance.gov/data-research/hmda/historic-data/. Data from before 2007 can be found on the National Archives website at https://catalog.archives.gov/id/2456161?q=2456161.

[8] Consumer Fin. Protect. Bureau, *Home Mortgage Disclosure Act*, https://ffiec.cfpb.gov/ (last visited Jan. 21, 2026).

Page 17 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
            MEMORANDUM OF LAW IN SUPPORT

example, New Jersey's Division on Civil Rights utilized HMDA data in its investigation of Republic First Bank. NJ-Melville Decl. ¶ 9. The data revealed that Republic First Bank's "redlining practices . . . harmed borrowers of color in New Jersey." *Id*. Likewise, Maryland's Civil Rights Division uses HMDA data to identify potential race discrimination in mortgage lending and to develop evidence necessary to initiate and pursue an investigation of a Maryland bank. MD-Smith Decl. ¶¶ 6–8. And Connecticut's Department of Banking "routinely accesses and utilizes the HMDA Platform when conducting examinations of Connecticut-chartered banks and credit unions under the Connecticut Community Reinvestment Act." CT-Chambers HMDA Decl. ¶ 6. In New York, the Research and Analytics Department in the Office of the Attorney General currently uses HMDA data for the Civil Rights Bureau's fair lending work. NY-Hodges Decl. ¶ 7.

Given Plaintiffs' longstanding reliance on the Consumer Response System and HMDA data, the Challenged Decisions will certainly and imminently impose substantial Article III injuries on Plaintiffs. Plaintiffs have come to rely on the Consumer Response System and HMDA data as integral components of their consumer protection work. NC-Woods Decl. ¶ 6; WI-Lawton Decl. ¶ 12; MN-Grove Decl. ¶ 9; MA-Thoman Decl. ¶ 9; CA-Fernandez CRS Decl. ¶ 10; AZ-Meislik Decl. ¶ 10; CT-Chambers CRS Decl. ¶ 10; NJ-Micco Decl. ¶¶ 10, 13; IL-Blackston Decl. ¶¶ 5, 8; OR-Alvarado Decl. ¶¶ 5, 7–9; ME-Conti Decl. ¶¶ 6, 10–11; RI-Spooner Decl. ¶ 11; MD-Meeks Decl. ¶¶ 10–11; NY-Filburn Decl. ¶¶ 10–11; NJ-Melville Decl. ¶ 6; IL-Wagner Decl. ¶¶ 7–8; MA-Gutierrez Decl. ¶¶ 7–8; MD-Smith Decl. ¶¶ 6–8. That is precisely what Congress intended when it directed the sharing of consumer complaint information with the States and the regular publication of HMDA data. 12 U.S.C. § 5493(b)(3); 12 U.S.C. § 2809. Denying Plaintiffs crucial services on which they have come to rely imposes several cognizable Article III injuries. *See Rhode Island v. Trump,* 155 F.4th 35, 44 (1st Cir. 2025) (finding standing where the plaintiff states "have been and will continue to be injured by the defendants' failure to provide services on which the plaintiffs rely."). And that is especially true where federal law requires the sharing of information: "The law is settled that a denial of access to information qualifies as an injury in fact where a

Page 18 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

statute . . . requires that the information be publicly disclosed." *Nat. Res. Def. Council, Inc. v. Env't Prot. Agency*, 961 F.3d 160, 168 (2d Cir. 2020) (citation modified). Indeed, a State has a "particularized interest" in the loss of information where it "will affect [the State's] ability to enforce state laws." *Id.* at 169; *see also Maryland v. King*, 567 U.S. 1301, 1303 (2012) (granting a stay and finding ongoing irreparable harm existed because there would be "ongoing and concrete harm to Maryland's law enforcement and public safety interests" if Maryland was unable to implement and enforce its DNA collection statute because DNA collection "provide[d] a valuable tool for investigating unsolved crimes and thereby helping to remove violent offenders from the general population."); *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). And because no other equivalent nationwide system exists for this information, Plaintiffs cannot avoid the harms wrought by the Challenged Decisions. *See, e.g.*, WI-Lawton Decl. ¶¶ 11–12; MN-Grove Decl. ¶ 8; CA-Fernandez CRS Decl. ¶¶ 11–12; VT-Souligny Decl. ¶¶ 11–12; NJ-Micco Decl. ¶¶ 11–12; RI-Spooner Decl. ¶¶ 10–11; MD-Meeks Decl. ¶¶ 10–13; NY-Filburn Decl. ¶¶ 10–13.

