BRETT A. SHUMATE
Assistant Attorney General
Civil Division

BRAD P. ROSENBERG
Special Counsel
Federal Programs Branch

ALEXANDER J. YUN
Counsel
(D.C. Bar No. 90028923)

> Trial Attorney, U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 1100 L Street N.W.
> Washington, D.C. 20005
> Tel.: (202) 674-0255
> E-mail: Alex.Yun@usdoj.gov

*Attorneys for Defendants Vought and CFPB*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| STATE OF NEW YORK, et al., | Case No. 6:25-cv-02384-AA |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| RUSSEL VOUGHT, in his official capacity As acting director of the Consumer Financial Protection Bureau, et al., | |
| Defendants | |

# TABLE OF CONTENT

Background ....................................................................................................................2

ARGUMENT ..................................................................................................................3

I.   Defendants' Request for and Receipt of Funding Moots this Case. ...................................3

II.   Plaintiffs' Claim Is at Least Prudentially Moot. ................................................................4

III.   Plaintiffs Lack Standing and Ripeness. ...........................................................................5

IV.   Dismissal Is Warranted to Avoid Duplicative Litigation and Gamesmanship. ................10

V.   The Complaint Fails to Satisfy the APA's Finality Requirement......................................12

VI.   Plaintiffs Are Not Entitled to Judgment on the Merits of Their Claims ............................13

    A.   The Complaint Does Not State a Claim Under 5 U.S.C. § 706(2). .............................13

       1.   Plaintiffs' 5 U.S.C. § 706(1) Claim Fails..................................................................16

       2.   Plaintiffs' 706(1) Claim Fails Insofar as it Does not Seek to Compel a Discrete Agency Action. ...............................................................................................................17

       3.   Plaintiffs' 706(1) Claim Fails Because § 5497(a)(1) Includes No Specific Unequivocal Command to Request Funds. ..........................................................................18

          (i)   Section 5497(a)(1) Imposes At Most Only One Duty on the CFPB Director, which He Has Satisfied for Fiscal Year 2026. ................................................................18

          (ii)   Any Duty to Request Funds Would be Premised on Plaintiffs' Misunderstanding that the "Combined Earnings of the Federal Reserve System" Refers to Revenues Rather than Profits...................................................................................................20

       4.   Plaintiffs Have Not Shown that a Discrete Agency Action Has Been Unreasonably Delayed. .........................................................................................................................24

    B.   Plaintiffs' Ultra Vires Claim is Foreclosed By Their Claims Under the Administrative Procedure Act ...............................................................................................................24

    C.   Plaintiffs' Separation of Powers Claim Is a Statutory Claim. ......................................26

    D.   Plaintiffs Have Abandoned Count Six and Are Otherwise Not Entitled to Judgment on It.   27

VII.   Plaintiffs Fail to Show Prejudicial Error.........................................................................27

VIII.   Plaintiffs Demand Inappropriate Remedies. .................................................................27

    A.   If the Court Determines that a Challenged Action is Invalid, Plaintiffs Are Entitled to a Remand, Not the Remedies They Request. ...........................................................................28

    B.   If Plaintiffs Are Successful on their § 706(1) Claim, the Court May only Compel the Acting Director to Take a Discrete Agency Action, and Only If Plaintiffs Show Entitlement, Which They have Not. ...................................................................................................29

    C.   Plaintiffs Are Not Entitled to Remedies They Demand for Additional Reasons. .........31

IX.   The Court Should Narrowly Tailor and Temporarily Stay Any Injunctive Relief. ...........32

Conclusion ...................................................................................................................33

# TABLE OF AUTHORITIES

## Cases

*A.L. Mechling Barge Lines, Inc v. United States,*
368 U.S. 324 (1961) ................................................................................................ 5

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ......................................................................................... 10, 11

*AFGE, AFL-CIO v. Weinberger,*
No. C86-242T, 1986 WL 15495 (W.D. Wash. Aug. 5, 1986) ............................. 11

*Alcoa, Inc. V. Bonneville Power Admin.,*
698 F.3d 774 (9th Cir. 2012) ................................................................................. 6

*Allentown Mack Sales & Service, Inc. v. NLRB,*
522 U.S. 359 (1998) ............................................................................................. 14

*Allis-Chalmers Corp. v. Arnold,*
619 F.2d 44 (9th Cir. 1980) ................................................................................... 5

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ............................................................................................... 25

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ............................................................................................. 29

*Ass'n of Flight Attendants-CWA v. Chao,*
493 F.3d 155 (D.C. Cir. 2007) ............................................................................. 15

*Audubon Soc'y. of Portland v. Jewell,*
104 F.Supp.3d 1099 (D.Or. 2015) ....................................................................... 24

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
502 U.S. 32 (1991) ............................................................................................... 25

*Bennett v. Spear,*
520 U.S. 154 (1997) ............................................................................................. 12

*Bhd. of Locomotive Eng'rs and Trainmen v. Union Pacific R.R. Co.,*
No. CV10–1366, 2011 WL 1706216 (D. Or. May 5, 2011) ................................ 12

*Biden v. Texas,*
597 U.S. 785 (2022) ....................................................................................... 13, 14

*Bova v. City of Medford,*
564 F.3d 1093 (9th Cir. 2009) ......................................................................... 6, 10

*Braniff Airways, Inc. v. Civil Aeronautics Bd.,*
379 F.2d 453 (D.C. Cir. 1967) ............................................................................. 15

*Cantrell v. City of Long Beach,*
241 F.3d 674 (9th Cir. 2001) ............................................................................. 3, 4

*Cascadia Wildlands v. Scott Timber Co.,*
618 F. Supp. 3d 1038 (D. Or. 2022) .................................................................... 31

*CFPB v. Cmty. Fin. Serv. Ass'n of Am., Ltd.,*
601 U.S. 416, 422 (2024) ..................................................................................... 20

*Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy,*
627 F.2d 289 (D.C. Cir. 1980) ............................................................................... 5

*Chamber of Com. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ........................................................... 25

*City of N.Y. v. U.S. Dep't of Def.*,
    913 F.3d 423 (4th Cir. 2019) .............................................................. 13

*City of Reno v. Netflix, Inc.*,
    52 F.4th 874 (9th Cir. 2022) .............................................................. 27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................... 6, 8, 9

*Coffman v. Breeze Corp.*,
    323 U.S. 316 (1945) ........................................................................... 32

*Comm'n on Judiciary of U.S. House of Reps. V. Miers*,
    542 F.3d 909 (D.C. Cir. 2008) ........................................................... 29

*Continental Grain Co. v. The FBL-585*,
    364 U.S. 19 (1960) ............................................................................. 11

*Cousins v. Sec'y of the U.S. Dep't of Transp.*,
    880 F.2d 603 (1st Cir. 1989) .............................................................. 25

*Ctr. for Biological Diversity v. Trump*,
    453 F. Supp. 3d 11 (D.D.C. 2020) .................................................... 26

*Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*,
    77 F.4th 679 (D.C. Cir. 2023) ........................................................... 27

*Dalton v. Specter*,
    511 U.S. 462 (1994) ..................................................................... 26, 27

*Dep't of Educ. v. Brown*,
    600 U.S. 551 (2023) ............................................................... 15, 25, 29

*Dep't of Homeland Sec. v. MacLean*,
    574 U.S. 383 (2015) ........................................................................... 21

*Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017) ........................................................... 10

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................... 14

*FDIC v. Massingill*,
    24 F.3d 768 (5th Cir. 1994) ............................................................... 28

*Fed. Power Comm'n v. Idaho Power Co.*,
    344 U.S. 17 (1952) ............................................................................. 28

*Fed. Trade Comm'n v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) ........................................................................... 13

*Fund for Animals, Inc v. U.S. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006) ............................................................. 15

*Gauthier v. Crosby Marine Serv., Inc.*,
    590 F. Supp. 171 (E.D. La 1984) ...................................................... 28

*Gerardi v. Pelullo*,
    16 F.3d 1363 (3d Cir. 1994) ..............................................................28

*Gerin v. Aegon USA, Inc.*, No. C,

No. 06-5407 SBA, 2007 WL 1033472 (N.D. Cal. April 4, 2007) .......................................... 11

*Hall v. Beals,*
396 U.S. 45 (1969) ................................................................................................... 3

*Haaland v. Brackeen,*
599 U.S. 255 (2022) ........................................................................................... 6, 32

*Haynes v. World Wrestling Ent., Inc.,*
No. 3:14–cv–01689, 2015 WL 3905281 (D. Or. June 25, 2015) .............................. 12

*Hearst Radio v. FCC,*
167 F.2d 225 (D.C. Cir. 1948) ............................................................................... 13

*Hill v. U.S. Dep't of Interior,*
151 F.4th 420 (D.C. Cir. 2025) ....................................................................... 29, 31

*In re Nat. Res. Def. Council,*
*956 F.3d 1134* (9th Cir. 2020) ............................................................................... 24

*Int'l Controls Corp. v. Vesco,*
535 F.2d 742 (2d Cir. 1976) .................................................................................. 28

*Jenkins Brick,*
321 F.3d, 1366 (11th Cir. 2003) ............................................................................. 9

*Leedom v. Kyne,*
358 U.S. 184 (1958) ........................................................................................ 25, 26

