DAN RAYFIELD
Attorney General
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
JOSEPH PLATT #T2511101, IL SBA #6317731
Senior Assistant Attorneys General
DEREK OLSON #225504
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email:  Leanne.Hartmann@doj.oregon.gov
        Brian.S.Marshall@doj.oregon.gov
        Joseph.Platt@doj.oregon.gov
        Derek.Olson@doj.oregon.gov

*Attorneys for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| STATE OF NEW YORK; STATE OF OREGON; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; and COMMONWEALTH OF VIRGINIA | Case No. 6:25-cv-02384-AA<br><br>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| *Plaintiffs*,<br><br>v.<br><br>RUSSELL T. VOUGHT, *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*; CONSUMER FINANCIAL PROTECTION BUREAU; and BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; | |
| *Defendants*. | |

Page 1 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## <u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF[1]</u>

1.      Since its inception in the aftermath of the 2008 financial crisis, the Consumer Financial Protection Bureau ("CFPB") has, by statutory command from Congress, aided the Plaintiffs in their zealous advocacy for and protection of consumers in their respective jurisdictions.

2.      Among CFPB's many important directives are the maintenance of a multifaceted consumer response system mandated by the Dodd-Frank Act, as well as ensuring the compilation of public data on home loans as required by the Home Mortgage Disclosure Act. Both of these statutorily mandated programs provide the Plaintiffs with valuable assistance in their efforts to combat consumer fraud and discriminatory lending practices, monitor consumer and homeowner trends in their states, and open and pursue investigations into potential violations of state and federal consumer protection laws.

3.      To carry out the CFPB's mission, Congress has directed that the Board of Governors of the Federal Reserve System (the "Board of Governors") shall transfer to the CFPB, "from the combined earnings of the Federal Reserve System, the amount determined by the [CFPB's] Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau." 12 U.S.C. § 5497(a)(1). The Board of Governors and—until recently—CFPB's Directors have consistently complied with this provision on the understanding that the CFPB's funding comes from *gross revenues* generated by the Federal Reserve System (the "Federal Reserve").

4.      Since his appointment to the CFPB as Acting Director on February 7, 2025, Defendant Russell T. Vought has worked tirelessly to terminate the CFPB's operations by any

---

[1] The sole amendments to this First Amended Complaint are those necessary to facilitate the inclusion of the Commonwealth of Virginia as a plaintiff. See ¶¶ 33, 61-62, 77. Although Plaintiffs are not required to seek leave to amend, Plaintiffs conferred with Defendants prior to filing the Amended Complaint; Defendants consented to the proposed amendments; and all Parties agreed that these amendments should not alter the existing briefing schedule.

Page 2 -   FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

means necessary—denying Plaintiffs access to CFPB resources to which they are statutorily entitled. In this action, Plaintiffs challenge Defendant Vought's most recent effort to do so.

5.      In a reversal of the position the CFPB and Board of Governors have held for more than a decade, Defendant Vought, and through him the CFPB, now take the position that the Federal Reserve's "combined earnings," from which CFPB's funding flows, are limited to the Federal Reserve's "profits" rather than its gross revenue. Thus, according to Defendant Vought, when the Federal Reserve is not "profitable," there is no money available for the Federal Reserve to transfer to the CFPB. Defendant Vought has thus determined both that he (i) *cannot* legally request funding from the Federal Reserve when its interest expenses exceed its interest income and (ii) *will not* request funding from the Federal Reserve, because the Federal Reserve's interest expenses currently exceed its income. These two decisions (collectively, the "Challenged Decisions") make it all but certain that the CFPB will run out of funding completely in January 2026.

6.      Because the Challenged Decisions are contrary to Congressional mandates, they violate the Administrative Procedure Act ("APA") and the United States Constitution.

7.      An inoperable CFPB will immediately harm the Plaintiffs, which will lose statutorily guaranteed access to data and systems that each Plaintiff State uses to further their own regulatory goals and protection of their citizens.

8.      For the reasons set forth in this First Amended Complaint, Plaintiffs are entitled to judgment that declares unlawful, sets aside, and enjoins the Challenged Decisions.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. The State of Oregon,

Page 3 -   FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

including the Oregon Department of Justice, resides in Marion County, and a substantial part of the events giving rise to this First Amended Complaint occurred and continue to occur within Marion County and the District of Oregon.

## PARTIES

**A.     Plaintiffs**

11.     Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

12.     Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

13.     Plaintiff the State of New Jersey, represented by and through its Attorney General Matthew J. Platkin, is a sovereign state of the United States. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

14.     Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

15.     Plaintiff the State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta. The Attorney General is the chief legal representative of the state and is authorized to pursue this action by California State Constitution, article V, section 13.

16.     Plaintiff the State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state of the United States of America. The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in a federal court." Ariz. Rev. Stat. § 41-193(A)(3).

Page 4 -   FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

17.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

18.    Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

19.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

20.    Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne E. Lopez, is a sovereign state of the United States of America. The Attorney General is Hawaii's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

21.    Plaintiff the State of Illinois, represented by and through its Attorney General. Kwame Raoul, is a sovereign state of the United States of America. Attorney General Raoul is the chief legal officer for the State of Illinois and is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

Page 5 -   FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

22.     Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

23.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

24.     Plaintiff the Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Commonwealth's chief legal officer.

25.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

26.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

27.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

28.     Plaintiff the State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez. The Attorney General is New Mexico's chief law enforcement officer and is authorized to pursue this action pursuant to N.M. Stat. Ann. § 8-5-2(B).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

29.     Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

30.     Plaintiff the State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

31.     Plaintiff the State of Vermont, represented by and through its Attorney General, Charity R. Clark, is a sovereign state of the United States of America. The Vermont Attorney General is authorized to act on behalf of the State in this matter. *See* 7 V.S.A. § 152.

32.     Plaintiff the State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

33.     Plaintiff Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

**B.     Defendants**

34.     Defendant Russell T. Vought is the Acting Director of the Consumer Financial Protection Bureau. He is sued in his official capacity.

35.     Defendant the Consumer Financial Protection Bureau is an agency of the United States.

36.     Defendant the Board of Governors of the Federal Reserve System is the governing body of the Federal Reserve System and is an agency of the United States comprised of seven members serving staggered 14-year terms who are nominated by the President and confirmed by

Page 7 -   FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

the Senate. The Board of Governors is named solely for purposes of declaratory relief pursuant to Plaintiffs' sixth cause of action.

## ALLEGATIONS

### A.    The CFPB's Mandate and Partnership with the States

37.    In 2008, the United States mortgage market collapsed, resulting in the most severe financial recession since the Great Depression. More than $10 trillion in American household wealth was wiped out. Millions of Americans lost their jobs, their life savings, their retirements, and their homes. Assessing the fallout, Congress concluded that one of the major causes of the collapse was the failure of fragmented federal banking regulators to address significant consumer protection issues that undermined the safety and soundness of the banking system. In response, Congress enacted the Dodd-Frank Act, Pub. L. No. 111-203, 124 Stat. 1955 (2010), which created the CFPB as the first federal financial regulator with a primary consumer protection mandate.

38.    Congress tasked the CFPB with the administration of 18 federal consumer protection statutes and "charged the Bureau with enforcing consumer financial protection laws to ensure . . . 'that markets for consumer financial products and services are fair, transparent, and competitive.'" *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024) (quoting 12 U.S.C. § 5511(a)). To fulfill this mandate, Congress provided the CFPB with supervisory, enforcement, and rulemaking authorities. To date, the CFPB has returned more than $21 billion improperly taken from over 205 million Americans.

39.    The Dodd-Frank Act also tasks the CFPB with non-discretionary obligations to provide the States with information, resources, and coordination in carrying out consumer protection work. Of paramount importance to the States, as described below, is the CFPB's statutory obligation to maintain a consumer complaint response system and to "share consumer complaint information with . . . State agencies." 12 U.S.C. § 5493(b)(3)(D). Similarly, the CFPB is also responsible for administering the collection of demographic and geographic lending data

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

under the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*, on which States and regulators rely to identify inequitable or discriminatory lending patterns.

40.    The Dodd-Frank Act also requires the CFPB to "issue a notice of proposed rulemaking whenever a majority of the States has enacted a resolution in support of the establishment or modification of a consumer protection regulation by the Bureau." 12 U.S.C. § 5551(c)(1).

41.    Congress also provided the CFPB with statutory responsibilities to carry out critical functions necessary for the functioning of a safe consumer marketplace and on which the Plaintiffs rely, which no other federal agency is authorized to perform. For example, the CFPB is the only federal agency authorized to supervise the nation's largest banks for their compliance with the federal consumer financial protection laws. 12 U.S.C. § 5515(b)(1)(A). Additionally, the CFPB is responsible for the weekly publication of the benchmark mortgage interest calculation called the Average Prime Offer Rates (APOR). *See* 12 C.F.R. § 1026.35(a)(2). APOR data is necessary for lenders to comply with ability-to-pay rules in setting interest rates, the loss of which would be catastrophic to the market and to Plaintiffs' residents. Key regulatory frameworks that govern lender compliance obligations are written relative to APOR and will be impossible to comply with absent APOR data, resulting in regulatory chaos. *See, e.g.*, *id.* § 1026.35(a)(1).