## II.    The Challenged Decisions Are Final Agency Actions

The Challenged Decisions are also "final agency action[s]" subject to review under the APA, 5 U.S.C. § 704, because they (1) "mark[ed] the consummation" of agency decision-making, and (2) determined "rights or obligations . . . from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. U.S. Off. of Pers. Mgmt.*, 786 F. Supp. 3d 647, 690–91 (S.D.N.Y. 2025).[9] In determining whether an agency action is final, courts consider "factors such as whether the action amounts to a definitive statement of the agency's position, whether it has a direct and immediate effect on the day-to-day operations of the subject party, and if immediate compliance . . . is

---

[9] Even in the absence of a final agency action that is subject to challenge under § 706(2) of the APA, a party can still bring a § 706(1) claim for agency action unlawfully withheld, as Plaintiffs' Third Cause of Action (ECF No. 1 ¶¶ 141–48) does here. *See infra* Argument § III.B.

Page 19 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT

expected." *Prutehi Litekyan: Save Ritidian v. U.S. Dep't of the Airforce*, 128 F.4th 1089, 1109 (9th Cir. 2025) (quoting *Nat'l Lab. Rels. Bd. v. Siren Retail Corp.*, 99 F.4th 1118, 1123 (9th Cir. 2024)). Finality is "interpreted in a pragmatic and flexible manner," "focus[ing] on the practical and legal effects of the agency action." *Saliba v. U.S. Sec. & Exch. Comm'n*, 47 F.4th 961, 967 (9th Cir. 2022) (quoting *Or. Nat. Res. Council v. Harrell*, 52 F.3d 1499, 1504 (9th Cir. 1995)).

The Challenged Decisions here are reminiscent of the broad decision by the current administration to no longer pay out grants, which was the subject of extensive litigation last year. For example, in *New York v. Trump*, the First Circuit held that the plaintiffs were likely to succeed in their argument that a broad freeze on funding was final agency action that satisfied the requirements of *Bennett*. 133 F.4th 51, 66–69 (1st Cir. 2025); *see also Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 468 (D.R.I. 2025) ("the Nonprofits are likely to establish that the funding freeze constitutes a 'final agency action' under the APA").

So too here. Defendant Vought has made a final determination that he *cannot* and *will not* request funding from the Federal Reserve while its interest expenses exceed its income, and announced to Congress that he will not request funding for FY 2026 on that basis. *See* Thompson Decl. Ex.1. In his letter to the Federal Reserve on January 9, 2026, Defendant Vought made clear that it was only because he was ordered to do so by the court in *NTEU II* that he was requesting funding for the CFPB from the Federal Reserve for the second quarter of federal fiscal year 2026. Thompson Decl. Ex. 20. There is no suggestion in Defendant Vought's letter or elsewhere that, absent a court order, either he or the CFPB intend to change course at some later time. And the Challenged Decisions will result in the complete defunding of the CFPB as soon as April 2026, when the third quarter of federal fiscal year 2026 begins, which will in turn have the immediate, inevitable legal consequence of cutting off Plaintiffs' access to statutorily mandated resources, as described *supra* in Argument § 1 and *infra* in Argument § IV.

Page 20 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT

III.    **Plaintiffs Prevail on the Merits of Their Claims**

    A.    **The Challenged Decisions are not in accordance with law.**

"The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law[]' . . . which means, of course, any law." *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (quoting 5 U.S.C. § 706(2)(A)). For the reasons described below, the Challenged Decisions are contrary to the plain text, structure, and Congressional intent of the Dodd-Frank Act and must be set aside.

First, the text and structure of the Dodd-Frank Act confirm that "combined earnings" means "all money earned." The Challenged Decisions rely on an incorrect interpretation of the phrase "combined earnings" as used in the CFPB's authorizing statute, 12 U.S.C. § 5497(a)(1). To interpret the meaning of "combined earnings" as used in this provision, the Court's analysis should "'begin, as always, with the language of the statute.'" *Carson Harbor Vil., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877–78 (9th Cir. 2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 172 (2001)). And "[w]ords in statutes must be interpreted according to their 'ordinary, contemporary, common meaning.'" *NTEU II*, 2025 WL 3771192, at *14 (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433–34 (2019)). The clear meaning of "combined earnings" in the Dodd-Frank Act is, simply, "everything that [the Federal Reserve] earns, before expenses are subtracted." *Id.*

The definition of "earnings" is "something (such as wages) earned." *Earnings*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earnings (last visited Jan. 21, 2026). The same dictionary defines "earned" as "to receive as return for effort and especially for work done or services rendered." *Earned*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earned (last visited Jan. 21, 2026); *see also NTEU II*, 2025 WL 3771192, at *13 (collecting dictionary definitions of "earnings"). In contrast with this straightforward reading of "earnings" to mean "money earned," Defendant Vought construes "earnings" to mean total income minus investment expenses (as opposed to all expenses from all sources). Thompson Decl. Ex. 1 at 4. That construction finds no support in the text of the Dodd-Frank Act or in any dictionary. *NTEU II*, 2025 WL 3771192, at *14 (holding that Defendant Vought's interpretation

Page 21 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

"cannot be squared with any definition or common understanding of the term ['combined earnings']," and that he "do[es] not point to a single dictionary entry, accounting principle, or business practice that supports this unusual hybrid approach").