*Leiva-Perez v. Holder,*
640 F.3d 962 (9th Cir. 2011) ................................................................................. 31

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ................................................................................................. 6

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990) ................................................................................................. 4

*Martinez-Serrano v. INS,*
94 F.3d 1256 (9th Cir. 1996) ................................................................................. 27

*Michigan v. EPA,*
576 U.S. 743 (2015) ............................................................................................... 14

*Monsanto Co. v. Geertson Seed Farms,*
561 U.S. 139 (2010) ............................................................................................... 29

*Mont. Env't Info. Ctr. V. Stone-Manning,*
766 F.3d 1184 (9th Cir. 2014) ................................................................................. 7

*Mont. Wildlife Fed'n v. Haaland,*
127 F.4th 1 (9th Cir 2025) ..................................................................................... 29

*Murphy Co. v. Biden,*
65 F.4th 1122 (9th Cir. 2023) ............................................................................... 27

*Nat'l Health Fed'n v. Weinberger,*
518 F.2d 711 (7th Cir. 1975) ................................................................................. 11

*Nat'l Council of Agric. Emps. V. U.S. Dep't of Lab.,*
No. 22-3569, 2023 WL 2043149 (D.D.C. Feb. 16, 2023) ...................................... 32

*Nat'l Treasury Emps. Union v. Vought*,
   --- F. Supp. 3d ---, 2025 WL 3771192 (D.D.C. Dec. 30, 2025) ........................................ 2, 21

*Nat'l Treasury Emps. Union*,
   No. 25-5091 (D.C. Cir., 2025) ........................................................................................ 3

*Nat'l Wildlife Fed'n v. United States*,
   626 F.2d 917 (D.C. Cir. 1980) ........................................................................................ 5

*Nuclear Regul. Comm'n v. Texas*,
   605 U.S. 665 (2025) ................................................................................................. 25, 29

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ................................................................... 13, 16, 17, 18, 19, 20, 30

*Olin Indus. v. NLRB*,
   192 F.2d 799 (5th Cir. 1952) ........................................................................................ 27

*Or. Nat. Res. Council. v. Harrell*,
   52 F.3d 1499 (9th Cir. 1995) ................................................................................... 18, 30

*Or. Nat. Desert Ass'n v. Bushue*,
   644 F.Supp.3d 813 (D. Or. 2022) ................................................................................ 24

*Pac. Mar. Ass'n v. Nat'l Lab. Rels. Bd.*,
   827 F.3d 1203 (9th Cir. 2016) ...................................................................................... 26

*Petroleum Exploration v. Public Serv. Comm'n of Kentucky*,
   304 U.S. 209 (1938) ...................................................................................................... 32

*Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*,
   400 U.S. 62 (1970) ........................................................................................................ 12

*PPG Indus. Inc. v. United States*,
   52 F.3d 363 (D.C. Cir. 1995) ........................................................................................ 28

*Pub. Citizen v. Bowen*,
   833 F.2d 364 (D.C. Cir. 1987) ...................................................................................... 12

*Racing Enthusiasts & Suppliers Coal. v. EPA*,
   45 F.4th 353 (D.C. Cir. 2022) ...................................................................................... 13

*Redding & Co. v. Russwine Const. Corp.*,
   417 F.2d 721 (D.C. Cir. 1969) ...................................................................................... 28

*Rise Economy v. Russell Vought*,
   5:25-cv-10481 (Dec. 9, 2025, N.D. Cal.) ...................................................................... 2

*Republic of Sudan v. Harrison*,
   587 U.S. 1 (2019) .......................................................................................................... 21

*Sanchez-Espinoza v. Reagan*,
   770 F.2d 202 (D.C. Cir. 1986) ...................................................................................... 29

*St. Pierre v. United States*,
   319 U.S. 41 (1943) ......................................................................................................... 3

*Texas v. United States*,
   523 U.S. 296 (1998) ....................................................................................................... 7

*Thomas v. Anchorage Equal Rights Comm'n*,
   220 F.3d 1134 (9th Cir. 2020) ....................................................................................... 6

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................ 6, 7, 32

*Viet. Veterans of Am. v. Cent. Intel. Agency*,
    811 F.3d 1068 (9th Cir. 2016) .................................................... 16

*Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013) ...................................................... 14

*Ward v. Lime Fin. Servs., LTD.*,
    No. CV 08-840-AC, 2009 WL 10692461 (D. Or. Jan. 15, 2009) ........ 12

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) .................................................................. 32

*Willow Creek Ecology v. U.S. Forest Serv.*,
    225 F. Supp. 2d 1312 (D. Utah 2002) ........................................... 5

*Woodke v. Dahm*,
    70 F.3d 983 (8th Cir. 1995) ......................................................... 9

**Statutes**

5 U.S.C. § 551 ................................................................................ 13, 15

5 U.S.C. § 552 ..................................................................................... 20

5 U.S.C. § 553(e) ................................................................................. 15

5 U.S.C. § 554(e) ................................................................................. 15

5 U.S.C. § 555 ..................................................................................... 15

5 U.S.C. § 702(1) ................................................................................... 5

5 U.S.C. § 704 ................................................................................ 12, 13

5 U.S.C. § 706 ..................................................................................... 22

5 U.S.C. § 706(1) ........................................................................... *passim*

5 U.S.C. § 706(2) ........................................................................... *passim*

5 U.S.C. § 553(e) ................................................................................. 14

5 U.S.C. § 554(e) ................................................................................. 14

5 U.S.C. § 555 ..................................................................................... 14

7 U.S.C. § 26(g)(5)(E) .......................................................................... 16

12 U.S.C. § 5367(b)(2) ......................................................................... 22

12 U.S.C. § 5381(b) ............................................................................. 22

12 U.S.C. § 5390(n)(2) ......................................................................... 22

12 U.S.C. § 5465(c) ............................................................................. 22

12 U.S.C. § 5493(b)(3)(D) ..................................................................... 10

12 U.S.C. § 5496 ................................................................................... 9

12 U.S.C. § 5497(a)(1) .................................................................... *passim*

12 U.S.C. § 5497(a)(4) ..................................................................... 19, 26

12 U.S.C. § 5497(e)(1)(B) ..................................................................... 19

12 U.S.C. § 8206(5)(C)(i)(II).................................................................................. 22

28 U.S.C. 1391(e)(1) ............................................................................................. 9

28 U.S.C. § 1404(a) ............................................................................................. 10

31 U.S.C. § 1341(a)(1)(B) ..................................................................................... 8

31 U.S.C. § 1342................................................................................................... 7

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376, 1433, 1444, 1592, 2195 (2010) .................................. 22

H.R. 4173, 111th Cong. § 4109(a)(1) .................................................................. 22, 23

**Other Authorities**

Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed. 2024) . 9

Earnings, Merriam-Webster.com https://www.merriam0webster.com/disctionary/earnings ..... 21

Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1 (Feb. 5, 2026) ..... 4

U.S. Dep't of Just., Off. of Legal Counsel, *Whether the CFPB May Continue to Draw Funds
    from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System is
    Operating at a Loss*, 49 Op. O.L.C. __ (Nov. 7, 2025).................................................. *passim*

Plaintiffs filed this duplicative suit on an expedited time frame regarding a matter that is neither live nor time-sensitive. Their entire motion challenges a series of abstract and nonfinal decisions, as opposed to agency action, defined by the Administrative Procedure Act ("APA"), made by the Consumer Financial Protection Bureau's (CFPB) Acting Director that have been superseded by court intervention and actions taken by the Acting Director himself. The CFPB has requested and received funding for this quarter. And no decision has been made as to future requests to the extent either (i) the *NTEU* injunction in DC requiring Defendants to continue seeking funding expires or is otherwise superseded at some hypothetical point in the future, or (ii) the Federal Reserve System is generating surplus funds such that it could provide funding even under the definition of "combined earnings" Plaintiffs dispute. Those and other threshold problems—including standing and avoiding duplicative litigation—justify denying Plaintiffs' Motion for Partial Summary Judgment (Mot.) and dismissing without prejudice.

In all events, Plaintiffs are not entitled to judgment on their claims. To the extent that Plaintiffs state a valid claim under § 706(1) or (2), Plaintiffs are not entitled to mandatory declaratory or injunctive relief compelling the Acting Director to request funds from the Federal Reserve System (Fed). The relevant statutory text assigns only one role to the CFPB Director: to determine the amount "reasonably necessary to carry out the authorities of the Bureau[.]" 12 U.S.C. § 5497(a)(1). The Acting Director has done that for the entire Fiscal Year 2026 (FY26). He is violating no mandatory duty described in § 5497(a)(1). Moreover, Plaintiffs' request for mandatory declaratory and injunctive relief is premised on a misunderstanding of the meaning of "combined earnings" in § 5497(a)(1). As the Office of Legal Counsel (OLC) has determined, the "combined Earnings of the Federal Reserve System" refers to the Fed's profits. When the Fed is operating at a loss, it cannot transfer funding to the CFPB.