42.    The Dodd-Frank Act also provides the States with authorities to enforce various federal consumer financial laws, thereby facilitating cooperative state and federal consumer protection work. *See* 12 U.S.C. § 5552(a). And the CFPB has been a critical partner to the States as the States have performed their many consumer-protection functions. The States have relied on the CFPB's use of its resources and authorities in jointly carrying out consumer protection work, resulting in efficiencies, cost savings, and improved outcomes for consumers.

**B.    The CFPB's Funding Structure**

43.    The Dodd-Frank Act provides the CFPB with a permanent and sufficient funding source outside of the Congressional appropriations process. *See* S. Rep. No. 111-176 at 162-64

Page 9 -    FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(2010) (describing that the Act "will ensure that the Bureau has the funds to perform its mission" and finding that "assurance of adequate funding, independent of the Congressional appropriations process, is absolutely essential").

44.     The Dodd-Frank Act provides that, subject to a statutory cap and on an annual or quarterly basis, the Federal Reserve "Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1).

45.     Jerome Powell, the Chair of the Federal Reserve, testified to the Senate Committee on Banking, Housing and Urban Affairs earlier this year that the Federal Reserve is required to fund the CFPB even when it is operating at a loss. *The Semiannual Monetary Policy Report to the Congress*: *Hearing Before the S. Comm. on Banking, Housing & Urban Affs.*, 119th Cong. (Feb. 11, 2025) (testimony of Jerome Powell, Chair, Bd. of Govs. of the Fed. Reserve Sys., at 1:24:50-1:26:02).[2]

46.     In 2024, the United States Supreme Court upheld the constitutionality of the CFPB's funding mechanism against a challenge that it violated the Appropriations Clause of the United States Constitution. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024).

47.     Following the Supreme Court's decision, and in response to renewed attacks on the CFPB's funding structure, the CFPB consistently maintained, and the courts who considered the issue agreed, that interpreting the definition of combined earnings to mean "net excess earnings" was not the best reading of the statute. *See, e.g.*, Opp. to Mot. Dismiss at 6, *CFPB v. Purpose Fin., Inc.*, No. 7:24-cv-3206 (D.S.C. Oct. 3, 2024), ECF No. 48; Mem. & Recommendation at 9, *Texas v. Colony Ridge, Inc.*, No. H-24-0941 (S.D. Tex. Oct. 11, 2024), ECF No. 61 (recommending that

---

[2] https://www.banking.senate.gov/hearings/02/04/2025/the-semiannual-monetary-policy-report-to-the-congress

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

the district court deny defendant's motion to dismiss, among other reasons, because the Supreme

Court in *CFPB v. Community Financial Services Ass'n of America, Ltd.*, 601 U.S. 441 (2024), had

"found that the CFPB is constitutionally funded" at a time when there were no net excess earnings

and thus, under defendant's argument, could not have been constitutionally funded, *see* Order at

3, *CFPB v. SoLo Funds, Inc.,* No. 2:24-cv-4108 (C.D. Cal. Oct. 17, 2024), ECF No. 54 (rejecting

defendant's argument that the Federal Reserve's lack of net excess earnings requires dismissal,

and finding that it need not interpret the Bureau's funding provision at all because it was not

"persuaded . . . that the Bureau's source of funding," even if it were somehow "illegitimate,"

would be "grounds for dismissal."); *CFPB v. Active Network, LLC,* No. 4:22-cv-00898, 2024 WL

4437639, at *2 (E.D. Tex. Oct. 7, 2024) (denying a motion to dismiss and summarily dismissing

defendant's argument that a Bureau action must be dismissed because the Bureau may draw funds

from the Federal Reserve only when it generates net excess earnings).

48.     Similarly, the Congressional Budget Office, in analyzing the One Big Beautiful Bill

Act's reduction of the statutory cap for Bureau funding, explained that it expected the Federal

Reserve to continue to transfer money to the Bureau, despite its recognition of the Federal

Reserve's recent "net losses." *See* Cong. Budget Off., *Reconciliation Recommendations of the

House Committee on Financial Services* 4 (May 7, 2025).[3]

## C.     Overview of the Federal Reserve System

49.     Established by Congress in 1913, the Federal Reserve is the central bank of the

United States and is composed of the Board of Governors, twelve regional Federal Reserve banks

("Reserve Banks"), and the Federal Open Market Committee ("FOMC"). Fed. Reserve Sys., *The

Fed Explained: What the Central Bank Does* 2 (11th ed. 2021) (hereinafter "*The Fed Explained*").[4]

While "parts of the Federal Reserve System share some characteristics with private-sector entities,

the Federal Reserve was established to serve the public interest." *Id.*

---

[3] https://www.cbo.gov/system/files/2025-05/HFS_Reconciliation2025.pdf

[4] https://www.federalreserve.gov/aboutthefed/files/the-fed-explained.pdf

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

50.     The Federal Reserve has a dual statutory mandate to promote maximum employment and stable prices, *see* 12 U.S.C. § 225a, and pursues this mandate primarily through its influence on short-term and long-term interest rates. *See The Fed Explained* 24-25. To achieve these aims, Congress structured the Federal Reserve as an independent agency "to ensure that its decisions are based on facts and objective analysis and serve the best interests of all Americans." *Id.* at 22. The Federal Reserve balances this independence with an "obligation for transparency" to ensure that it remains "accountable to Congress and the American people for its actions." *Id.*

51.     The Federal Reserve is primarily funded from interest earned on securities it holds, fees for services provided to depository institutions by Reserve Banks, and interest charged on loans. *See generally* 12 U.S.C. §§ 342-361.

52.     The Federal Reserve uses this income to pay "necessary expenses," *see id.* § 289(a)(1)(A), including operating expenses for the Board of Governors, *id.* § 243, dividends to member banks, *id.* § 289(a)(1), payments to credit surplus accounts at each Reserve Bank, *id.* § 289(a)(2), and the funds transferred to the CFPB under 12 U.S.C. § 5497(a). Any remaining funds are transferred to the general fund of the Department of the Treasury. *Id.* § 289(a)(3)(B); *id.* § 290.

53.     Reserve Banks also pay "earnings on balances," or interest payments, on balances maintained by or on behalf of depository institutions at the Reserve Banks at rates set by the Federal Reserve. *Id.* § 461(b)(12).

54.     When the Federal Reserve's total expenditures exceed its income, the Federal Reserve stops remitting funds to Treasury, and instead records a "deferred asset" on its balance sheet, which represents "the amount of future net earnings to be realized before remittances to Treasury resume." Fed. Reserve Bank of N.Y., *Open Market Operations During 2024* 32 (2025) (hereinafter "*2024 Open Market Operations*").[5] This tends to occur during periods of tighter monetary policy, when the Federal Reserve increases interest rates to control rising prices, because

---

[5] https://www.newyorkfed.org/medialibrary/media/markets/omo/omo2024-pdf.pdf

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Reserve Banks must immediately pay increased interest payments to depository institutions while the Reserve Banks' long-term securities continue to generate returns at lower interest rates. Miguel Faria-e-Castro & Samuel Jordan-Wood, *The Fed's Remittances to the Treasury: Explaining the 'Deferred Asset'*, Fed. Reserve Bank of St. Louis: On the Economy Blog (Nov. 21, 2023).[6] When the Federal Reserve's income once again exceeds its expenditures, "the deferred asset will be reduced and eventually extinguished," and remittances to Treasury will resume. *2024 Open Market Operations* 32.

55.     To reduce rising inflation in the aftermath of the COVID-19 pandemic, the Federal Reserve raised interest rates, and as a result, in September 2022, most Reserve Banks stopped remitting funds to Treasury and began recording a deferred asset on their balance sheets. Fed. Reserve Bank of N.Y., *Open Market Operations During 2022* 19 (2023) (hereinafter "*2022 Open Market Operations*").[7]

56.     At the end of 2024, the cumulative deferred asset for all Reserve Banks was approximately $216 billion, *see* Fed. Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* 3 (2025) (hereinafter "*2024 Financial Statements*"),[8] and it continued to increase for most of 2025. However, in recent weeks, the size of the deferred asset has started to decrease, from $243.8 billion as of November 5, 2025, to $242.7 billion as of December 17, 2025. *Compare Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, Bd. of Govs. of the Fed. Reserve Sys.: Data (Nov. 6, 2025, at 16:30 ET) (listing the cumulative deferred asset amount as $243.818 billion in table 6 under the label "Earnings remittances due to the U.S. Treasury"),[9] *with Federal Reserve Balance Sheet: Factors Affecting Reserve Balances – H.4.1*, Bd. of Govs. of the Fed. Reserve Sys.:

---

[6] https://www.stlouisfed.org/on-the-economy/2023/nov/fed-remittances-treasury-explaining-deferred-asset

[7] https://www.newyorkfed.org/medialibrary/media/markets/omo/omo2022-pdf.pdf

[8] https://www.federalreserve.gov/aboutthefed/files/combinedfinstmt2024.pdf

[9] https://www.federalreserve.gov/releases/h41/20251106/

Page 13 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Data (Dec. 18, 2025, at 16:30 ET) (listing the cumulative deferred asset amount as $242.728 billion in table 6 under the label "Earnings remittances due to the U.S. Treasury");[10] *see also* Michael S. Derby, *Fed Data Suggests Central Bank Has Stopped Losing Money*, Reuters (Dec. 3, 2025, at 16:30 UTC).[11]

57.     Critically, the existence and size of the deferred asset "has no effect on the ability of the Federal Reserve to implement monetary policy or meet any of its financial obligations." *2024 Open Market Operations* at 32. As recognized in the 2022 report to the FOMC, "income is not a policy objective for the FOMC, but rather an outcome of conducting policy to achieve its employment and price stability objectives." *2022 Open Market Operations* 34; *see also* Seth Carpenter et al., *The Federal Reserve's Balance Sheet and Earnings: A Primer and Projections*, 11 Int'l J. Central Banking 237, 270 (2015) ("[A] central bank differs from a private corporation in that its objective is not profit maximization . . . and it can therefore operate with negative equity.").