Other provisions of the Dodd-Frank Act confirm that the Act uses the term "earnings" in the same way as its ordinary dictionary definition. For example, the Act describes the Federal Deposit Insurance Corporation's ("FDIC") "proceeds" to include, among other things, "interest and other earnings from investments" without reference to expenses. Pub. L. No. 111-203, 124 Stat. 1506 (codified at 12 U.S.C. § 5390(n)(2)). Similarly, the Act elsewhere refers to "earnings on investments," *id.* at 1743 (codified at 7 U.S.C. § 26(g)(5)(E)), and authorizes the Federal Reserve Banks to "pay earnings on balances maintained by or on behalf of a designated financial market utility." *Id.* at 1812 (codified at 12 U.S.C. § 5465(c)); *see also NTEU II,* 2025 WL 3771192, at *14 (collecting examples).

Second, the Challenged Decisions are contrary to Congress's clear intent both to fund the CFPB and ensure that the Federal Reserve pursues its dual mandate. In creating the funding structure of the CFPB, "which is entirely separate from the ordinary appropriations process and the political considerations and accommodations that characterize that process, . . . Congress intended that the [CFPB] must be able to rely upon a stable, independent source of funding." *NTEU II*, 2025 WL 3771192, at *16. And it could hardly be otherwise, given Congress's statutory directives to CFPB: the Dodd-Frank Act directs that CFPB "implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Without a steady and reliable source of funding, CFPB could not possibly satisfy this Congressional directive. Yet Defendant Vought's definition of "combined earnings" would tie the CFPB's ability to operate to volatile economic forces to which it is the Federal Reserve System's duty to respond.

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

Indeed, Defendant Vought's conclusion regarding the meaning of "combined earnings"—that it means the Federal Reserve's income minus its interest expenses—is squarely at odds with the Federal Reserve's unique statutory responsibility for setting monetary policy and its dual mandate to maximize employment and stabilize prices, not turn profits. *See NTEU II*, 2025 WL 3771192, at *13 (holding that Defendant Vought's interpretation "ignore[s] the unique role the Federal Reserve plays in the American financial system"). Defining "combined earnings" as a specific subset of profits directly constrains the Federal Reserve's independence by attaching draconian consequences to the tools used by the Federal Reserve to set monetary policy. As explained *supra* in Factual Background § II, net interest losses are a predictable consequence of the Federal Reserve's decision to increase interest rates, and the recording of a deferred asset to reflect these losses does not affect the Federal Reserve's ability "to implement monetary policy or meet any of its financial obligations." Thompson Decl. Ex. 8 at 32. Yet under Defendant Vought's interpretation, the Federal Reserve's decision to tighten monetary policy for a sustained period in response to rising inflation would effectively shut down the CFPB, an agency that the Federal Reserve collaborates with to promote consumer protection aims. *See* 12 U.S.C. § 5492(c)(1). This is an untenable result that would necessarily impair the ability of either the Federal Reserve or the CFPB to meet its statutory mandate. *See NTEU II*, 2025 WL 3771192, at *16 (Defendant Vought's interpretation would "undermine [Congress's] objective because the [CFPB's] funding could fluctuate significantly based on interest rates, putting the [Federal Reserve System] in the untenable position of choosing between controlling inflation by adjusting interest rates or ensuring there was a 'profit' in place to fund the CFPB.").

For all of these reasons, the Court should reject Defendant Vought's interpretation of "combined earnings" and hold that the Challenged Decisions are not in accordance with law.

### B.    The Challenged Decisions unlawfully withhold agency action and are *ultra vires*.

This Court's intervention is also necessary because Director Vought has declared his intention not to request funds from the Federal Reserve for Fiscal Year 2026. *See* Thompson Decl.