## BACKGROUND

On November 7, 2025, OLC issued a memorandum opinion concluding that, because "the Federal Reserve has no profits" at present, "it cannot transfer money to the CFPB" under 12 U.S.C. § 5497(a)(1). U.S. Dep't of Just., Off. of Legal Counsel, *Whether the CFPB May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System is Operating at a Loss*, 49 Op. O.L.C. ___, at *1 (Nov. 7, 2025). (Op.), *available at* http://www.justice.gov/olc/opinions. In light of that opinion, on November 20, 2025, Acting Director Vought issued a report required by § 5497(e)(1) in which he identified the amount determined by the Director to be reasonably necessary for the CFPB to carry out its authorities under law. Dkt. 29-1. He then transmitted that report to the President and to the Committee on Appropriations of the Senate and the Committee on Appropriations of the House of Representatives as required by § 5497(e)(1)(B).

About a month later, a district court in the District of Columbia issued an order concluding that an earlier preliminary injunction required the CFPB to request funding from the Fed under the present circumstances, notwithstanding the OLC Opinion. *Nat'l Treasury Emps. Union v. Vought*, --- F. Supp. 3d ---, 2025 WL 3771192 (D.D.C. Dec. 30, 2025) (*NTEU*). In accordance with that order, the Acting Director submitted a request for funding to the Fed. *See* Dkt. 29-20. On January 14, 2026, the CFPB informed litigation counsel in that case that it is in receipt of the funds requested. *Id.* The earlier preliminary injunction is on appeal before the *en banc* D.C. Circuit, with argument set for February 24, 2026. *NTEU*, 2025 WL 3771192, at *17.

On December 5, 2025, three organizations filed a suit in the Northern District of California challenging the same alleged decision by the Acting Director to not request funding from the Fed. *Rise Economy v. Russell Vought*, 5:25-cv-10481 (Dec. 9, 2025, N.D. Cal.) (*Rise*). Two of those

three Plaintiffs participated in the D.C. litigation as amici.[1] Summary judgment briefing is complete in that case, and a hearing was held on February 11, 2026.

Plaintiffs filed this action on December 22, 2025. Compl. Fourteen of the twenty-two Plaintiffs participated in the D.C. litigation as amici.[2] Here, they seek declaratory and injunctive relief regarding the Acting Director's alleged decision not to request funding from the Fed and the legal definition of "combined earnings" in 12 U.S.C. § 5497(a)(1), as well as attorney's fees. Compl. 41, Prayer for Relief. Plaintiffs filed their motion for partial summary judgment on January 21, 2026. Mot.

## ARGUMENT

### I.     Defendants' Request for and Receipt of Funding Moots this Case.

It is axiomatic that "[a] federal court is without power to decide moot questions or to give advisory opinions which cannot affect the rights of the litigants in the case before it." *St. Pierre v. United States*, 319 U.S. 41, 42 (1943). A case becomes moot when it "los[es] its character as a present, live controversy of the kind that must exist" to avoid "advisory opinions on abstract propositions of law." *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir. 2001) (quoting *Hall v. Beals*, 396 U.S. 45, 48 (1969)).

This case is moot. Plaintiffs challenge Director Vought's decision to not request funding for the CFPB from the Federal Reserve. Mot. at 13-14. But Defendants have requested and received funding. Dkt. 29-20. And Plaintiffs can point to no decision as to future requests that could conceivably keep their moot claims alive.

Although Plaintiffs do not expressly state it, they appear to assume that the issue is live

---

[1] Amicus Br., *Nat'l Treasury Emps. Union*, No. 25-5091 (D.C. Cir. Oct. 7, 2025).

[2] Amicus Br., *Nat'l Treasury Emps. Union*, No. 25-5091 (D.C. Cir. May. 9, 2025).

because the CFPB's funding will lapse on March 31, 2026. But that assumption is belied by two points. *First*, Defendants must and will continue to request funds in accordance with the *NTEU* injunction, which will remain in place unless the *en banc* D.C. Circuit rules otherwise following oral argument on February 24. *Second*, by all accounts, the Fed appears to have returned to profitability, such that it would have sufficient "combined earnings" to continue funding the CFPB. In the last week, the Fed's deferred asset (i.e., operating losses that exceed liabilities) has shrunk by $316 million, Federal Reserve Balance Sheet: Factors Affecting Reserve Balances - H.4.1 (Feb. 5, 2026), https://www.federalreserve.gov/releases/h41/20260205/. Three forthcoming records may shed even further light on this development. On December 16, Defendants' counsel requested the Fed's opinion on whether it has returned to profitability. *NTEU*, Dkt. 164-1. And, apart from that anticipated response, the Fed consistently releases both its financial statements for the prior year and its quarterly financial report for Q1 in March. Defendants will, in accordance with the OLC opinion and § 5497, continue seeking funds if it is established that there are sufficient "combined earnings" to draw from.[3]

These developments have extinguished the purported case or controversy at the heart of the complaint. To the extent Plaintiffs still seek relief regarding future requests, this Court should not be drawn into such "abstract propositions," *Cantrell*, 241 F.3d at 678, especially regarding an agency's "day-to-day operations." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 899 (1990).

## II. Plaintiffs' Claim Is at Least Prudentially Moot.

Even if these developments did not technically moot this case, they still would render Plaintiffs' current request prudentially moot, such that the Court should deny it and dismiss without

---

[3] Defendants also submitted a report regarding the CFPB's funding needs to Congress, pursuant to § 5497(e)(1)(B), so that body also may consider providing funding. Dkt. 29-1.

prejudice. The APA specifically provides for "the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground," 5 U.S.C. § 702(1), including "where it appears that a challenged" action "is, at the moment adjudication is sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." *A.L. Mechling Barge Lines, Inc v. United States*, 368 U.S. 324, 331 (1961). For example, a court may decline to intervene in "budget procedures" where a case presents "serious justiciability questions" (such as "standing" and "moot[ness]") or the possibility that "this issue may never arise again." *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 924-28 (D.C. Cir. 1980) (affirming dismissal of suit alleging failure to comply with certain statutory requirements related to preparing a proposed fiscal budget because intervening in budgetary matters would be "improvident").[4]

As discussed further below, Plaintiffs fail to establish any "final agency action" as defined by the APA. *See infra* Parts V, VI.A. But if the Court finds action, it still should withhold relief because that action "is currently under review" by the agency "and may never recur" in light of the events discussed above. *Chamber of Com. of U.S. of Am. v. U.S. Dep't of Energy*, 627 F.2d 289, 292 (D.C. Cir. 1980) (affirming dismissal of challenge to agency decision to provide funds to a consumer-oriented organization based on *Mechling Barge*). Doing so here also avoids the risk of conflicting judicial orders on the same issue. It therefore would be "improvident" for the Court to intervene. *Nat'l Wildlife Fed'n*, 626 F.2d at 924-28.

## III.    Plaintiffs Lack Standing and Ripeness.

To show that they have standing at summary judgment, Plaintiffs must demonstrate with

---

[4] *See, e.g.*, *Allis-Chalmers Corp. v. Arnold*, 619 F.2d 44, 47 (9th Cir. 1980) (affirming dismissal of challenge to ended agency conduct); *Willow Creek Ecology v. U.S. Forest Serv.*, 225 F. Supp. 2d 1312, 1318 (D. Utah 2002) (dismissing challenge to withdrawn decision).

evidence "an injury in fact, that is, 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Imminence is "a somewhat elastic concept," but "it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). To that end, the Supreme Court has "repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that allegations of possible future injury are not sufficient." *Id.* (citation modified).

A State bringing a lawsuit against the Federal Government may not rely on injuries of its citizens, as opposed to injury to the State itself. *Haaland v. Brackeen*, 599 U.S. 255, 295 (2022). And as the Supreme Court has recently emphasized, "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). "[I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects" on a state. And "when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.*

The related doctrine of ripeness is often "characterized as standing on a timeline." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2020) (en banc)). For instance, a claim that "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all," is not yet ripe; nor is it sufficiently concrete and particularized to establish an injury-in-fact. *Id.* (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). In other words, if "the supposed injury has not

materialized and may never materialize," the "dispute is more an abstraction than an actual case" and cannot "survive the standing/ripeness inquiry." *Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014) (cleaned up).

Here, for many of the same reasons this case is moot, Plaintiffs lack standing or ripeness.

**A.** As an initial matter, Acting Director Vought has requested and received $145,000,000 in funds from the Federal Reserve to allow the CFPB to carry out its authorities for the second quarter of FY26—in other words, at least through March 31, 2026. That funding request was made pursuant to the *NTEU* order, which will require the CFPB to request additional funds for as long as it remains in effect. For the order to no longer remain in effect, Defendants would need to obtain relief from the *en banc* D.C. Circuit—relief which the court may or may not provide. And even if that court does provide relief, it is unclear when it will provide that relief, or what the scope of relief would be. Even if the *en banc* court provides Defendants complete relief, the OLC opinion would still provide for CFPB to request funding if the Fed has returned to profitability. As noted above, the Fed's deferred asset has already shrunk, thus raising the likelihood of current profitability. And by the time the *en banc* court issues its decision—whenever that may be—the likelihood that the Fed will have returned to profitability may be even greater. Any injury is thus undeniably "attenuated." *Texas*, 599 U.S. at 680 n.3.