58.     The Federal Reserve does not use the kinds of accounting procedures and terminology that private sector banks use. Because the Federal Reserve's actions are driven by public policy goals—like economic stability—rather than an attempt to produce a profit for shareholders, the Federal Reserve has created its own "specialized accounting principles" specific to "the nature and function of a central bank." *See Federal Reserve System Audited Annual Financial Statements*, Bd. of Govs. of the Fed. Reserve Sys.: About the Fed (Mar. 21, 2025).[12]

59.     Consistent with the Federal Reserve's unique responsibilities described above, a group of former Federal Reserve employees, spanning functions such as legal, operations, consumer affairs, and members of the Board of Governors, recently expressed their collective view that, among other things, because "[n]either the Board of Governors nor the [Federal] Reserve

---

[10] https://www.federalreserve.gov/releases/h41/20251218/

[11] https://www.reuters.com/business/fed-data-suggests-central-bank-has-stopped-losing-money-2025-12-03/

[12] https://www.federalreserve.gov/aboutthefed/audited-annual-financial-statements.htm

Page 14 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Banks are profit-maximizing private enterprises," a "lack of 'profits' does not prevent the Federal Reserve from continuing to meet any of its obligations, including the obligation to make requested transfers to the CFPB under the terms of 12 U.S.C. § 5497(a)." Brief of *Amici Curiae* Former Federal Reserve Officials in Support of Plaintiff's Motion to Clarify 7, 10, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ (D.D.C.), ECF No. 162.

**D.    The Consumer Response System**

60.    As required by the Dodd-Frank Act, the CFPB has created and maintained a system for collecting, tracking, sharing, and facilitating responses to consumer complaints across the spectrum of consumer financial products (the "Consumer Response System"). The Consumer Response System includes, among other things, a statutorily required database of consumer complaints, 12 U.S.C. § 5493(b)(3)(A), statutorily required "procedures to provide a timely response to consumers," *id.* § 5534(a), and statutorily required data sharing to States and other entities, *id.* § 5493(b)(3)(D).

61.    According to its 2024 Consumer Response Annual Report, the CFPB received over 3 million complaints via the statutorily mandated portal in 2024. Consumer Fin. Prot. Bureau, *Consumer Response Annual Report 2024* (May 2025).[13] This includes 317,668 complaints from consumers in California; 208,305 complaints from consumers in New York; 115,158 complaints from consumers in New Jersey; 25,161 complaints from consumers in Connecticut; 19,082 complaints from consumers in Colorado; 83,033 complaints from consumers in Maryland; 20,226 complaints from consumers in Wisconsin; 8,822 complaints from consumers in Oregon; and 63,229 complaints from consumers in Virginia. *Id.* at 89-92. Despite a freeze on the CFPB's outreach to consumers, it has received over 5.3 million complaints in 2025 per the publicly searchable version of the database. Consumer Complaint Database (last updated Dec. 19, 2025) (filtered to complaints received between 1/1/2025 – 12/19/2025).[14] And the CFPB has received

---

[13] https://files.consumerfinance.gov/f/documents/cfpb_cr-annual-report_2025-05.pdf

[14] https://www.consumerfinance.gov/data-research/consumer-complaints/search/?chartType=line&dateInterval=Month&date_received_max=2025-12-

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

more complaint information on the Government Portal, which is limited to law enforcement and includes consumer contact information, company responses, and attachments. Many consumers submit attachments with documentation in support of their complaints to the CFPB complaint database.

62.    Covered persons subject to supervision and enforcement by the CFPB are required to file a timely response to consumer complaints that come in through this system. 12 U.S.C. § 5534(b). According to the CFPB's 2024 Consumer Response Annual Report, companies reported providing monetary relief totaling over $90 million directly to consumers in response to complaints in 2024. This includes over $21 million to consumers in California, $8.5 million to consumers in New York, $3.2 million to consumers in New Jersey, $1.8 million to consumers in Colorado, $1.1 million to consumers in Connecticut, $1.7 million to consumers in Maryland, $370,000 to consumers in Wisconsin, $710,000 to consumers in Oregon, $2.5 million to consumers in Virginia. *Consumer Response Annual Report 2024 supra* n. 12, at 93-96

63.    State agencies—after executing an agreement with the CFPB that, among other things, affirms that they will protect consumer personal identifying information—are given access to consumers' complaints and contact information, the company's response, and any attachments provided by the consumer or company.

64.    As required by 12 U.S.C. § 5493(b)(3)(D), the CFPB has shared consumer complaint information with the States, which in turn have used such access to support investigations and litigation, to spot and monitor trends, and to explore opportunities for coordinated multi-state investigations and litigation. Plaintiffs' staff with access to the Consumer Response System use it to identify harms to consumers and locate investigation and litigation witnesses.

65.    Unlike other complaint systems, the CFPB Consumer Response System requires certain covered persons to respond to the consumer complaints. States make regular use of the

19&date_received_min=2025-01-
01&lens=Product&searchField=all&subLens=sub_product&tab=Trends

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

company complaint responses, which can include explanations of the companies' behavior or admissions of wrongdoing.

66.     States have also regularly referred thousands of residents to the CFPB's Consumer Response System for a variety of reasons, including when the CFPB had a track record for being able to quickly connect consumers with relevant providers (such as education lenders, mortgage originators, or servicing companies).

67.     For example, New Jersey has relied on hundreds of CFPB consumer complaints in multiple successful enforcement actions that recovered tens of millions on behalf of consumers. New Jersey's consumer protection agencies also receive quarterly reports from CFPB of those companies that have been the subject of consumer complaints to CFPB. The New Jersey Office of Consumer Protection utilizes the reports to determine areas of investigative interest and focus its resources on New Jersey based companies.

68.     New York relies on the hundreds of thousands of consumer complaints made by New York residents to the CFPB to open and conduct investigations, support litigation, and engage in other consumer protection work.

69.     Minnesota relies on the Consumer Response System when conducting consumer protection investigations and supporting litigation. This database provides invaluable information such as complaints submitted by Minnesota consumers, responses to those complaints made by our investigative targets and defendants, and additional evidence consumers submit to the CFPB. This information helps Minnesota connect with and learn from complainants, who might not otherwise be reachable. The consumer complaints also inform which targets Minnesota will pursue and the claims brought against those targets.

70.     California also uses the CFPB complaint portal as a source of intelligence to support consumer protection law enforcement investigations and resulting enforcement actions. The information in the portal complements other sources of information, helps identify victims and

Page 17 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

witnesses, and aids in identifying and understanding business practices that may violate state or federal law.

71.    Maryland's Consumer Protection Division uses the CFPB database to identify financial products that may violate Maryland law and to identify the frequency and severity of companies engaging with such products. Maryland also relies on the database to identify Maryland consumers who can assist during investigations by providing more detail and documentation of their experience.

72.    Arizona uses the system to search for complaints about particular conduct or particular entities. This system and its search capabilities have been very beneficial to some of Arizona's most successful consumer protection cases, and Arizona may not have been able to obtain the same information from other sources.

73.    Massachusetts uses data available through the Consumer Response System to support its ongoing consumer protection work. Consumer complaints and supporting documents maintained by the CFPB's Consumer Response System provide important information that aids in ongoing investigations and consumer protection efforts. Massachusetts also uses the Consumer Response System to help assess and respond to complaints that have been filed with the Massachusetts Attorney General's Office and the CFPB and to forward complaints to the CFPB.

74.    Illinois also uses complaint data from the CFPB's consumer complaints database to investigate potential violations of Illinois and federal consumer protection laws. In particular, Illinois relies on the CFPB's complaint database over other sources of consumer complaint information because the search functions of the CFPB's database are more flexible and sophisticated.