Page 23 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
              MEMORANDUM OF LAW IN SUPPORT

Ex. 1 at 4 (notifying Congress, pursuant to 12 U.S.C. § 5497(e)(1), that funding from the Federal

Reserve "will not be sufficient to carry out the authorities of the [CFPB] under Federal consumer

financial law *for Fiscal Year 2026*" because "there are no funds legally available for the [CFPB]

to request") (emphasis added).[10] This refusal to request funds constitutes "unlawfully withheld"

agency action under 5 U.S.C. § 706(1), which requires courts to "compel agency action" when "an

agency fail[s] to take a discrete agency action that it is required to take." *Norton v. S. Utah*

*Wilderness All.*, 542 U.S. 55, 55–64 (2004); *see also Al Otro Lado v. Exec. Off. for Immigr. Rev.*,

138 F.4th 1102, 1122 (9th Cir. 2025), *cert. granted sub nom.*, *Noem v. Al Otro Lado*, No. 25-5,

2025 WL 3198572 (Nov. 17, 2025).

Courts apply traditional rules of statutory construction in making this assessment, including

the "fundamental canon of statutory construction that the words of a statute must be read in their

context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S.

424, 438 (2016) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)); *see also Al*

*Otro Lado*, 138 F.4th at 1113–20 (applying rules of statutory construction to determine what

agency action was required under § 706(1)).

The text and structure of the Dodd-Frank Act make clear that the CFPB Director is required

---

[10] Although Director Vought has now requested funding through March 2026 pursuant to the court order in *NTEU I*, the Challenged Decisions make clear his intention not to do so for the remainder of Fiscal Year 2026 absent a court order to the contrary. Indeed, he is actively appealing the *NTEU I* injunction, which means that Plaintiffs' claims here continue to present a live case or controversy for this Court to adjudicate. *See, e.g.*, *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 n.7 (2005) (noting that relief awarded by a judgment affirmed by the state supreme court did not moot dispute because the loser in the state-court action represented that it would petition U.S. Supreme court for review); *Taylor v. United States*, 181 F.3d 1017, 1017–18 (9th Cir. 1999) (decision in underlying action was no longer ripe for review because a final judgment had been entered contrary to this matter); *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1303 (11th Cir. 2000) (dispute was not moot because related state proceeding decision was subject to "modification"); *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 969 (3d Cir. 1998) (dispute was not moot where district court order "might be reversed by [the appellate court] or the Supreme Court"); *Mausolf v. Babbitt*, 85 F.3d 1295, 1297 (8th Cir. 1996) (appellant's right to intervene was not mooted by judgment in underlying action because party had appealed judgment); *U.S. Postal Serv. v. Brennan*, 579 F.2d 188, 190 n.1 (2d Cir. 1978) (decision in underlying action "ha[d] not reached final judgment" and therefore did not moot appeal over right to intervene since application for rehearing had been filed and time for petition for certiorari had not expired).

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

to request funding from the Federal Reserve by identifying its budgetary needs. The Act directs that "the Board of Governors *shall* transfer to the [CFPB] from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the [CFPB]," subject to certain statutory caps. 12 U.S.C. § 5497(a)(1) (emphasis added). By using the word "shall," Congress mandated a transfer of funds in an amount decided by the Director. *See Kingdomware Techs., Inc. v. United States,* 579 U.S. 162, 171 (2016) (recognizing that "shall" connotes a mandatory requirement). That necessarily imposes interlinked affirmative obligations on both parties to the transaction: the Director must request from the Board the amount of funds "determined . . . to be reasonably necessary," and the Board must transfer exactly that amount to the CFPB from its "combined earnings." Absent a request from the Director identifying the needed amounts, the mandated transfer cannot occur; thus, the Director is obligated to request the funds to fulfill the statutory mandate. *See Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932–33 (9th Cir. 2010) (recognizing, for purposes of § 706(1), that statute required Forest Service to prohibit use of motorized vehicles even though the statutory prohibition did not specifically refer to the Forest Service). Indeed, the Supreme Court has characterized § 5497(a)(1) as providing for an affirmative action by the CFPB: it "draws money from the Federal Reserve." *CFSA*, 601 U.S. at 425.