It is also unknown at this point how the CFPB would respond to any lapse in its funding, including whether it would again submit a report to Congress pursuant to § 5497(e) or whether the lapse even would impact its ability to carry out the specific statutory authorities regarding the information and services that these Plaintiffs allegedly use. For instance, Plaintiffs' arguments nowhere account for the *NTEU* injunction or the Antideficiency Act, either of which may operate to permit or require the CFPB to continue performing many obligations in the event of a lapse. *See*

*NTEU* Dkt. 88 (requiring agency to maintain data and certain consumer complaint collection functions, among other things); 31 U.S.C. §§ 1341(a)(1)(B), 1342 (Antideficiency Act).

Plaintiffs allege two potential injuries giving rise to standing: loss of ability to refer residents to the CFPB's Consumer Response System, loss of access to information already in that system, and loss of access to Home Mortgage Disclosure Act (HMDA) data. As the CFPB is currently funded, none of these alleged harms are "actual," and the links in Plaintiffs' chain of causation are too speculative to be "imminent." For Plaintiffs to lose access to either of these items, (i) the *en banc* D.C. Circuit would need to provide relief to CFPB, (ii) by the time it provides relief, the Fed would still need to be unprofitable; and (iii) the CFPB would need to be unable to carry out statutory obligations in a manner that impacts these particular Plaintiffs. This is exactly the "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. Indeed, the fact that Plaintiffs' Complaint is based on a factual pattern that has now been overtaken by events—and that may be subject to further intervening events by the D.C. Circuit and the Fed—confirm the speculative nature of Plaintiffs' claims.

Plaintiffs' allegations fall flat upon closer examination. The CFPB is enjoined from shutting down the Consumer Response System by the *NTEU* injunction. *NTEU*, Dkt. 88, at 2-3 (requiring "maintain[ing]" complaint collection functions and "continu[ing] to monitor and respond to those complaints, including by providing Elevated Case Management."). Neither are Plaintiffs are injured by an alleged loss of "access to material information" in the Consumer Response System, Mot. at 17. Complaints received "during the preceding year," i.e., during a period that the agency has been funded, are due "concurrent[ly] with each semi-annual hearing" held by two congressional committees. § 5496(a), (b), (c)(4). Plaintiffs nowhere plausibly allege

that this report would not be ready for any as-yet-unscheduled hearing; nor do they cite any authority requiring more frequently updated data.

The second allegation, HMDA data, Plaintiffs admit is published "by March" each year, *i.e.*, during the period covered by the agency's recently fulfilled funding request. Mot. at 17. And, as Plaintiffs further admit, that data "is compiled by . . . an interagency body composed of five different federal financial regulators," Mot. at 7, further extending the causal chain from any hypothetical lapse in funding to any concrete harm to Plaintiffs. Moreover, Plaintiff Oregon, the venue-creating Plaintiff, does not allege harm from loss of HMDA data.[5]

To the extent that Plaintiffs' speculation about potential future degradation of data access prove true, that may give rise to a claim about that specific access. At this hypothetical stage, though, they have not and cannot plausibly allege such loss with any of the required certainty or imminence. *Clapper*, 568 U.S. at 409. Whether and how their data access might be affected by a hypothetical future lapse in funding is uncertain. *See* Mot. at 3 ("the CFPB will exhaust funding completely by the end of March 2026 or if the preliminary injunction is lifted, whichever comes later."); Mot. at 16 ("Should . . . the Consumer Response System shut[] down . . . .").

**B.** For these same reasons, Plaintiffs cannot establish that their claims are ripe. They apparently

---

[5] Plaintiffs' only theory of venue for their claims depends entirely on Oregon's residence. *See* Compl. ¶ 10. Specifically, they claim that venue is proper here only because "the State of Oregon is a resident of this judicial district[.]" *Id*. Insofar as Oregon is not a proper plaintiff for its failure to satisfy standing, irreparable harm, or any other necessary component of Plaintiffs' claims, there is no basis for venue in this district: no defendant resides here, *see* 28 U.S.C. § 1391(e)(1)(A); none of the "events or omissions giving rise to the claim occurred" here, *id*. § 1391(e)(1)(B); and no (proper) plaintiff resides here, *see id*. § 1391(e)(1)(C). Section 1391(e)(1)(B)'s language "protects defendants, and Congress therefore 'meant to require courts to focus on relevant activities of the defendant, not of the plaintiff.'" *Jenkins Brick*, 321 F.3d 1366, 1371–72 (11th Cir. 2003)(quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995)). Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 3815 (4th ed. 2024) ("[V]enue cannot be based on the joinder of a plaintiff" that has been added "for the purpose of creating venue in the district."). Because this is Defendants' first defensive move, Defendants raise this issue for preservation purpose only in this filing.

mean to challenge the CFPB's November 20 legal position in a court filing, based on the OLC opinion, that CFPB could not request funds from the Fed at that time, but that determination has been overtaken as a practical matter by the January 9 request for funds. What Plaintiffs are now challenging—even though they have not amended their Complaint—can only be the future, theoretical possibility that the CFPB will once again find itself in the position of needing funds at a point in time where it is not bound by an injunction and the Fed is not running at a profit. Again, such claims may become ripe if or when Plaintiffs' claims of data loss become true. At this stage, though, their claims are not ripe. *See Bova*, 564 F.3d at 109

**C.** Oregon also lacks standing based on "informational harm." To show an informational injury, courts require that Plaintiffs show (i) a deprivation of information guaranteed by statute; and (ii) the deprivation suffered is "the type of harm Congress sought to prevent by requiring disclosure." *Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017). Plaintiffs have established neither here. There is no likelihood of any deprivation when the CFPB is funded and operating. And while 12 U.S.C. § 5493(b)(3)(D) does require the CFPB to share consumer complaint information with the States, it does not specify a timeframe or frequency for when that data must be shared. Thus, Oregon cannot and has not shown any deprivation, let alone one of the type Congress sought to prevent. Nor has any Plaintiff.

## IV.    Dismissal Is Warranted to Avoid Duplicative Litigation and Gamesmanship.

**A.** As the Supreme Court has stated, a "court may . . . in its discretion dismiss a . . . suit if the same issue is pending in litigation elsewhere." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). In this analysis, courts consider the identity of the issues, the stage of the other litigation, avoiding conflicting decisions, and broad principles of convenience, expediency, and efficiency. *AFGE, AFL-CIO v. Weinberger*, No. C86-242T, 1986 WL 15495, at *2 (W.D. Wash. Aug. 5,

1986).

Here, dismissal without prejudice would be appropriate for several reasons. The issue raised in the complaint is "identical" to the one addressed in *NTEU* and *Rise*, so "a full airing of the issues is occurring in [those] litigation[s];" whereas litigating the same issue here raises "a concern for judicial economy," "duplication of effort," and "piecemeal litigation." *Nat'l Health Fed'n v. Weinberger*, 518 F.2d 711, 713-14 (7th Cir. 1975) (applying *Abbott Labs.*). Plaintiffs very well "were aware of the [*NTEU*] suit." *Id.* at 714. "In fact, [Plaintiffs the State of New York, the State of New Jersey, the District of Columbia, and the States of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, and Michigan] appeared as amicus curiae" *in that case. Id.* at 714; *see supra* n.2. "In view of these circumstances," "this suit could have been as easily brought in the" District of Columbia, "and the filing of the complaint here smacks of gamesmanship." *Id.* "No reason [has been] given for not filing in that district which might then have led to a consolidation of the suits." *Id.* This Court should decline "the burden of considering anew the same issues." *Id.*

**B.** Similarly, 28 U.S.C. § 1404(a) authorizes transferring a case "in the interest of justice." *See Gerin v. Aegon USA, Inc.*, No. 06-5407 SBA, 2007 WL 1033472, at *4 (N.D. Cal. April 4, 2007). "Interests of justice" considerations include whether transfer will affect judicial economy, limit wasted resources, and, of chief importance, avoid duplicative litigation. *Id.* The Supreme Court has counseled that "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Continental Grain Co. v. The FBL-585*, 364 U.S. 19 (1960).

For the same reasons discussed above, this Court alternatively should consider transferring

to the District of Columbia. Plaintiffs' choice of forum is owed little deference when that choice would waste judicial and party resources. And courts in this District routinely transfer actions in similar situations. *See, e.g.*, *Haynes v. World Wrestling Ent., Inc.*, No. 3:14-cv-01689, 2015 WL 3905281 (June 25, 2015, D. Or.) (transferring action because "multi-jurisdictional filings constitute evidence of forum shopping."); *Ward v. Lime Fin. Servs., LTD.*, No. CV 08-840-AC, 2009 WL 10692461 (Jan. 15, 2009, D. Or.) (same); *Bhd. of Locomotive Eng'rs and Trainmen v. Union Pacific R.R. Co.*, No. CV 10-1366, 2011 WL 1706216 (May 5, 2011, D. Or.) (transferring action because parties and issues are identical to case pending in Norther District of Illinois).