75.    Wisconsin's Department of Financial Institutions ("WDFI") uses the CFPB's consumer complaints database on a daily basis to carry out its regulatory responsibilities. Among other things, WDFI relies on the database to obtain information about companies subject to

Page 18 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

consumer complaints; to assess whether a complaint fits with a pattern or history of conduct; and to determine whether to refer a complaint.

76.     Colorado uses the CFPB complaint portal as a valuable source of information for consumer protection enforcement cases and to prioritize its limited supervision resources.

77.     Virginia relies on the CFPB's Consumer Response System to gather additional information about investigatory targets, including consumer narratives and information about the substance and scope of harm to Virginians. The ability to track and monitor consumer complaint trends nationwide and in the Commonwealth of Virginia is vital to the work of the Office of the Attorney General of Virginia's Consumer Protection Section.

78.     From 2023 to 2024, Oregon saw a 51% increase in complaint volume to the CFPB Consumer Response System. State agencies in Oregon routinely review data and information made available through the Consumer Response System to assess consumer complaints, identify trends warranting further inquiry, and investigate potential violations of federal and state law. In addition, Oregon state agencies direct consumers to the Consumer Response System when they have complaints, because many times the fact of entering a complaint and getting a response can resolve a consumer's issue, saving state resources.

79.     Many of the Plaintiffs are currently using the CFPB's consumer complaint database to support ongoing inquiries, investigations, and litigation. Losing access to the database will prejudice those Plaintiffs in these active matters by depriving the Plaintiffs of a tool that Congress created on which they are presently relying. For example, many Plaintiffs are currently conducting investigations that originated in part from complaint information derived from the CFPB consumer complaint database and consumer complaint information remains relevant to the matters. Many Plaintiffs are also using CFPB complaint data in other active inquiries and investigations. Moreover, many Plaintiffs are engaged in active litigation in which CFPB consumer complaint data was used in drafting the complaints, thereby remaining relevant to the actions.

Page 19 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

E.     **The Home Mortgage Disclosure Act Database**

80.     Several Plaintiffs also rely on Home Mortgage Disclosure Act ("HMDA") data maintained by CFPB to support a range of ongoing investigations and enforcement actions.

81.     Congress enacted HMDA in 1975 in response to its findings that "some depository institutions have sometimes contributed to the decline of certain geographic areas by their failure pursuant to their chartering responsibilities to provide adequate home financing to qualified applicants on reasonable terms and conditions." Pub L. 94-200, § 301, 89 Stat. 1124, 1125 (1975) (codified at 12 U.S.C. § 2801(a)). To rectify this failure, HMDA was intended "to provide the citizens and public officials of the United States with sufficient information to enable them to determine whether depository institutions are filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located and to assist public officials in their determination of the distribution of public sector investments in a manner designed to improve the private investment environment." *Id.* § 2801(b). Under HMDA, Congress requires "depository institutions" to maintain and make available to the public information regarding home improvement and residential mortgage loans. *See id.* § 2803.

82.     Congress amended HMDA in 1988 and 1989 to "expand[] the coverage of depository and nondepository institutions, require[] transaction-level disclosure of applications and loans, and add[] new reporting requirements regarding the applicant's or borrower's race, gender, and income." Consumer Fin. Prot. Bureau, *Report on the Home Mortgage Disclosure Act Rule Voluntary Review* 22 (2023).[15]

83.     Recognizing the need for increased public availability of mortgage data in light of the 2008 mortgage market collapse, Congress again amended HMDA and transferred its rulemaking authority and other functions from the Federal Reserve to the CFPB when it passed the Dodd-Frank Act. *Id.* at 23 n.53 (identifying the relevant portions of the Dodd-Frank Act); *see also* 12 U.S.C. § 5512 (transferring rulemaking authority to the Bureau); *id.* § 5581(b)(1)

---

[15] https://files.consumerfinance.gov/f/documents/cfpb_hmda-voluntary-review_2023-03.pdf.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

(transferring consumer financial protections function from the Board of Governors to the CFPB); *id.* § 2803 (amending HMDA to expand the scope of information that institutions must collect and report).

84.     The CFPB is now empowered to "prescribe such regulations as may be necessary to carry out the purposes" of the statute, 12 U.S.C. § 2804(a), and has "principal authority to examine and enforce compliance" with HMDA. *Id.* § 2804(d). The public data required by HMDA is compiled by the Federal Financial Institutions Examination Council (FFIEC), an interagency body composed of five different federal financial regulators, including the CFPB. *Id.* § 2809(a). The CFPB is statutorily required to "provide staff and data processing resources to the [FFIEC] to carry out" its compilation requirements. *Id.* § 2809(b). The data from 2017 onward is available online on the HMDA Platform, a website created and maintained by the CFPB. *The Home Mortgage Disclosure Act*, CFPB: FFIEC, https://ffiec.cfpb.gov/ (last visited Dec. 17, 2025).

85.     Several Plaintiffs have used and are currently using the HMDA data that CFPB staff compile to support ongoing investigations and litigation. Losing access to the data will prejudice the Plaintiffs by depriving Plaintiffs of a tool on which they are presently relying. For example, Plaintiff New Jersey's Division of Civil Rights uses the data as an essential tool in identifying lenders that lend far less to minorities and those in minority areas than their competitors. Plaintiff Michigan's Department of Civil Rights ("MDCR") Housing Investigators use HMDA data for comparative information necessary to carry out an investigation. Plaintiff Maryland's Civil Rights Division uses HMDA data to identify potential race discrimination in mortgage lending and to develop evidence necessary to initiate and pursue an investigation of a Maryland Bank. Maryland plans to continue to reference HMDA data to identify additional lending institutions that may have discriminatory practices.

**F.     The Trump Administration's Early Efforts to Shut Down the CFPB**

86.     On February 7, 2025, Defendant Vought was appointed by President Trump as Acting Director of the CFPB and immediately moved to dismantle the agency. That day, Elon

Page 21 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Musk—who, as a "Special Government Employee," was assisting Defendant Vought's efforts to shut down the CFPB—posted a tombstone emoji and the words "CFPB RIP" on his social media site X.[16]

87.     On February 8, 2025, Defendant Vought sent a letter to the Federal Reserve Chair Jerome Powell requesting $0 to fund the CFPB's operations for the third quarter of fiscal year 2025, stating that the CFPB would rely on its reserve fund to fund its operations for that period. Defendant Vought said that he was requesting $0 because the CFPB's "funds are more than sufficient" to carry out the CFPB's authorities.[17] Defendant Vought did not suggest that he was legally barred from seeking funding. Indeed, although the Federal Reserve was not running a profit at the date of his letter, Defendant Vought reiterated that the Dodd-Frank Act "requires . . . the Federal Reserve System to transfer each quarter an 'amount determined by the Director to be reasonably necessary'" for the CFPB's operations.

88.     On February 10, Defendant Vought sent an email to all CFPB staff ordering them to "stand down from performing any work task."[18] He set up a "tip line" for the public to report "being pursued by CFPB enforcement or supervision staff, in violation of Acting Director Russ Vought's stand down order."[19] In accordance with Defendant Vought's orders, CFPB personnel stopped performing the CFPB's statutorily required functions.

---

[16] Elon Musk (@elonmusk), X (Feb. 7, 2025, at 16:41 ET), https://x.com/elonmusk/status/1887979940269666769.

[17] Letter from Russell Vought, Acting Dir., CFPB, to Jerome Powell, Chair, Bd. of Govs. of the Fed. Reserve Sys. (Feb. 8, 2025), https://files.consumerfinance.gov/f/documents/cfpb_letter-from-frb-to-cfpb_2025-02.pdf.

[18] Stacy Cowley, *Confusion Reigns as 'a Wrecking Ball' Hits the Consumer Bureau*, New York Times (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/business/cfpb-shutdown-confusion.html.

[19] CFPB Tipline (@cfpb_tipline), X, https://x.com/CFPB_tipline.

Page 22 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

89.     On February 10, 2025, when asked by a reporter about the efforts to eliminate the CFPB, President Trump referred to the agency in the past tense, stating that "we did the right thing" and "that was a very important thing to get rid of."[20]

90.     Defendant Vought then moved to fire nearly the entire CFPB workforce. After firing approximately 85 CFPB probationary employees and 130 term employees on February 11 and 13, 2025, Defendant Vought moved to fire nearly all the agency's approximately 1,200 remaining employees on February 14. Defendant Vought's plan was to have a skeleton staff of CFPB personnel finish winding down the agency and then fire remaining staff in another round of layoffs. The plan, allegedly in the words of one of Defendant Vought's senior executives, was to turn the CFPB into a "room . . . with five men and a phone in it."[21]

91.     Before Defendant Vought could finalize his plan to fire the 1,200 CFPB employees by end of day on February 14, 2025, a CFPB employee union and other plaintiffs sued for a temporary restraining order (TRO). On February 14, the U.S. District Court for the District of Columbia held a hearing on the TRO application at which the court suggested, and the parties agreed, to enter into a consent order pausing the firings and dismantling of the agency while the district court decided whether to enter a preliminary injunction.