Moreover, a contrary reading of § 5497(a)(1) would lead to an implausible result: that the Director has unilateral and unchecked power to de-fund the CFPB—even where, as here, he has determined that it needs additional funds to continue operating. That is irreconcilable with the structure and purpose of the statute. For one, Congress has expressly required that the CFPB "*shall* seek to implement and, where applicable, enforce Federal consumer financial law" for the benefit of American consumers. 12 U.S.C. § 5511(a) (emphasis added). Granting the Director the unfettered discretion to single-handedly shut down the CFPB would prevent the agency from achieving its Congressionally mandated job of implementing the nation's consumer financial laws. *See In re A Community Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (inferring a mandatory, ongoing

Page 25 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
        MEMORANDUM OF LAW IN SUPPORT

duty from several statutory provisions where the failure to recognize an ongoing duty would undermine the agency's statutory responsibility). Furthermore, conferring such sweeping discretion on the CFPB Director would contravene Congress' express reason for adopting 12 U.S.C. § 5497(a)(1): protecting the CFPB from the vagaries of political change. *See United States v. Vance Crooked Arm*, 788 F.3d 1065, 1079 (9th Cir. 2015) ("Certainly our goal in interpreting any statute is to give effect to the intent of Congress."). The Supreme Court has recognized as much, noting that Congress "provid[ed] the Bureau a standing source of funding outside the ordinary annual appropriations process" to insulate the agency "from the influence of the political branches." *CFSA*, 601 U.S. at 422. Reading the CFPB Director's ministerial duty to submit a budgetary figure as an independent authority to shutter the agency subjects the CFPB to precisely the kind of political interference that Congress intended to preclude.

To be sure, Defendant Vought appears to acknowledge that the statute generally requires not just that he calculate the amounts needed for the CFPB, but that he affirmatively request that amount from the Board of Governors when "combined earnings" are available. However, he takes the position that he cannot "legally request" funds at this time, Thompson Decl. Ex. 1, based on his determination that the Federal Reserve lacks any "combined earnings" from which it can transfer funds to CFPB. *See also* Thompson Decl. Ex. 11 (OLC Memo). That is wrong on the merits for the reasons set forth in Section III.A above. But it is also beside the point: the Director's mandatory duty under § 5497(a)(1) does not turn on *his* legal determinations as to whether the Federal Reserve has "combined earnings." His obligation under § 5497(a)(1) is simply to calculate and report to the Board of Governors the amount of funds needed for CFPB's operations. It is then the Board's responsibility to transfer that amount from its "combined earnings," up to the statutory cap. In short, the Director's statutory role is to determine what the CFPB needs, not whether the Federal Reserve has "combined earnings" from which it can transfer that amount. *See also NTEU II*, 2025 WL 3771192, at *15 ("There is no suggestion that the Director should assess what the Fed can afford when he calculates what is reasonably necessary.").

Page 26 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT

For the same reasons that Defendant Vought's initial refusal to request funds warrants relief under Section 706(1), his conduct is *ultra vires*. When an agency acts contrary to a "clear and mandatory" statutory directive, its unlawful action may be enjoined by the courts. *Leedom v. Kyne*, 358 U.S. 184, 188 (1958). Here, as explained above, Defendant Vought's decision not to request funds from the Federal Reserve when it is operating at a purported loss directly violates his mandatory duty under 12 U.S.C. § 5497(a)(1). To be sure, courts may enjoin such agency actions as *ultra vires* only where a statutory review scheme does not otherwise allow for judicial review—and here, for all the reasons set forth above, Plaintiffs are entitled to relief under the APA. *See Nuclear Regulatory Comm'n v. Texas*, 605 U.S. 665, 681 (2025). But to the extent this Court concludes that Plaintiffs are not entitled to judicial review under the APA for any reason, Defendant Vought's decision not to request funds from the Federal Reserve must still be enjoined as *ultra vires*.

### C.    The Challenged Decisions violate the separation of powers.

The Challenged Decisions are also unconstitutional because they contravene separation-of-powers principles. The Executive's authority to act, "[n]o matter the context," "necessarily 'stem[s] either from an act of Congress or from the Constitution itself." *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)); *see also Youngstown*, 343 U.S. at 640 (Jackson, J., concurring) ("[T]he executive branch, like the Federal Government as a whole, possesses only delegated powers."). As set out by the tripartite framework in Justice Jackson's seminal concurring opinion in *Youngstown*, Defendants Vought and CFPB are operating at the "lowest ebb" of authority, because no constitutional or statutory provision authorizes Defendants to refuse to obtain necessary funding for the CFPB. *See* 343 U.S. at 637. To the contrary, Defendants Vought and CFPB have taken actions incompatible with Congress's clear direction that the Bureau "shall" receive "the amount determined . . . necessary to carry out the authorities of the Bureau under Federal consumer financial law[.]" 12 U.S.C. § 5497(a)(1).

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

Congress's authority over spending is clear: the Constitution "exclusively grants the power of the purse to Congress, not the President," and that spending power is "directly linked to [Congress's] power to legislate." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231–32 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). The Constitution declines to grant the Executive "unilateral authority to refuse to spend" duly authorized and appropriated funding. *See City & Cnty. of S.F.*, 897 F.3d at 1231 (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *New York v. Trump*, 769 F. Supp. 3d 119, 127 (D.R.I. 2025), *denying stay pending appeal*, 2025 WL 914788 (1st Cir. Mar. 26, 2025) ("Federal agencies and departments can spend, award, or suspend money based only on the power Congress has given to them—they have no other spending power.").