## V.    The Complaint Fails to Satisfy the APA's Finality Requirement

Plaintiffs fare no better on finality. The APA requires judicial review of only "final agency action[.]" 5 U.S.C. § 704. Two conditions must be met for finality. First, the challenged action must mark the "consummation" of the agency's decisionmaking process. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). It may not be a "preliminary, procedural, or intermediate agency action or ruling[.]" 5 U.S.C. § 704. Second, it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). The CFPB's November litigation notice was neither a consummation of its decisionmaking process, nor one by which rights or obligations were determined, or from which legal consequences flowed. *See* Dkt. 29-1 ("The acting director of the Bureau anticipates . . . . The Bureau does not know . . . ."). Indeed, "later proceedings" can "clearly deprive [an agency action] of any finality that it may have enjoyed." *Pub. Citizen v. Bowen*, 833 F.2d 364, 366 (D.C. Cir. 1987). And as discussed above, the CFPB has now requested funding, making clear that any "decision not to request funds," Compl. ¶ 134, had no "concrete impact" on the Plaintiffs, *Racing*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
Page 12

*Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (explaining that courts must consider the "concrete impact the [agency action] had on [Plaintiffs]."); *see Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate ... effect on the day-to-day business' of the complaining parties").

## VI. Plaintiffs Are Not Entitled to Judgment on the Merits of Their Claims

### A. The Complaint Does Not State a Claim Under 5 U.S.C. § 706(2).

Plaintiffs are not entitled to judgment on their claim for relief under 5 U.S.C. § 706(2). The APA's judicial review provision is divided into Section 706(1) and Section 706(2). The divide reflects two types of claims that can be brought against Executive Branch agencies. First, "[t]he APA provides relief for [an agency's] failure to act in § 706(1): 'The reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). Section 706(2), in contrast, applies after the agency has taken a specific "final agency action," as that term is defined in the APA. Under § 706(2), a plaintiff may not seek review of an "abstract decision." *Biden v. Texas*, 597 U.S. 785, 809 (2022). Rather, only "specific agency action, as defined in the APA," is subject to judicial review. *See id*. The APA defines the term "agency action" to include a specific "rule, order, license, sanction, relief, or the equivalent[.]" 5 U.S.C. § 551(13). The Act further defines each of these terms. *Id.* § 551(4), (6), (8), (10), (11). And, as discussed above, it requires that such action be "final" for review to be had. *Id.* § 704.

The term "agency action" "does not provide review for everything done by an agency." *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) (quoting *Hearst Radio v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). Rather, the "term is similar in concept to the meaning of 'final decision' as used in describing the appealability of court orders." *Vill. of Bald Head Island*

*v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). Even if construed expansively, the definition of "agency action" does not encompass (1) the mental processes or abstract plans of an agency head, (2) discrete statements shared by an agency head with his staff as part of a deliberative process, or (3) other abstract policy decisions divorced from the vehicles though which an agency conveys a substantive decision.

Start with the last of these categories. As the Supreme Court confirmed in *Biden v. Texas*, an "agency action" is the vehicle through which an agency conveys a substantive decision either during or at the conclusion of an agency proceeding, not an "abstract" policy decision. 597 U.S. at 809. Agency actions are judged by courts on whether they are supported by "reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Allentown Mack Sales & Service Inc. v. NLRB*, 522 U.S. 359, 374 (1998)). Because a central goal of APA review is to determine whether a specific agency action rests on an adequate rationale, challenges to agency action under the APA do not—indeed, could not—separate out for review an agency's disembodied substantive "decision" from the vehicle through which the decision is conveyed and explained. *Biden*, 597 U.S. at 809.

In fact, the opposite is true: § 706(2) review necessarily focuses simultaneously on the vehicle in which an agency decision is delivered and the reasoning expressed in that vehicle. *Id*. Particularly for arbitrary-and-capricious review, the soundness of the agency's reasoning is what counts. *See, e.g.*, *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 426 (2021) (considering whether "in particular" the agency has "reasonably considered the relevant issues and reasonably explained the decision" and determining that the agency's "analysis" in the agency action "was reasonable and reasonably explained").

No matter how expansively "agency action" under 5 U.S.C. § 551 is construed, the term

does not encompass either the mental processes or abstract plans of an agency head, or statements he shares with his staff as part of a deliberative process. The APA reflects the "general rule [] that a party is not entitled to probe the deliberations of administrative officials, oversee their relationships with their assistants, or screen the internal documents and communications they utilize.'" *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 462 (D.C. Cir. 1967). Indeed, an agency's "plans themselves are generally unreviewable; it is only specific [concrete agency] actions implementing the plans that are subject to judicial scrutiny." *Fund for Animals, Inc v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 21 (D.C. Cir. 2006).[6]

Plaintiffs' Complaint seeks § 706(2) review of precisely the type of "abstract decision apart from specific agency action, as defined in the APA," that § 706(2) does not subject to judicial review. *See Biden*, 597 U.S. at 809. Specifically, the Complaint seeks judicial review of two abstract "Challenged Decisions." Compl. ¶ 5. But the § 706(2) claim in the Complaint does not seek to hold unlawful and set aside any rule, order, license, sanction, or relief on the claimed "position[s]" in the Complaint. It thus fails to state a claim under 5 U.S.C. § 706(2).

The Court should carefully consider the consequences of misunderstanding the APA to authorize a plaintiff to challenge an abstract "decision" and then enter declaratory or injunctive relief precluding the agency from implementing or enforcing the alleged "decision" as plaintiffs seek to do here. The APA intentionally precludes these types of claims for a reason. If Plaintiffs could proceed in the manner they have alleged, then nothing would preclude a different set of

---

[6] The APA also contemplates that interested parties can generate an agency action if one does not exist. *E.g.*, 5 U.S.C. §§ 553(e), 554(e), 555. "Ordinarily, a party's recourse to induce an agency to [issue] a desired [agency] action is to file not a lawsuit, but" to file a petition. *Dep't of Educ. v. Brown*, 600 U.S. 551, 565 (2023). In that way, the APA's codification of the exhaustion doctrine, "does not contain an escape hatch for litigants" like Plaintiffs "who steer clear of established [APA] procedures altogether." *Ass'n of Flight Attendants-CWA v. Chao*, 493 F.3d 155, 159 (D.C. Cir. 2007).

plaintiffs from brining similar claims against a different CFPB director with a different view on managing the agency. Although the Acting Director has expressed an interested in bringing the CFPB down to its statutory studs, the tactics plaintiffs employ could be used against a different CFPB director who wants to aggressively enforce the agency's authorities. Plaintiffs disagreeing with that approach could seek to hold unlawful and set aside an alleged "decision to exceed the limits of the agency's statutory authority" and ask the court to issue declaratory or injunctive relief precluding the agency from enforcing the abstract decision. That would make every proposed regulation or order that the agency wants to issue to exercise its statutory responsibilities subject to pre-clearance by the court that issued the injunction. The APA does not permit for these types of claims, but rather only permits for review of each concrete agency action, as defined by the APA, once it is final and issued. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004).[7]

### 1.    Plaintiffs' 5 U.S.C. § 706(1) Claim Fails.

Plaintiffs fail to succeed on their 5 U.S.C. § 706(1) claim that Acting Director Vought has unlawfully withheld or unreasonably delayed a request for funding from the Federal Reserve.  Mot. at 24.  Section 706(1) permits judicial review of agency inaction, but only within strict limits. Courts can only compel "*discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (*"SUWA"*); *see also Viet. Veterans of Am. v. Cent. Intel. Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) ("A court can compel agency action under [§ 706(1)] only if there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action.").  That standard reflects the common-law writ of mandamus, which the APA "carried forward" in Section 706(1).  *SUWA*, 542 U.S. at 63. Thus, Section 706(1) grants judicial review of withheld or delayed agency action only if a federal

---

[7] Even if Plaintiffs do state a valid claim under 5 U.S.C. § 706(2), their interpretation of "combined earnings" fails for the reasoned provided *infra* at Part VI.A.3.ii.

agency has a "ministerial or non-discretionary" duty amounting to "a specific, unequivocal command." *Id*. at 63-64. "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ." *Id*. at 65. Plaintiffs' § 706(1) claim fails for several distinct reasons. First, Plaintiffs' claim is not focused on a discrete action that Acting Director Vought is required to take. Second, the Complaint is not seeking to compel the Acting Director to perform a specific, unequivocal command in the statute that could suffice for mandamus. Third, insofar as Plaintiffs are alleging that the Acting Director has unreasonably delayed in taking a discrete agency action, they fail to make the required showing.

> ### 2. Plaintiffs' 706(1) Claim Fails Insofar as it Does not Seek to Compel a Discrete Agency Action.

As in initial matter, Plaintiffs' 706(1) claim fails insofar as it does not seek to compel a discrete agency action. In their brief, Plaintiffs say that the Acting Director's generalized "refusal to request funds constitutes 'unlawfully withheld' agency action[.]" Mot. at 24. But Plaintiffs' claims as framed in their brief do not seek to compel the Acting Director to request funds for the first quarter of this year. Indeed, they admit that "Director Vought has now requested funding through March 2026[.]" *Id*. at 24 n.10. In the Complaint, Plaintiffs claim to be "entitled to an order compelling Defendant Vought to submit to the Board of Governors his determination of the funding necessary for the Bureau's continued operation pursuant to 12 U.S.C.§5497(a)(1)." But Plaintiffs do not dispute that Acting Director Vought has submitted the information that the Fed needed to transfer funds associated with Vought's request for this quarter's funding.