92.     The district court entered a preliminary injunction on March 28, 2025, enjoining Defendant Vought from taking further action to dismantle the CFPB. The district court found that Defendant Vought "engaged in a hurried effort to dismantle and disable the agency entirely," and that defendants' representations to the court were "so disingenuous that the Court is left with little confidence that the defense can be trusted to tell the truth about anything." *Nat'l Treasury Emps.*

---

[20] White House Rapid Response (@RapidResponse47), X (Feb. 10, 2025, at 18:48 ET), https://x.com/RapidResponse47/status/1889099138941235509.

[21] Declaration of Drew Doe, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, ECF No. 38-5 ¶ 10 (D.D.C. Feb 7, 2025); Hugh Son, *Trump Administration, Musk's DOGE Plan to Fire Nearly All CFPB Staff and Wind Down Agency, Employees Say*, CNBC (Feb. 28, 2025), https://www.cnbc.com/2025/02/28/cfpb-leaders-and-elon-musk-doge-planned-to-fire-nearly-all-staff.html.

Page 23 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Union v. Vought*, 774 F. Supp. 3d 1, 11 & 57 (D.D.C.), *vacated and remanded*, 149 F.4th 762 (D.C. Cir. 2025).

93.    In entering the preliminary injunction, the district court expressed particular concern about injuries caused by the "shutdown of the statutorily required consumer complaint system," which the court found to be "the heartbeat of the agency subscribed to by more than 70 stakeholders, Members of Congress, state regulators, and the only existing means within the federal government to resolve the over 350,000 consumer complaints per year . . . ." *Id.* at 71. The court found that if Defendant Vought succeeded in terminating the contracts that supported the consumer complaint database the system would "collapse," and that the plaintiff consumer groups who rely on the Consumer Response System to facilitate their work would suffer irreparable harm. *Id.* at 79.

94.    The CFPB's Consumer Response System did, in fact, suffer degradation and harm which, but for the district court's intervention and injunction, would have been irreparable. All contracts for the companies that managed the maintenance and functionality of the Consumer Response System were cancelled.[22] Activities to monitor and safeguard the system to prevent bad actors from misusing it stopped.[23] Contracts for virus scanning software were terminated.[24] As a result of this lack of maintenance, the Consumer Response System began to crash and break down.

95.    The breakdown of the Consumer Response System caused harm to the Plaintiffs during the period prior to the entry of the district court's injunction. The contracts necessary for "enabling consumer complaint information to be shared with the public and with states" were cancelled.[25] Complaints referred by Plaintiffs to the CFPB were not reviewed and sent to

---

[22] *See* Declaration of Erie Meyer, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, ECF No. 14-4 ¶ 25 (D.D.C. Feb 14, 2025).

[23] *See* Declaration of Matthew Pfaff, *Nat'l Treasury Emps. Union v. Vought*, No. 1:25-cv-00381-ABJ, ECF No. 14-4 ¶ 26 (D.D.C. Feb 27, 2025).

[24] *See id.* ¶ 30.

[25] *See* Declaration of Charlie Doe, *Nat'l Treasury Emps. Union v. Vought*, No. No. 1:25-cv-00381-ABJ, ECF No. 38-4 ¶ 5 (D.D.C. Feb 27, 2025).

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

companies because doing so requires manual intervention by CFPB staff.[26] Any complaints involving the Plaintiffs' residents that would have normally been escalated to the CFPB's Consumer Response's Escalated Case Management Team—including those related to imminent foreclosures or consumers who may be a risk to others or to themselves—were not addressed.[27] And many complaints from Plaintiffs' residents made to the CFPB during this time went into a backlog of tens of thousands of complaints.[28]

96.    On August 15, 2025, a divided panel of the United States Court of Appeals for the District of Columbia Circuit vacated the district court's preliminary injunction but stayed the issuance of the mandate during the plaintiff's application for *en banc* review. On December 17, 2025, the full United States Court of Appeals for the District of Columbia Circuit granted the plaintiffs' application for *en banc* review and vacated the panel's August 15 judgment. Oral argument before the full Court of Appeals sitting *en banc* is currently scheduled for February 24, 2026.

97.    Notwithstanding the district court's injunction remaining in effect pending the resolution of the *en banc* petition, Defendant Vought stated in an October 15, 2025 interview that his team was working to "close down the agency" and estimated that he would "be successful probably within the next two or three months."[29] That timeline aligns with the early-2026 date on which the CFPB states that it expects to run out of funding.

---

[26] *See* Declaration of Matthew Pfaff, *Nat'l Treasury Emps. Union v. Vought*, No. No. 1:25-cv-00381-ABJ, ECF No. 14-4 ¶ 12 (D.D.C. Feb 27, 2025).

[27] *See id.* ¶ 19.

[28] *See id.* ¶ 30.

[29] Nandita Bose, Doina Chiacu & Douglas Gillison, *White House Budget Director Plans to Shut US Consumer Finance Watchdog Within Months*, Reuters (Oct. 15, 2025), https://www.reuters.com/business/world-at-work/white-house-budget-director-vought-says-over-10000-federal-workers-could-be-laid-2025-10-15/.

Page 25 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**G.    The Challenged Decisions—Defendant Vought's Most Recent Attempt to Shut Down the CFPB**

98.    Opening another front in his effort to unlawfully close the CFPB, Defendant Vought has now decided to starve the agency of funds based on the implausible proposition that Congress, in enacting the Dodd-Frank Act, intended for the CFPB to periodically shut down whenever the Federal Reserve's interest expenses exceeded its interest income. That argument cannot be squared with the text or the structure of the CFPB's statutory funding provisions and thus neither can the Challenged Decisions.

99.    On November 20, 2025, Defendant Vought wrote to President Trump and the Chair of the Senate Committee on Appropriations to provide CFPB's report required by 12 U.S.C. § 5497(e)(1)(B). In that report, Defendant Vought admitted that, at the very least, CFPB's "'funding need' for Fiscal Year 2026 is $279,566,358.82." Attached as Exhibit A. But Defendant Vought stated that the normal mechanism for obtaining funding for CFPB—a request from CFPB to the Board of Governors for funding from the "combined earnings" of the Federal Reserve pursuant to 12 U.S.C. § 5497(a)(1)—was insufficient to cover CFPB's funding requirements. *Id.*

100.    This was because, as stated in the report, Defendant Vought has determined that "the amount currently available for [CFPB] to request" from the Federal Reserve "is legally $0." In support of this conclusion, Defendant Vought cited an Office of Legal Counsel ("OLC") memorandum "conclud[ing] that the Federal Reserve System has no combined earnings from which the Bureau can legally request funds at this time." *Id.* That is, Defendant Vought determined that he, as Acting Director, cannot request funds from the Federal Reserve at any time when its interest expenses exceed its interest income.

101.    OLC's memorandum, dated November 7, 2025, is attached as Exhibit B to this First Amended Complaint. That memorandum was requested by Defendant Vought, who "informed [OLC] that, upon further consideration . . . [t]he CFPB now believes its source of funding—the combined earnings of the Federal Reserve—has been exhausted." *Id.* at 9.

Page 26 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

102.     OLC's strained interpretation of "combined earnings" is legally erroneous. It is contrary to the plain meaning of the term, inconsistent with structure of the Dodd-Frank Act and Congressional intent, at odds with the statutory purpose of the Federal Reserve, and based on illogical inferences.

103.     For example, OLC quotes the secondary definition of "earnings" from *Merriam-Webster* ("the balance of revenue after deduction of costs and expenses") while ignoring the primary definition: "something (such as wages) earned."[30] The same dictionary defines "earned" as "to receive as return for effort and especially for work done or services rendered."[31] The two main funding streams for the Federal Reserve—interest and the provision of professional expertise—are income streams flowing from "services rendered" and form the basis for calculation of "combined earnings."

104.     Indeed, the Dodd-Frank Act clearly uses the term "earnings" to refer specifically to income elsewhere in the text. *See*, *e.g.*, Pub. L. No. 111-203, 124 Stat. 1506 (defining "proceeds" to mean, among other things, "interest and other earnings from investments"); *id.* at 1743 ("the amount of earnings on investments of amounts in the Fund during the preceding fiscal year"); *id.* at 1812 (authorizing Federal Reserve Banks to "pay earnings on balances maintained by or on behalf of a designated financial market utility in the same manner and to the same extent as the Federal Reserve Bank may pay earnings to a depository institution under the Federal Reserve Act").

105.     OLC's definition of "combined earnings" also relies on a complicated inferential chain to argue that "earnings" is total income minus *interest* expenses, but not *operating* expenses. But nothing in the OLC memo suggests that either the plain meaning or any agreed-on technical

---

[30] *Earnings*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earnings (last visited Dec. 17, 2025).

[31] *Earned*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/earned (last visited Dec. 17, 2025).

Page 27 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

meaning of "combined earnings" is the difference between total income and a certain *type* of expense.