Congress determined that the CFPB's funding mechanism was "absolutely essential" to ensure adequate funding. *See* S. Rep. No. 111-176 at 162–64. By refusing to request sufficient funding, in an attempt to shut down an agency that they are required to operate, Defendants Vought and CFPB have usurped Congress's spending power in violation of the separation-of-powers principles.

## IV.   Plaintiffs Are Entitled to Relief

### A.   Plaintiffs are entitled to vacatur of the Challenged Decisions.

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be not in accordance with law. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of unlawful agency actions. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Because the Challenged Decisions violate the APA, they should be vacated.

### B.    Plaintiffs are entitled to an order compelling Defendant Vought to request funding from the Federal Reserve.

The APA directs reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). *Norton*, 542 U.S. at 64 (2004) (holding that relief must be granted where "an agency failed to take a *discrete* agency action that it is *required to take*.") (emphasis in original); *see also Vietnam Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075–76 (9th Cir. 2016) (compelling agency action where there is a "specific, unequivocal command" placed on an agency). For the reasons set forth above, *see supra* Argument § III, the Court should order Defendants Vought and CFPB to request funding from the Federal Reserve, as required by 12 U.S.C. § 5497, without regard to their position on whether the Federal Reserve has "combined earnings" from which to satisfy a funding request.

### C.    Plaintiffs are entitled to a declaratory judgment.

Plaintiffs seek judicial declarations that: (1) the Challenged Decisions are unlawful because they violate the APA and are contrary to the Constitution; (2) the decision by Defendants CFPB and Vought not to request funds from the Board of Governors is *ultra vires*; (3) the "combined earnings" of the Federal Reserve, as set forth in 12 U.S.C. § 5497(a)(1), means the Federal Reserve's gross revenues without any deduction for its expenses; and (4) the Federal Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations.

The APA expressly contemplates declaratory relief. 5 U.S.C. § 703 ("The form of proceeding for judicial review . . . include[es] actions for declaratory judgments[.]"). Federal courts "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Declaratory

Page 29 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

judgment is appropriate when a lawsuit alleges an "actual controversy[.]". *See Aetna Life Ins. Co. of Hartford. v. Haworth*, 300 U.S. 227, 240–41 (1937). Declaratory relief is given when it will clarify and settle the legal relations in issue, terminate the proceedings, and afford relief from the uncertainty and controversy faced by the parties. *See Md. Cas. Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir. 1971); *see also United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985). Lastly, declaratory relief should always be given with "reference to the public interest." *U.S. v. Wash.*, 759 F.2d at 1357.

An "actual controversy" exists between the parties concerning the meaning of the term "combined earnings" of the Federal Reserve and whether Defendants Vought and CFPB are required to request adequate funding from the Federal Reserve, who is in turn required to release those funds. This controversy is definite and concrete as Defendants Vought and CFPB have only requested funding as required under 12 U.S.C. § 5497(a)(1) through March 2026, in order to comply with an injunction, and it is unclear if additional requests will be forthcoming. *See* Thompson Decl. Ex. 20. The declaratory judgments Plaintiffs seek would wholly clarify and settle the legal issues at stake and afford relief from the uncertainty and controversy faced by the parties. Once the Court declares the correct reading of the term "combined earnings," the rationale behind the Challenged Decisions disintegrates, and Defendants Vought and CFPB have no grounds to fail to follow their obligations under 12 U.S.C. § 5497(a)(1). Along with the requested injunctions, the judicial declarations would terminate the entirety of the controversy and serve the public interest.

### D.    Plaintiffs are entitled to a permanent injunction.

Plaintiffs are also entitled to a permanent injunction enjoining implementation of the Challenged Decisions. The APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703; *see also id.* § 706(1) (a reviewing court "shall . . . compel agency action unlawfully withheld or unreasonably delayed"). Once a district court's equitable powers are invoked, it has "broad discretionary power" in fashioning injunctive relief. *See United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 495–96 (2001).

Page 30 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
              MEMORANDUM OF LAW IN SUPPORT

Courts use this broad remedial power to issue injunctive relief for APA violations, including to compel agency action. Injunctive relief may also be granted "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). Courts are authorized to enjoin any Executive or agency action that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579, 589 (1952).