Insofar as Plaintiffs' claims are not limited to an order seeking to compel the Acting Director to make a specific discrete request for funds, but rather seek ongoing court oversight, Plaintiffs fail to state a claim under § 706(1). *See SUWA* 542 U.S. at 55, 64.

### 3.   Plaintiffs' 706(1) Claim Fails Because § 5497(a)(1) Includes No Specific Unequivocal Command to Request Funds.

Plaintiffs' § 706(1) claim independently fails because § 5497(a)(1) does not unequivocally command the Acting Director to submit a request for funds to the Fed. Again, the § 706(1) standard reflects the common-law writ of mandamus, which the APA "carried forward." *SUWA*, 542 U.S. at 63. Under that standard, "[m]andamus may be granted when '(1) the plaintiff's claim is clear and certain; (2) the duty is 'ministerial and so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available.'" *Or. Nat. Res. Council. v. Harrell*, 52 F.3d 1499, 1508 (9th Cir. 1995). "The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . ." *SUWA*, 542 U.S. at 63. Plaintiffs fail to show any of these required criteria.

#### (i)   Section 5497(a)(1) Imposes At Most Only One Duty on the CFPB Director, which He Has Satisfied for Fiscal Year 2026.

First, the statute places the duty to transfer funds on the Fed rather than the CFPB Director. As OLC explains, "[o]n its face, Congress's instruction that 'the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law' is not directed at the CFPB" at all. Op. at *30-31 (quoting 12 U.S.C. § 5497(a)(1)). Rather, the statute imposes on "the Board of Governors" a duty to "transfer to the Bureau" certain sums of money. 12 U.S.C. § 5497(a)(1). Indeed, in the same subsection, Congress demonstrated that it knows how to specifically require the Director to provide information to another agency. *See id.* § 5497(a)(4) ("The Director *shall provide to the Director* of the Office of Management and Budget copies of the financial operating plans and forecasts of the Director . . . ." (emphasis added)). The contrast with paragraph (a)(1), which contains no such requirement— whether to provide any determination or request to the Fed, defeats Plaintiffs argument that the

statute imposes a "specific, unequivocal command," *SUWA*, 542 U.S. at 63, on the CFPB director that he make a request for funds.

To be sure, the statute implies that the Director must determine "the amount ... reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law[.]" *Id*. But even before the Acting Director's recent funding request, Plaintiffs could not have suggested that the Acting Director had failed to comply with that obligation. The Acting Director had made the required determination in the context of reports under 12 U.S.C. § 5497(e)(1)(B). Dkt.29-1.

Of course, the Fed cannot transfer funds absent knowledge of the Acting Director's funding determinations. But an "affirmative obligation," Mot. at 25, to request the funds from the Fed via an unsolicited letter issued by the CFPB Director to the Fed is only one avenue to accomplish this task. The statutory language itself does not plainly prescribe any such letter. As it stands, the Acting Director sent his determination to the chairs and ranking members of relevant congressional committees, as well as the President. Dkt. 29-1 (and materials attached to original filing). And he filed it on the public docket in federal court. *Id*. Plaintiffs provide no evidence, because there is none, that the Acting Director would not have provided the Fed with a copy of that document upon request, permitting the Fed to comply with any mandatory duty the statute imposes on that non-party. OLC had opined that Acting Director could not have issued an "instruction for the Federal Reserve to" "draw[] on Treasury funds." Op. at *32. But it did not bar the Acting Director from communicating with the Fed or complying with an information request therefrom. Indeed, the CFPB would have been required to provide the Fed the report even if it was not widely publicized. See 5 U.S.C. § 552. Ultimately, though, the Fed is responsible for transferring funds and obtaining the information needed to comply with its duty.

Plaintiffs retort that a reading of § 5497(a)(1) that does not place an affirmative obligation

on the Acting Director would allow him the power to de-fund the CFPB. But the Acting Director's discretion to refuse to request funding flows directly from Congress's conscious decision to vest the Fed with the mandatory duty to transfer—placing the responsibility for ensuring that the Bureau Fund remains solvent in the Fed's hands—and not to vest the Acting Director with a clear statutory duty to seek funds. *See* 12 U.S.C. § 5497(a); *see CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 422 (2024) ("Each year, the Bureau *may* requisition ...").[8] Only the Fed can theoretically withhold funds and shutter the agency.

### (ii)    Any Duty to Request Funds Would be Premised on Plaintiffs' Misunderstanding that the "Combined Earnings of the Federal Reserve System" Refers to Revenues Rather than Profits.

Section 5497(a) independently precludes any determination that Vought has failed to request funds in violation of § 706(1) insofar as Plaintiffs' argument that he is "required" to do so under the statute, *SUWA*, 542 U.S. at 64, is premised on an interpretation of "combined earnings" that differs from OLC's correct reading of the statute. As an initial matter, Plaintiffs argue that the Acting Director's requirement to request funding is not predicated on a legal determination of whether the Fed has combined earnings available. Defendants deny that the Acting Director ever admitted "that the statute generally requires . . . that he affirmatively request [funds] . . . ." Mot. at 26. Rather, the statute authorizes but does not require the CFPB Director to make a requisition for funding. However, if the Fed does not have combined earnings, the Court may not compel Acting Director Vought to issue such a request under § 706(1) because the statute only permits transfers "from the [Fed's] combined earnings." 12 U.S.C. 5497(a)(1).

---

[8] Plaintiffs incorrectly suggest that *CFSA* "characterized § 5497(a)(1) as providing for an affirmative action by the CFPB." Mot. 25. The decision, if anything, suggests the opposite, with this permissive, discretionary characterization.

Plaintiffs argue that "combined earnings" means "everything that [the Federal Reserve] earns, before expenses are subtracted." Mot. at 21 (citing *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-0381, 2025 WL 3771192, at \*14 (D.D.C. Dec. 30, 2025). In contrast, the OLC memorandum construed the term as referring "to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues." Op. at \*1. Thus, if the "Federal Reserve has no profits, it cannot transfer money to the CFPB." *Id*.

Plaintiffs claim to follow the "ordinary" meaning of the term, yet their interpretation is anything but. They begin by citing the Merriam-Webster's definition of the term "earnings" ("something (such as wages) earned"), yet they omit the second definition given in that dictionary. That defines "earnings" as "the balance of revenue after deduction of costs and expenses," Earnings, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earnings (last visited Feb. 10, 2026), a near identical definition to that given in the OLC memo. Op. at \*1. It is therefore odd for Plaintiffs to claim that Defendants' definition "finds no support . . . in any dictionary." Mot. at 21.

Neither is Plaintiffs' definition consistent with the Dodd-Frank Act. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Republic of Sudan v. Harrison*, 587 U.S. 1, 12 (2019) (quoting *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015)). Thus, the term "earnings" in § 5497(a)(1) must be distinguished "from the use of the term 'revenues' elsewhere in Dodd-Frank[.]" Op. at \*14. *See*, *e.g.*, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 167(b)(2), 124 Stat. 1376, 1433 (2010) (codified at 12 U.S.C. § 5367(b)(2)) (referring to "revenues generated from [a specific] activity"); *id.* § 201(b), 124 Stat. at 1444 (codified at 12 U.S.C. § 5381(b)) (referring to "the consolidated revenues of such company from such activities"

in relation to the definition of "financial company"); *id*. § 527(5)(C)(i)(II), 124 Stat. at 1592 (codified at 12 U.S.C. § 8206(5)(C)(i)(II)) (referring to the generation of "annual revenues"); *id*. § 1473(h)(2), 124 Stat. at 2195 (referring to "[i]ncremental revenues").

Plaintiffs argue that statutory context supports their reading because of how the term "earnings" is used elsewhere in the Dodd-Frank Act. Mot. at 22. (citing 12 U.S.C. §§ 5390(n)(2), 5465(c), and 7 U.S.C. § 26(g)(5)(E)). But, in their own specific contexts, many of these uses have a more specific meaning. Op. at *23-24. For example, one usage refers to "earnings from investments"—not earnings or combined earnings more generally. 12 U.S.C. § 5390(n)(2); see Op. at *23-24. OLC explains that these uses of "'earnings' are most naturally understood as the difference between the value of an initial outlay [in this case, the cost of an investment] against a later inflow that it was intended to yield—that is, that 'earnings' account for costs and are not the equivalent of 'revenues.'" Op. at *24.

Next, Plaintiffs argue that Defendants' definition contradicts Congress's intent to provide the CFPB with "a steady and reliable source of funding." Mot. at 22. The legislative history and Congress's policy aims prove otherwise. Plaintiffs' interpretation essentially adopts the original, rejected proposal to fund the CFPB. The OLC memo explains that the "original proposal would have provided the CFPB with a mandatory payment of a fixed portion of the Federal Reserve's 'total system expenses' without limiting this payment to any particular source of funds." Op. at *19 (citing H.R. 4173, 111th Cong. § 4109(a)(1)11). That proposal "would have ensured that the CFPB would receive funding regardless of the Federal Reserve's financial performance." *Id*. After legislative proceedings, Congress ultimately restricted § 5497(a)(1) transfers such that they came not from total system expenses of the Federal Reserve, but from its "combined earnings." 12 U.S.C. § 5497(a)(1). Thus, Congress consciously rejected the original proposal that the Fed fund

the CFPB even when it is unprofitable, as Congress required of the Fed for other entities. Op. at *25-26. The Court should accord the difference in these provisions a difference in meaning. *See id*. at *19.