106.    OLC's conclusion regarding the meaning of "combined earnings" is also at odds with the Federal Reserve's unique responsibility for setting monetary policy and its dual mandate to maximize employment and stabilize prices, not turn profits. Defining "combined earnings" as profits directly constrains the Federal Reserve's independence by attaching draconian consequences to the tools used by the Federal Reserve to set monetary policy. As explained above, net interest losses are a predictable consequence of the Federal Reserve's decision to increase interest rates, and the recording of a deferred asset to reflect these losses does not affect the Federal Reserve's ability "to implement monetary policy or meet any of its financial obligations." *2024 Open Market Operations* at 32. Yet under OLC's interpretation, the Federal Reserve's decision to tighten monetary policy for a sustained period in response to rising inflation would effectively shut down the CFPB's operations, an agency that the Federal Reserve collaborates with to promote consumer protection aims.

107.    Defendant Vought's and CFPB's unreasonable reliance on an unreasonable and unlawful interpretation of "combined earnings" in making the Challenged Decisions puts the CFPB at risk of losing all of its funding as early as January 2026.

## H.    Plaintiffs Will Be Harmed as a Result of the CFPB Being Defunded

108.    The Plaintiffs will be injured if Defendant Vought engineers a CFPB shutdown by unlawfully refusing to request operating funds from the Federal Reserve. The failure to request funding will cripple or entirely shut down the CFPB's Consumer Response System to Plaintiffs' detriment. Much of the damage will be irreversible.

109.    Should Defendant Vought succeed in starving the CFPB of funding, consumers will be unable to make complaints in the CFPB's Consumer Response System. The CFPB uses a cloud-based service provider to facilitate complaint processing and must pay the service provider a fee that scales with the number of consumers making complaints. CFPB's inability to pay the cloud-

Page 28 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

based service provider will cause the system to shut down and consumers will be unable to lodge complaints. Plaintiffs will lose a critical source of information that is necessary for conducting investigations, supporting litigations, monitoring the marketplace, and assisting harmed consumers, to which they are *statutorily entitled*. The Plaintiffs' ongoing investigations and litigations will be impaired.

110.     Many Plaintiffs will also lose access to material information regarding millions of consumer complaints in the database, including company responses to consumer complaints documentation provided by consumers and companies, that are already in CFPB's consumer complaint database. Some of this information concerns subjects of active litigations and confidential investigations by the Plaintiffs. In addition, many complaints that would have come in during the indefinite funding lapse will not come in later because it is highly unlikely that frustrated consumers will re-attempt to lodge the complaints in a system that does not appear to work. *See* Jean-Charles Chebat, Moshe Davidow & Isabelle Codjovi, *Silent Voices: Why Some Dissatisfied Consumers Fail to Complain*, 7 J. Serv. Rsch. 328, 328 (2005) (citing Steve Downton, *Measurements to Achieve Customer Focus* (2002)).[32] States will lose the ability to use CFPB complaints and company responses that would have come in absent the shutdown to monitor trends and open new investigations. Many of Plaintiffs' residents make complaints to the CFPB that are not also directly made to Plaintiffs' agencies, and absent a functioning CFPB Consumer Response System the Plaintiffs will not be able to obtain that information.

111.     Even if the system were somehow able to receive new complaints despite a funding termination, certain categories of consumer complaints that require manual routing would not get processed due to the absence of the relevant CFPB staff. For example, complaints about companies that are not yet onboarded onto the consumer complaint database system require staff review to be processed and sent to the companies. Similarly, incomplete consumer complaints or complaints in

---

[32] https://chaireomerdesserres.hec.ca/wp-content/uploads/2020/05/Silent-Voices.pdf

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

which consumers misspell the name of the company are not sent to the companies without manual intervention.

112.    The Plaintiffs will also suffer harm by being unable to refer complaints from their residents to the CFPB. Presently, the Plaintiffs refer certain complaints from their residents to the CFPB for resolution through a portal that is set up and maintained by the CFPB. For example, from 2023 to the present, New York referred approximately 2,170 consumer complaint intakes to the CFPB. Similarly, since January 1, 2023, Maryland has referred 461 complaints to the CFPB. Using the CFPB's complaint system in this way allows the Plaintiffs to assist their residents in a cost effective manner.

113.    Critical consumer complaint data is also at risk of being permanently deleted if the CFPB is not funded. The CFPB relies on cloud-based software companies to maintain much of the consumer complaint data in their cloud storage systems. Much of the data, including the company responses to the consumer complaints and relevant attached documents, is not held anywhere else. The CFPB is obligated to pay the contractors to maintain the data. It is industry practice for contractors to delete government data if they are not permitted to retain that data once they no longer have a contract to perform work that requires it. Contractors also delete data once contracts end pursuant to broadly applicable data retention and deletion protocols. Should consumer complaint information be deleted from these cloud systems the Plaintiffs will be harmed by forever losing key sources of information needed to conduct Plaintiffs' consumer protection work.

114.    A lapse in funding also poses a risk of the consumer complaint data being permanently corrupted or manipulated due to the CFPB's inability to monitor the Consumer Response System for anomalous data and to respond to bad actors and computer viruses. The CFPB's consumer complaint database is a potential target for hackers, given that it holds the sensitive personal identifying information of millions of consumers, many of whom are Plaintiffs' residents, as well as consumer complaints that allege illegal conduct by third parties. The CFPB performs regular security monitoring to determine if inappropriate access to the system has

Page 30 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

occurred. Regular maintenance, such as implementing software updates to address security vulnerabilities, is performed by CFPB personnel multiple times per month to keep the Consumer Response System functioning properly. Monitoring also includes generating audit logs when certain types of activity, such as mass downloads, occur. Audit logging systems require active maintenance and trained personnel to review logs and identify anomalies and escalate and respond to issues. Without funding, audit log review stops immediately and escalation of and response to suspicious activity is not possible. And even if funding were restored, the lack of audit activity would make it impossible for the CFPB to reconstruct what occurred and remedy the data corruption. As a result, the Plaintiffs would be harmed by being deprived of reliable consumer complaint data necessary for their consumer protection work.

115.    The Plaintiffs would not be able to avoid the harm from the loss of the CFPB's Consumer Response System because no other equivalent nationwide system exists. The Federal Trade Commission's ("FTC") Consumer Sentinel Network, for example, is not a substitute because it does not collect company responses or attachments submitted by consumers and companies, both of which many Plaintiffs find to be valuable in their consumer protection work. The documentation uploaded to the CFPB consumer complaint database by consumers and companies can be relevant to ascertaining whether a consumer complaint is credible and worth devoting Plaintiffs' resources to investigating. Moreover, the Sentinel Network relies heavily on complaints provided through the CFPB's complaint system that are forwarded to the FTC. Thus, any interruption in the ability of CFPB to receive and process consumer responses will necessarily undermine Plaintiffs' ability to utilize the Sentinel Network to access complaint information. And it would be enormously costly, and in any event not feasible, for the Plaintiffs to attempt to replicate the functionalities of the CFPB's nationwide Consumer Response System.

116.    Several Plaintiffs would also be harmed by losing access to HMDA data that the CFPB collects and publishes. Those Plaintiffs use HMDA data that CFPB staff compile to support ongoing investigations and litigations of state and federal antidiscrimination laws. Losing access

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

to the data will prejudice the affected Plaintiffs by depriving them of a tool on which they are presently relying.

## FIRST CAUSE OF ACTION

### Violation of Administrative Procedure Act
### Agency Action in Excess of Statutory Authority and Contrary to Law
### (Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)

117.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

118.    The APA requires that a court set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

119.    The APA also requires that a court set aside final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

120.    Congress has mandated that the CFPB administer federal consumer protection statutes to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Among the CFPB's many statutory duties, it is required to create and maintain a system for fielding and responding to consumer complaints regarding the whole gamut of consumer financial products, and to share this consumer complaint information with the States. 12 U.S.C. §§ 5493(b)(3), 5534, 5493(b)(3)(D). The CFPB is also required to collect data under HMDA and to provide staff and data processing resources to the FFIEC to carry out its compilation requirements. 12 U.S.C. §§ 2803(h)(1), 2809(b).

121.    Furthermore, Congress has mandated that the "Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1).

122.    The Challenged Decisions are final agency actions. First, Defendant Vought has determined that the CFPB cannot legally request funds from the Board of Governors at any point

Page 32 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in time during which the Federal Reserve's interest expenses exceed its interest income. That determination is contrary to the meaning of "combined earnings" in the Dodd-Frank Act. Moreover, even if CFPB's conclusion about the meaning of "combined earnings" were correct, that does not bar CFPB from requesting funds from the Federal Reserve.

123.    Second, Defendant Vought has decided not to request funds from the Federal Reserve because, under Defendant Vought's reading of the Dodd-Frank Act, the Federal Reserve was operating at a loss as of November 2025. Defendant Vought is obligated to determine an amount necessary to carry out the CFPB's authorities and request such funding from the Board of Governors. Defendant Vought's failure to do so is in direct contravention of 12 U.S.C. § 5497(a)(1). And it is also "not in accordance with the law" because it is based on an erroneous interpretation of "combined earnings" in the Dodd-Frank Act.