Furthermore, a plaintiff is entitled to a permanent injunction where it shows: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010). Plaintiffs readily satisfy these factors. They have submitted numerous declarations demonstrating that such a loss will inflict irreparable harm, including by cutting off a critical source of information on which Plaintiffs rely to conduct investigations, support litigations, monitor the marketplace, and assist harmed consumers pursuant to Plaintiffs' consumer protection and civil rights laws. *See supra* Argument § I. And no legal remedies, such as monetary damages, can adequately remedy these harms. Even if money damages could theoretically compensate for Plaintiffs' injuries, the federal government's sovereign immunity forecloses any such remedy here. *See Washington v. Trump,* 145 F.4th 1013, 1036–37 (9th Cir. 2025) (finding irreparable harm existed "[b]ecause defendants are federal officers and federal agencies, [therefore] money damages are unavailable in this case."); *Calvillo Manriquez v. Devos*, 345 F.Supp.3d 1077, 1106 (N.D. Cal. 2018) ("Where sovereign immunity bars certain types of damages, those damages can constitute irreparable harm."). The balance of equities and the public interest—which merge into a single factor when the government is a party, *see Nat'l Ass'n. of Wheat Growers v. Becerra*, 468 F. Supp. 3d 1247, 1265 (E.D. Cal. 2020), *aff'd sub nom.*, *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th

Page 31 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
            MEMORANDUM OF LAW IN SUPPORT

1263 (9th Cir. 2023)—likewise clearly favor Plaintiffs. As a threshold matter, when a defendant violates federal statutes, a court's traditional discretion in balancing equities to determine injunctive relief is removed, and the court is compelled to grant injunctive relief. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 153 (1978) (finding a violation of a federal statute and removing the traditional discretion of courts in balancing the equities because "Congress has spoken in the plainest of words"); *see also Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002) (equitable relief is determined by whether an injunction is necessary to effectuate Congressional purpose behind statute). Here, the Challenged Decisions trample over Congress's clear statement that the CFPB "shall" be funded by the Federal Reserve. 12 U.S.C. § 5497(a)(1).

But even if Defendants Vought and CFPB were not acting in direct contravention of a federal statute, the balance of the equities and public interest would demand an injunction here. As detailed in Plaintiffs' declarations, their consumer protection activities will be substantially impaired by Defendant Vought's attempts to de-fund the CFPB. By contrast, Defendants would suffer no harm or hardship at all. To the contrary, an injunction would enable the CFPB to continue performing its statutory duties. The Federal Reserve would likewise suffer no harm; it would simply continue funding the CFPB in the same manner that it has for years, while continuing to pursue its dual mandate. And preserving the CFPB's ability to operate will also inure to the considerable benefit of the broader public. In addition to undertaking the considerable regulatory and supervisory responsibilities that it is charged with, the CFPB has since its creation returned more than $21 billion improperly taken from millions of Americans.[11] In short, every party with an interest will benefit from having a functioning agency that continues to implement and enforce consumer protection laws consistent with its statutory duties.

## CONCLUSION

For all the reasons stated above, Plaintiffs respectfully request that the Court enter summary judgment in Plaintiffs' favor on Plaintiffs' First, Third, Fourth, Fifth, and Sixth Causes

---

[11] *The CFPB*, *supra* n.2.

Page 32 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT

of Action (ECF No. 1 ¶¶ 115–127, 141–176) and (1) declare that the Challenged Decisions are unlawful because they violate the APA and are contrary to the Constitution of the United States; (2) declare that the decision by Defendants CFPB and Vought not to request funds for the CFPB from the Board of Governors is *ultra vires*; (3) declare that the "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1), means the Federal Reserve's gross revenues without any deductions for its expenses; (4) declare that the Federal Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations; (5) vacate and set aside the Challenged Decisions pursuant to 5 U.S.C. § 706(2); (6) permanently enjoin the Challenged Decisions and any steps taken to implement the Challenged Decisions; (7) compel Defendants CFPB and Vought pursuant to 5 U.S.C. § 706(1) to take the actions required by 12 U.S.C. § 5497; (8) retain jurisdiction to monitor Defendants' compliance with this Court's judgment; (9) award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and (10) award such additional relief as this Court may deem just and proper.