Indeed, Congress's decision to limit § 5497(a)(1) transfers to money from the combined earnings of the Federal Reserve System reflects rational purposes. The final statute reflects a compromise that places limits on that interest by requiring funding to come from earnings. 12 U.S.C. § 5497(a)(1). That compromise advances an interest in minimizing Fed losses if it might one day not run at a profit—an interest that would not be advanced had the original language of H.R. 4173 § 4109(a)(1) been signed into law. Op. at *20-21. Indeed, "limiting the transfer of funds to profits ensured that the Federal Reserve would never have to create or increase a deferred asset to fund the CFPB in the never-before-seen event that [the] Federal Reserve became unprofitable[.]" Id. at *20.[9] Thus, Congress "str[uck] a balance between providing stable CFPB funding and preserving the Federal Reserve's operational independence," while also preserving its own role when the Fed is unable to provide funds. Id. at *21.

In any event, Congress in 2010 may well have believed that limiting the source of § 5497(a)(1) funding to Federal Reserve System profits as opposed to total system expenses placed only a minimal burden on providing the CFPB a "stable funding source[.]" Mot. at 20. After all, at the time the Dodd-Frank Act was signed into law, the Federal Reserve had a "century-long record of profitability"—through various interest-rate environments— indicating that "Federal Reserve profits" were likely "a reliable source of plentiful funds." Op. at *19. Indeed, the "Federal Reserve had over $39 billion of profits in 2008 and nearly $57.4 billion in 2009." *Id*. At the lower

---

[9] Plaintiffs incorrectly assert that the Fed's recent unprofitability was "[f]ar from an 'unprecedented' scenario" and that such unprofitability "tends to occur during periods of tighter monetary policy" (*i.e.*, that it has occurred multiple times before). Mot. 9. In fact, such a scenario never occurred before 2022, and Plaintiffs cite no evidence to suggest otherwise.

of these figures, the Federal Reserve's profits "were sufficient to cover the $242 million budget for the CFPB's first full year of operations more than 160 times over." *Id*. Congress chose to rely on the "combined" earnings of the System, which had a century-long record of profitability. *Id*. at *19.

### 4.    Plaintiffs Have Not Shown that a Discrete Agency Action Has Been Unreasonably Delayed.

Insofar as Plaintiffs are claiming that Acting Director Vought has unreasonably delayed a request for funds, and even assuming that the statute compels him to make such a request—which it does not—Plaintiffs fail to show that any request has been unreasonably delayed.   "In determining the appropriate timeline for agency action, the Ninth Circuit has instructed district courts to follow a standard of reasonableness." *Audubon Soc'y. of Portland v. Jewell*, 104 F.Supp.3d 1099, 1102 (D.Or. 2015). "But 'courts in this and other circuits have concluded that a reasonable time for agency action is typically counted in weeks or months, not years.'" *Or. Nat. Desert Ass'n v. Bushue*, 644 F.Supp.3d 813, 839 (D. Or. 2022) (citing *In re Nat. Res. Def. Council*, 956 F.3d 1134, 1139 (9th Cir. 2020).  Plaintiffs fail to make any argument that any discrete agency action has been unreasonably delayed.

### B.    Plaintiffs' Ultra Vires Claim is Foreclosed By Their Claims Under the Administrative Procedure Act

Courts have recognized that an equitable cause of action for *ultra vires* review may be available in rare instances where, because Congress has failed to provide a cause of action, "the individual is left to the absolutely uncontrolled and arbitrary action of a public and administrative officer, whose action is unauthorized by any law, and is in violation of the rights of the individual." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902); *see also Leedom v. Kyne*, 358 U.S. 184, 189 (1958). However, the Supreme Court has expressly held that an *ultra vires* cause

of action is "unavailable if . . . a statutory review scheme provides aggrieved persons 'with a meaningful and adequate opportunity for judicial review[.]'" *Nuclear Regul. Comm'n, v. Texas*, 605 U.S. 665, 681 (2025) (quoting *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991)); *see id.* at 681-82 (describing *Leedom v. Kyne* claim as "essentially a Hail Mary pass" which "in court as in football . . . rarely succeeds").

*Ultra vires* review is unavailable here. Plaintiffs cannot pursue their *ultra vires* claim because it parrots their APA claims. When a plaintiff invokes both the APA and ultra vires causes of action, a court should first consider the plaintiff's APA claim. See *Chamber of Com. v. Reich*, 74 F.3d 1322, 1326–27 (D.C. Cir. 1996). Because Plaintiffs' *ultra vires* claim is essentially an alternative to their APA claim, *see* Mot. at 27 ("to the extent this Court concludes that Plaintiffs are not entitled to judicial review under the APA. . .) consideration of their ultra vires claims should be avoided.[10] The lack of an agency action is no impediment to review because the APA provides several means for Plaintiffs to petition the agency to generate an agency action. *Dep't of Educ. v. Brown*, 600 U.S. 551, 656; *Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 610 (1st Cir. 1989).

Even if *ultra vires* claims were available, the Acting Director's actions were not *ultra vires*. An agency's actions are *ultra vires* if they infringe upon "clear and mandatory" statutory language. *Pac. Mar. Ass'n v. Nat'l Lab. Rels. Bd.*, 827 F.3d 1203, 1210 (9th Cir. 2016) (citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)). As demonstrated above, *supra* Part VI.A.3, 12 U.S.C. § 5497 does not mandate that the Acting Director request funds from the Fed. And even if it did, the duty would be anything but "clear," especially given the contrast with § 5497(a)(4).

---

[10] Plaintiffs admit as much. Mot. 27 (courts may enjoin such agency actions as *ultra vires* only where a statutory review scheme does not otherwise allow for judicial review—and here. . . Plaintiffs are entitled to relief under the APA").

### C.     Plaintiffs' Separation of Powers Claim Is a Statutory Claim.

For similar reasons, Plaintiffs cannot bring a statutory claim dressed up as a constitutional one. It is well settled that "claims simply alleging that the [Executive Branch] has exceeded [its] statutory authority are not 'constitutional' claims[.]" *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id*. at 471. Rather, the Court explained that not "every action by the President, or by another executive official, in excess of his statutory authority is ipso facto in violation of the Constitution." *Id*. at 472. In reaching this conclusion, the Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases). It explained that the Constitution is implicated only if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute. *Id*. at 473 & n.5.

In this case, Plaintiffs do not claim that the Acting Director's actions or the statutory authority he relied on are themselves unconstitutional. Rather, they are dressing up their claim that the Acting Director failed to act as required by the statute as a constitutional violation. *Dalton*'s reasoning thus controls here. *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (rejecting separation-of-powers claim based on Appropriations Clause under *Dalton* because "[a]t bottom, this is just an allegation that [executive officials] exceeded their statutory authority")*see also Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023) (requiring "specific allegations regarding separation of powers"). The present matter concerns "simply" whether Defendants have "exceeded [their] statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation." *Dalton*, 511 U.S. at 473–74 & n.6 (quotation omitted). Were it otherwise, every alleged statutory violation could take on

constitutional dimensions. *See,, e.g.*, <u>*Glob. Health Council v. Trump*</u>, 153 F.4th 1, 14 (D.C. Cir. 2025).

### D.    Plaintiffs Have Abandoned Count Six and Are Otherwise Not Entitled to Judgment on It.

Although Plaintiffs assert in their motion that they move for partial summary judgment on their sixth cause of action, Mot. at 1, their memorandum of law includes no argument articulating their success on any claim identified in this count, Compl. ¶ 169-76.   Plaintiffs have thus abandoned the claims in their sixth cause of action.  *Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996).   Regardless, Plaintiffs are not entitled to judgment on the claims in count six because the declaratory judgment act does not itself provide a cause of action.   *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878-79 (9th Cir. 2022). Rather, it provides a remedy for claims raised in other causes of action in limited circumstances.   *Id*.

### VII.    Plaintiffs Fail to Show Prejudicial Error.

The APA requires the Court to take "due account" of "the rule of prejudicial error[,]" 5 U.S.C. § 706, and it is Plaintiffs' burden to show prejudice, *Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023). Error is prejudicial if it "affect[ed] the [Plaintiffs'] substantial rights." *Olin Indus. v. NLRB*, 192 F.2d 799, 799 (5th Cir. 1952). Here, any error had no impact on Plaintiffs' substantial rights because the agency has requested funding from the Fed and, even before that, the Acting Director had determined and publicized the amounts reasonably needed to fund the Bureau for FY26.

### VIII.    Plaintiffs Demand Inappropriate Remedies.

Plaintiffs demand inappropriate remedies. As an initial matter, if the Court grants Plaintiffs' motion for partial summary judgment in whole or in part, the Court should provide Defendants with clear notice of whether it intends any relief to take immediate effect.  Unless the

Court makes clear that it is entering an immediately effective and appealable interlocutory injunction, relief entered upon entry of an order granting a motion for partial summary judgment would be interlocutory and thus ineffective until the Court enters final judgment.[11] A motion for partial summary judgment seeks "a pre-trial adjudication that certain issues are established for trial of the case," not a final judgment. *FDIC v. Massingill*, 24 F.3d 768, 774 (5th Cir. 1994). An order granting a motion for partial summary judgment is "subject to revision by the district court, and has no *res judicata* effect." *Id.* Even if the Court addresses remedial issues at this stage, the remedies Plaintiffs demand are inappropriate.