124.    No constitutional or statutory authority authorizes the CFPB to refrain from fulfilling its statutory duties, or to violate federal law by refusing to request funding sufficient to maintain its statutory obligations, including maintenance of the Consumer Response System it is required to make available to Plaintiffs. By failing to request funding from the Board of Governors, Defendant Vought puts the operations of the CFPB as a whole at risk of imminent cessation in their entirety.

125.    The Challenged Decisions will directly impact Plaintiffs' legal right to the Consumer Response System and the HMDA data maintained by the CFPB.

126.    Plaintiffs are injured by the Challenged Decisions because they will deny Plaintiffs access to statutorily required resources, which the Plaintiffs use, among other things, to enforce the law within their authority.

127.    Because the Challenged Decisions are outside of CFPB's authority and contrary to its statutory obligations, they violate the APA.

128.    For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Challenged Decisions violate the APA.

Page 33 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

129.    Plaintiffs are also entitled to vacatur of the Challenged Decisions and injunctive relief prohibiting Defendants from implementing the Challenged Decisions.

## SECOND CAUSE OF ACTION
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action
### (Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)

130.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

131.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made") (internal quotation marks omitted); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025).

132.    When changing positions, an agency must consider both the "alternatives that are within the ambit of the existing policy" and the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (brackets and internal quotation marks omitted).

133.    An agency must not take action that "entirely fail[s] to consider an important aspect of the problem" or "relie[s] on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43.

134.    The Challenged Decisions are final agency action that fail to comply with these bedrock requirements for multiple reasons.

Page 34 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

135. First, with the Challenged Decisions, Defendants have changed their position on how and when the CFPB can request funds to operate without an adequate explanation for the change in position. Before an agency adopts a new policy, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33. It must also "display awareness that it is changing position" and "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Fox Television Stations*, 556 U.S. at 515). For years, the CFPB has requested funding from the Federal Reserve in the ordinary course regardless of whether the Federal Reserve is operating at a profit. Moreover, they have long taken the position that "earnings," as used in the relevant statute, does not refer to profits net of expenses. Now, they have suddenly reversed course, rubber-stamping an OLC opinion without any acknowledgement of their change in position or thoughtful assessment of how to reconcile them.

136. Second, CFPB's stated reasons for the Challenged Decisions for refusing to request funding from the Federal Reserve are pretextual. *See Dep't of Com. v. New York*, 588 U.S. 752, 780-85 (2019). Though the agency now claims that it cannot request funds from the Federal Reserve because it has no "combined earnings"—a legal theory that finds no support in the text, history, or purpose of the statute, nor in any case law—this manufactured change in CFPB's legal position is meant to obscure the real reason for its decision not to request funds: to further Defendant Vought's year-long effort to dismantle the agency for policy and political reasons.

137. Third, Defendants have entirely ignored the reliance interests that have accrued for Plaintiffs who have now, for years, come to rely on CFPB's statutory functions. They have also failed to consider the fallout of the timing of the Challenged Decisions. Given how the CFPB has not yet sought any funding from the Federal Reserve, it is now guaranteed that there will be a gap in operations.

138. Fourth, Defendants' decision not to request funding from the Federal Reserve is arbitrary and capricious because it is based on a legally erroneous determination—that CFPB

Page 35 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

cannot request funds from the Board of Governors at any point in time during which the Federal Reserve's interest expenses exceed its interest income.

139.    Plaintiffs are injured by the Challenged Decisions because they have denied Plaintiffs access to statutorily guaranteed resources, which the Plaintiffs use to enforce the law within their authority.

140.    Because the Challenged Decisions are arbitrary and capricious, they violate the APA.

141.    For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Challenged Decisions violate the APA.

142.    Plaintiffs are also entitled to vacatur of the Challenged Decisions and injunctive relief prohibiting Defendants from implementing the Challenged Decisions.

### THIRD CAUSE OF ACTION
#### Violation of the Administrative Procedure Act
#### Unlawfully Withheld Agency Action
#### (Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)

143.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

144.    Under the APA, a court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (holding that courts must grant relief where "an agency failed to take a *discrete* agency action that it is *required to take*").

145.    To fund the CFPB, 12 U.S.C. § 5497 requires that the Board of Governors "shall transfer" to the CFPB "beginning on the designated transfer date, and each quarter thereafter" the amount "determined by the Director to be reasonably necessary to carry out the [CFPB's] authorities."

146.    This mandatory directive imposes interlinked affirmative obligations on the CFPB and the Federal Reserve. The Director must submit to the Board of Governors the amount of money

Page 36 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

he determines is needed to fund the agency's operations for purposes of obtaining such funds, and the Federal Reserve in turn "shall transfer" that amount from its "combined earnings."

147.    Defendant Vought has stated that he will not comply with his duties under 12 U.S.C. § 5497(a)(1) on the ground that the Federal Reserve lacks the "combined earnings" necessary to cover the CFPB's costs. But nothing in the statute permits Defendant Vought to decline to submit his determination of CFPB's funding needs to the Board of Governors, let alone on the grounds that the Federal Reserve lacks the necessary funding to provide for those needs.

148.    Nor does anything in 12 U.S.C. § 5497(e) exempt the Director from his obligation under § 5497(a)(1) to convey his determination of the Bureau's funding needs to the Board of Governors for purposes of obtaining funding. Rather, the mechanisms under § 5497(e) necessarily follow the funding process in § 5497(a)(1), meaning that the function and purpose of § 5497 does not contemplate filing a report under subsection (e) without submitting to the Board of Governors the determination required by subsection (a).

149.    Plaintiffs are injured by the Director's failure to submit the statutorily required determination of CFPB's funding needs to the Board of Governors because it has denied them access to statutorily required resources, which the States use to enforce the law within their authority.

150.    Plaintiffs are thus entitled to an order compelling Defendant Vought to submit to the Board of Governors his determination of the funding necessary for the Bureau's continued operation pursuant to 12 U.S.C. § 5497(a)(1).

## FOURTH CAUSE OF ACTION
### *Ultra Vires* Agency Action Not Authorized by Congress
### (Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)

151.    Plaintiffs realleges and incorporate by reference the allegations set forth in each of the preceding paragraphs.

152.    An executive agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)

Page 37 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

153.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

154.    Congress has directed CFPB to identify to the Board of Governors the amounts "reasonably needed" to carry out CFPB's duties. Defendants' decision not to request funds from the Board of Governors is contrary to Congress's specific mandate that "the Board of Governors *shall* transfer to" the CFPB "the amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the [CFPB]" and therefore *ultra vires*. 12 U.S.C. § 5497(a)(1) (emphasis added).

155.    Furthermore, Congress has mandated that the CFPB "shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a).

156.    Plaintiffs are injured by Defendants' decision not to request funds because it denies Plaintiffs access to statutorily required resources, which the Plaintiffs use to enforce the law withing their authority.

157.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

158.    For these reasons, pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the decision not to request funds from the Board of Governors is *ultra vires*.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

159.    Plaintiffs are also entitled to vacatur of the decision not to request funds and injunctive relief prohibiting Defendants from implementing that decision.

## FIFTH CAUSE OF ACTION
### Violation of the Separation of Powers Doctrine – Usurping Legislative Authority
### (Against Defendants Russell T. Vought and Consumer Financial Protection Bureau)

160.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

161.    Article I, Section 1 of the United States Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in . . . Congress." U.S. Const. art. I, sec. 1.

162.    "The Framers viewed the legislative power as a special threat to individual liberty, so they divided that power to ensure that 'differences of opinion' and the 'jarrings of parties' would 'promote deliberation and circumspection' and 'check excesses in the majority.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 223 (2020) (quoting The Federalist No. 70, at 475 (A. Hamilton) and No. 51, at 350 (J. Madison)).

163.    Thus "'important subjects . . . must be entirely regulated by the legislature itself,' even if Congress may leave the Executive 'to act under such general provisions to fill up the details.'" *West Virginia v. EPA*, 597 U.S. 697, 737 (2022) (Gorsuch, J., concurring) (quoting *Wayman v. Southard*, 10 Wheat. 1, 42-43, 6 L.Ed. 253 (1825)).

164.    The separation of powers doctrine thus represents a central tenet of our Constitution. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 637-38 (2024); *Seila Law LLC*, 591 U.S. at 227.

165.    Consistent with these principles, the Executive's powers are limited to those specifically conferred by the Constitution and federal statutes, and do not include any undefined residual or inherent power.

166.    Here, where Congress has created the CFPB, given it statutory mandates, and authorized it *without exception* to obtain funding by requesting it periodically from the Federal

Page 39 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Reserve, the Challenged Decisions have violated constitutional and statutory mandates, contravened Congressional intent, and are unlawful.