Dated: January 21, 2026

Respectfully submitted,

**LETITIA JAMES**
Attorney General of New York

By: *s/ Stephen Thompson*
Stephen C. Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Patrick Gibson
*Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: *s/ Leanne Hartmann*
Leanne Hartmann #257503
Brian Simmonds Marshall #196129
Joseph Platt #T2511101, IL SBA #6317731
*Senior Assistant Attorneys General*
Derek Olson #225504
*Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000

Page 33 - PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT

Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Joseph.Platt@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of New York*            *Counsel for the State of Oregon*

**JENNIFER DAVENPORT**                          **PHILIP J. WEISER**
Acting Attorney General of New Jersey            Attorney General of Colorado

By: *s/ Shankar Duraiswamy*                      By: *s/ David Moskowitz*
Shankar Duraiswamy                               David Moskowitz
*Deputy Solicitor General*                       *Deputy Solicitor General*
Monica E. Finke                                  Martha Upton Fulford
Amanda McElfresh                                 *Assistant Deputy Attorney General*
Jake Mazeitis                                    Colorado Department of Law
*Deputy Attorneys General*                       1300 Broadway, #10
Office of the Attorney General                   Denver, CO 80203
25 Market Street                                 (720) 508-6000
Trenton, NJ 08625                                David.Moskowitz@coag.gov
(609) 376-3377                                   Martha.Fulford@coag.gov
Shankar.Duraiswamy@njoag.gov

*Counsel for Plaintiff State of New Jersey*      *Counsel for Plaintiff State of Colorado*

Page 34 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
         MEMORANDUM OF LAW IN SUPPORT

**ROB BONTA**
Attorney General of California

By: *s/ Asal Akhondzadeh*
Asal Akhondzadeh
*Deputy Attorney General*
Nicklas Akers
*Senior Assistant Attorney General*
Michele VanGelderen
*Supervising Deputy Attorney General*
300 S Spring St, Ste 1702
Los Angeles, CA 90013-1256
asal.akhondzadeh@doj.ca.gov

*Counsel for the State of California*

**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Rebecca Borne*
Rebecca Borne
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5400
Rebecca.Borne@ct.gov

*Counsel for Plaintiff State of Connecticut*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: *s/ William Y. Durbin*
William Y. Durbin
*Senior Litigation Counsel*
Office of the Attorney General
2005 North Central Ave.
Phoenix, Arizona 85004
602-542-3333
William.Durbin@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for Plaintiff State of Delaware*

Page 35 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: *s/ Mitchell P. Reich*
MITCHELL P. REICH
Senior Counsel to the Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

By: *s/ Katharine Roller*
Katharine Roller
Complex Litigation Counsel
Sarah J. Gallo
Ethics Unit Supervisor, Special Litigation
Bureau
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov
Sarah.gallo@ilag.gov

*Counsel for Plaintiff State of Illinois*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**AARON M. FREY**
Maine Attorney General

By: *s/ Katherine W. Thompson*
Katherine W. Thompson
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for Plaintiff  State of Maine*

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: *s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.maryland.gov

*Counsel for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: *s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: *s/ Nita K. Klunder*
Katherine Dirks
*Chief State Trial Counsel*
Nita K. Klunder*
*Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2394
katherine.dirks@mass.gov
nita.klunder@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KEITH ELLISON**
Attorney General of Minnesota

By: *s/ Sarah Doktori*
Katherine Bies
Sarah Doktori
Assistant Attorneys General
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 583-6694
sarah.doktori@ag.state.mn.us
katherine.bies@ag.state.mn.us

*Counsel for the State of Minnesota*

Page 37 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MEMORANDUM OF LAW IN SUPPORT

**AARON D. FORD**
Attorney General of Nevada

By: *s/ K. Brunetti Ireland*
K. Brunetti Ireland (Nevada Bar No. 15368)
Chief Deputy Attorney General, Special
Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov


*Counsel for the State of Nevada*

**JEFF JACKSON**
Attorney General of North Carolina

**LAURA HOWARD**
Chief Deputy Attorney General

By: *s/ Daniel P. Mosteller*
Daniel P. Mosteller
*Associate Deputy Attorney General*
Daniel T. Wilkes
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for the State of North Carolina*

**RAÙL TORREZ**
New Mexico Attorney General

By: *s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501
(505) 270-4332
ASamant@nmdoj.gov

*Counsel for the State of New Mexico*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: *s/ Alex Carnevale*
Alex Carnevale
Special Assistant Attorney General
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

Page 38 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
          MEMORANDUM OF LAW IN SUPPORT

**CHARITY R. CLARK**
Attorney General of Vermont

By: *s/ Ryan P. Kane*
Ryan P. Kane
*Deputy Solicitor General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: *s/ Samuel T. Ward-Packard*
Samuel T. Ward-Packard
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938
samuel.ward-packard@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

Page 39 -  PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND
        MEMORANDUM OF LAW IN SUPPORT

Attorney General for the State of New York
28 Liberty St.
New York, NY 10005
(929) 638-0047