> **A.    If the Court Determines that a Challenged Action is Invalid, Plaintiffs Are Entitled to a Remand, Not the Remedies They Request.**

When reviewing agency action under § 706(2), the function of the reviewing court ends when "an error of law is laid bare." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952). Thus, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the [agency action] must be remanded to the agency for further action consistent with the correct legal standards." *PPG Indus. Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995). The Ninth Circuit has held that "[w]here a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA[.]" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025). A court that vacates an agency action should not issue

---

[11] *Gerardi v. Pelullo*, 16 F.3d 1363, 1371 n.13 (3d Cir. 1994); *Int'l Controls Corp. v. Vesco*, 535 F.2d 742, 744-46 (2d Cir. 1976); *Redding & Co. v. Russwine Const. Corp.*, 417 F.2d 721, 727 (D.C. Cir. 1969); *Gauthier v. Crosby Marine Serv., Inc.*, 590 F. Supp. 171, 175 (E.D. La. 1984).

other relief, such as declaratory relief[12] or an injunction. *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. 139, 165 (2010).[13]

In this case, Plaintiffs' request for vacatur of the "Challenged Decisions," Mot. at 29, only serves to emphasize that they do not state a claim under § 706(2). The mental processes, abstract plans, or statements an agency head shares with his staff do not constitute "agency action." *See supra* Part VI.A. Neither are the "challenged decisions" final. *See supra* Part V. Because a decision in an agency head's mind is not binding on anyone, Plaintiffs fail to explain the import of holding it unlawful and setting is aside, letting alone vacating an official's thoughts.

**B.    If Plaintiffs Are Successful on their § 706(1) Claim, the Court May only Compel the Acting Director to Take a Discrete Agency Action, and Only If Plaintiffs Show Entitlement, Which They have Not.**

If Plaintiffs are successful on their § 706(1) claim, the Court may issue a mandatory injunction "compel[ing] agency action[.]" 5 U.S.C. § 706(2). But that encompasses "the ordering of [only] a 'precise, definite act[.]'" SUWA, 542 U.S. at 63 (citation omitted). Plaintiffs seek an order to "compel Defendants CFPB and Vought pursuant to 5 U.S.C. § 706(1) to take the actions required by 12 U.S.C. § 5497." Mot. at 33. But "the actions required by 12 U.S.C. § 5497" is not

---

[12] "[T]he discretionary relief of declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court. Such equivalence of effect dictates an equivalence of criteria for issuance." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) (Scalia, J.); *see also Hill v. U.S. Dep't of Interior*, 151 F.4th 420, 433 (D.C. Cir. 2025) (declaratory relief requires similar analysis as injunction); *Comm'n on Judiciary of U.S. House of Reps. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008) (similar).

[13] Plaintiffs cite *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-37 (2015), which is not an APA case. Mot. at 31. The cases Plaintiffs cite that invoke nonstatutory review would permit for declaratory or injunctive relief based on a pure equitable claim only if Plaintiffs met a demanding standard. *Nuclear Regulatory Commission v. Texas*, 605 U.S. 665, 680-83 (2025). These remedies are generally unavailable because Plaintiffs have an "alternative path to judicial review" under the APA, even if that requires the Plaintiff to seek to compel a discrete agency action or, alternatively, to petition the agency for an agency action before seeking judicial review. *See Brown*, 600 U.S. at 565.

a discrete action. If Plaintiffs succeed on this claim, the court may at most order only a specific discrete action (e.g., transmittal of the funding needs determination or a request for funds).

Moreover, § 706(1) "carrie[s] forward the traditional practice" associated with the writ of mandamus. *SUWA*, 542 U.S. at 63. Under that standard, "[m]andamus may be granted [only] when '(1) the plaintiff's claim is clear and certain; (2) the duty is 'ministerial and so plainly prescribed as to be free from doubt'; and (3) no other adequate remedy is available.'" *Harrell*, 52 F.3d at 1508. Plaintiffs fail to satisfy any of these required criteria. Again, Plaintiffs fail to satisfy the first two elements. *See supra* at 16-22. But Plaintiffs also cannot show that "no other adequate remedy is available." *Harrell*, 52 F.3d at 1508. Plaintiffs have an adequate remedy in the form of an action for mandatory injunctive relief under § 706(1) directly against the Fed seeking to compel the Fed to transfer funds.[14] Plaintiffs already have the Acting Director's determination of the amounts necessary to carry out the authorities of the CFPB. Dkt. 29-1. (and attachments in original filing). To issue an order to compel one official to requisition another official to transfer funds when a Plaintiff can proceed directly against the second official would be inconsistent with courts' characterization of mandamus relief as an "extraordinary remedy[.]" See *Harrell*, 52 F.3d at 1508.

Also, the likelihood that the Fed will have combined earnings, even under OLC's definition, provides even further grounds to withhold mandamus relief against the Acting Director. "The extraordinary remedy of mandamus lies within the discretion of the trial court, even if the three elements are satisfied." *Id*. The Fed—not Plaintiffs, the CFPB, or the Court—is best positioned to opine on whether it has combined earnings within the meaning of OLC's definition. Defendants' counsel has requested the Fed's opinion on whether it has combined earnings as

---

[14] Plaintiffs bring only one count for relief against the Fed in this case, but it is not a claim to relief in the nature of mandamus under § 706(1) or otherwise seeking to compel a transfer of funds.

defined by OLC but has not yet received a response. *NTEU*, Dkt. 164-1. Even if the Acting Director was not already compelled by another court's order to continue to seek funding from the Federal Reserve, therefore, mandamus relief should be withheld at least until the Fed reports back. Although (absent a court order) OLC's opinion is binding on Executive Branch officials, a report that the Fed has returned to profitability would mean that OLC's opinion would no longer restrain the Acting Director's discretion to request funding from the Fed. Additionally, if the Fed has returned to profitability, it is far from clear why the Fed would not comply with its duties under § 5497(a)(1) given that the Acting Director has already determined the amounts reasonably necessary to fund the CFPB for FY26.

**C.    Plaintiffs Are Not Entitled to Remedies They Demand for Additional Reasons.**

Beyond these issues, Plaintiffs are not shown entitlement to a permanent injunction or a declaratory judgment. First, Plaintiffs have not met all the requirements of a permanent injunction. "A plaintiff seeking a permanent injunction must show: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.*" Cascadia Wildlands v. Scott Timber Co*., 618 F. Supp. 3d 1038, 1067 (D. Or. 2022). The third and fourth factors merge when the government is the opposing party. *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011). Plaintiffs must satisfy these factors to obtain a declaratory judgment as well. *Hill*, 151 F.4th at 433 ("[W]hen declaratory relief functions like an injunction, a plaintiff must plausibly allege that equitable relief is justified"). The venue-creating Plaintiff, Oregon, provides no evidence supporting these factors. Plaintiffs seem to assume that any injury to the state of Oregon, even for $1, would support extraordinary injunctive relief.

Mot. at 31-32. Not so. An injunction "is not a remedy which issues as a matter of course[.]" *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982) (citation omitted). Plaintiffs point out that they cannot seek damages against the Federal Government. Mot. at 31. But because an injunction is extraordinary, the Supreme Court has held that "the expense" must still be "disproportionate to the business" of the plaintiff to "justify an injunction[,] even if the expenses are not recoverable in damages. *Petroleum Exploration v. Public Serv. Comm'n of Kentucky*, 304 U.S. 209, 220 (1938). Oregon—indeed all Plaintiffs—"fail[] to provide any information placing the alleged losses in the context of [their] overall finances." *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-3569, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023). These standards are all the more important because plaintiffs are States that cannot represent their citizens in a suit against the Federal Government. *Texas*, 599 U.S. at 680 n.3; *Haaland*, 599 U.S. at 295.

        Plaintiffs are not entitled to a declaratory judgment for additional reasons. Mot. at 29. "The declaratory judgment procedure is available in federal courts only in cases involving an actual case or controversy." *Coffman v. Breeze Corp.*, 323 U.S. 316, 324 (1945). "[I]t may not be made *Id*. Because no actual or imminent controversy exists between the parties, *see* Part III, and the alleged issue is itself moot. *see* Parts I & II, Plaintiffs' request for declaratory judgment is in actuality a request for an illegal advisory opinion.

## IX.    The Court Should Narrowly Tailor and Temporarily Stay Any Injunctive Relief.

        Should the Court enter an order that compels a funding request, that relief should be tailored to any actual injury a Plaintiff with standing has demonstrated, and the Government respectfully requests that the relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General of the United States, or at a minimum that such relief be administratively stayed for a period of seven days to allow an opportunity to seek expedited relief.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied and this case should be dismissed.

DATED: February 11, 2026                    Respectfully submitted,

                                            */s/ Alexander J. Yun*
                                            ALEXANDER J. YUN
                                            Counsel

**CERIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: February 11, 2026                    */s/ Alexander J. Yun*
                                            ALEXANDER J. YUN
                                            Counsel