167.    This court is authorized to enjoin any action by the Executive and his agencies that "is unauthorized by statute, exceeds the scope of constitutional authority, or is pursuant to unconstitutional enactment." *Youngstown Sheet & Tube Co. v. Sawyer*, 103 F. Supp. 569, 576 (D.D.C. 1952), *aff'd*, 343 U.S. 579.

168.    Plaintiffs are injured by the Challenged Decisions because they have denied Plaintiffs access to statutorily required resources, which the Plaintiffs use to enforce the law within their authority.

169.    For these reasons, pursuant to 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Challenged Decisions violates the constitutional separation of powers doctrine and impermissibly arrogates to the executive power that is reserved to Congress.

170.    Plaintiffs are also entitled to vacatur of the Challenged Decisions and injunctive relief prohibiting Defendants from implementing the Challenged Decisions.

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment**
**5 U.S.C. § 703; 28 U.S.C. § 2201**
**(Against All Defendants)**

171.    Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

172.    Defendants Vought and CFPB have decided that they cannot and will not request funds from the Board of Governors because the Board of Governors cannot, according to Defendant Vought, lawfully provide funds when the Federal Reserve's interest expenses exceed its interest income. That determination is contrary to the meaning of "combined earnings" in the Dodd-Frank Act, which refers to the gross revenues of the Federal Reserve without any deduction for interest or other expenses.

Page 40 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

173.    Moreover, the Board of Governors is required by statute to transfer to the CFPB, from the combined earnings of the Federal Reserve System, "the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau" previously. 12 U.S.C. § 5497(a)(1).

174.    Because the statute compels Defendant Vought to determine the amount necessary to carry out the statute and, in turn, compels the Board of Governors to transfer those funds on a quarterly or annual basis, the Board of Governors does not have the ability to decline transfer absent some accounting of other funds available to the CFPB. 12 U.S.C. § 5497(a)(1).

175.    An actual and substantial controversy exists between Plaintiffs and Defendants about whether the Board of Governors must provide to the CFPB funds "determined by the Director to be reasonably necessary to carry out the [CFPB's] authorities" when its interest expenses exceed its interest income.

176.    Plaintiffs rely on the CFPB's operations, as described above, for critical consumer protection activities. Plaintiffs therefore have powerful reliance interests in the continuation of CFPB funding.

177.    Declaratory relief is necessary to provide clarity regarding Plaintiffs' rights and Defendants' obligations with respect to funding the CFPB's operations and to ensure that Plaintiffs can continue to rely on the CFPB's operations.

178.    Specifically, the Court should declare, pursuant to 28 U.S.C. § 2201, that the "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1), means the Federal Reserve's gross revenues without any deduction for its expenses, and that the Federal Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations.

Page 41 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays that the Court:

a. Declare that the Challenged Decisions are unlawful because they: (a) violate the APA; and (b) are contrary to the Constitution of the United States;

b. Declare that Defendants' decision not to request funds from the Board of Governors is ultra vires;

c. Declare that the "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1), means the Federal Reserve's gross revenues without any deduction for its expenses;

d. Declare that the Federal Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations;

e. Set aside the Challenged Decisions pursuant to 5 U.S.C. § 706(2);

f. Permanently enjoin the Challenged Decisions and any steps taken to implement the Challenged Decisions;

g. Compel Defendants Vought and the CFPB pursuant to 5 U.S.C. § 706(1) to take the actions required by 12 U.S.C. § 5497;

h. Retain jurisdiction to monitor Defendants' compliance with this Court's judgment;

i. Award the Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

j. Award such additional relief as this Court may deem just and proper.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Dated: February 24, 2026,

Respectfully submitted,

**LETITIA JAMES**
Attorney General of New York

By: *s/ Stephen Thompson*
Stephen C. Thompson
*Special Counsel*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Patrick Gibson
*Assistant Attorney General*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov




*Counsel for the State of New York*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

By: *s/ Shankar Duraiswamy*
Shankar Duraiswamy
*Deputy Solicitor General*
Monica E. Finke
Amanda McElfresh
Jake Mazeitis
*Deputy Attorneys General*
Office of the Attorney General
25 Market Street
Trenton, NJ 08625
(609) 376-3377
Shankar.Duraiswamy@njoag.gov

*Counsel for Plaintiff State of New Jersey*

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: *s/ Leanne Hartmann*
Leanne Hartmann #257503
Brian Simmonds Marshall #196129
Joseph Platt #T2511101, IL SBA #6317731
*Senior Assistant Attorneys General*
Derek Olson #225504
*Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Joseph.Platt@doj.oregon.gov
Derek.Olson@doj.oregon.gov

*Counsel for the State of Oregon*

**PHILIP J. WEISER**
Attorney General of Colorado

By: *s/ David Moskowitz*
David Moskowitz
*Deputy Solicitor General*
Martha Upton Fulford
*Assistant Deputy Attorney General*
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Martha.Fulford@coag.gov

*Counsel for Plaintiff State of Colorado*

Page 43 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**ROB BONTA**
Attorney General of California

By: *s/ Asal Akhondzadeh*
Asal Akhondzadeh
*Deputy Attorney General*
Nicklas Akers
*Senior Assistant Attorney General*
Michele VanGelderen
*Supervising Deputy Attorney General*
300 S Spring St, Ste 1702
Los Angeles, CA 90013-1256
asal.akhondzadeh@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: *s/ William Y. Durbin*
William Y. Durbin
*Senior Litigation Counsel*
Office of the Attorney General
2005 North Central Ave.
Phoenix, Arizona 85004
602-542-3333
William.Durbin@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Rebecca Borne*
Rebecca Borne
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5400
Rebecca.Borne@ct.gov

*Counsel for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of the State of Delaware

By: s/ *Vanessa L. Kassab*
IAN R. LISTON
Director of Impact Litigation
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for Plaintiff State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: *s/ Mitchell P. Reich*
MITCHELL P. REICH
Senior Counsel to the Attorney General
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 279-1261
mitchell.reich@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General for the State of Hawaiʻi

By: *s/ Kalikoʻonālani D. Fernandes*
David D. Day
Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

Page 44 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**KWAME RAOUL**
Attorney General of Illinois

By: *s/ Katharine Roller*
Katharine Roller
Complex Litigation Counsel
Sarah J. Gallo
Ethics Unit Supervisor, Special Litigation
Bureau
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 519-1842
Katharine.roller@ilag.gov
Sarah.gallo@ilag.gov

*Counsel for Plaintiff State of Illinois*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: *s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.maryland.gov

*Counsel for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: *s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
P.O. Box 30758
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**AARON M. FREY**
Maine Attorney General

By: *s/ Katherine W. Thompson*
Katherine W. Thompson
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for Plaintiff State of Maine*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: *s/ Nita K. Klunder*
Katherine Dirks
*Chief State Trial Counsel*
Nita K. Klunder*
*Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2394
katherine.dirks@mass.gov
nita.klunder@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**KEITH ELLISON**
Attorney General of Minnesota

By: *s/ Sarah Doktori*
Katherine Bies
Sarah Doktori
*Assistant Attorneys General*
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 583-6694
sarah.doktori@ag.state.mn.us
katherine.bies@ag.state.mn.us

*Counsel for the State of Minnesota*

Page 45 - FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**AARON D. FORD**
Attorney General of Nevada

By: *s/ K. Brunetti Ireland*
K. Brunetti Ireland (Nevada Bar No. 15368)
Chief Deputy Attorney General, Special Litigation
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov


*Counsel for the State of Nevada*

**JEFF JACKSON**
Attorney General of North Carolina

**LAURA HOWARD**
Chief Deputy Attorney General

By: *s/ Daniel P. Mosteller*
Daniel P. Mosteller
*Associate Deputy Attorney General*
Daniel T. Wilkes
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov


*Counsel for the State of North Carolina*

**CHARITY R. CLARK**
Attorney General of Vermont

By: *s/ Samuel B. Stratton*
Samuel B. Stratton
*Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 595-4085
sam.stratton@vermont.gov

*Counsel for Plaintiff State of Vermont*

**RAÚL TORREZ**
New Mexico Attorney General

By: *s/ Anjana Samant*
Anjana Samant
Deputy Counsel for Impact Litigation
New Mexico Department of Justice
408 Galisteo Street
Villagra Building
Santa Fe, NM 87501
(505) 270-4332
ASamant@nmdoj.gov


*Counsel for the State of New Mexico*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: *s/ Alex Carnevale*
Alex Carnevale
Special Assistant Attorney General
Office of the Attorney General – State of Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov


*Counsel for the State of Rhode Island*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: *s/ Samuel T. Ward-Packard*
Samuel T. Ward-Packard
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 267-8938
samuel.ward-packard@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

Page 46 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**JAY JONES**

Attorney General of Virginia

By: _s/ Tillman J. Breckenridge_
Tillman J. Breckenridge
*Solicitor General*
Mikaela A. Phillips
*Assistant Solicitor General*
Office of the Attorney General of Virginia
202 N. 9th Street
Richmond, VA 23219
(804) 786-2071
solicitorgeneral@oag.state.va.us
mphillips@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

Page 47 -  FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF