IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

STATE OF NEW YORK; STATE OF OREGON; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF CALIFORNIA; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NORTH CAROLINA; STATE OF RHODE ISLAND; STATE OF VERMONT; STATE OF WISCONSIN; COMMONWEALTH OF VIRGINIA,

Plaintiffs,

v.

RUSSELL T. VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau; CONSUMER FINANCIAL PROTECTION BUREAU; BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,

Defendants.

Civ. No. 6:25-cv-02384-AA

**OPINION & ORDER**

---

AIKEN, District Judge.

This case comes before the Court on Plaintiffs' Motion For Partial Summary Judgment. ECF No. 28. The Court has heard oral argument on the motion and, for the reasons set forth below, the motion is GRANTED.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiffs in this case are the States of New York, Oregon, New Jersey, Colorado, California, Arizona, Connecticut, Delaware, Hawaii, Illinois, Maine,

Maryland, Michigan, Minnesota, Nevada, New Mexico, North Carolina, Rhode Island, Vermont, and Wisconsin, the Commonwealths of Massachusetts and Virginia, and the District of Columbia.

Defendants are the federal Consumer Financial Protection Bureau ("CFPB"); Russell T. Vought in his official capacity as Acting Director of the CFPB; and the Board of Governors of the Federal Reserve System.[1]

Plaintiffs rely on information and services provided by the CFPB to carry out their own consumer protection and anti-discrimination obligations. Meislik Decl. (Arizona), ECF No. 31; Fernandez Decl. (California), ECF No. 32; Second Fernandez Decl. (California), ECF No. 33; Blake Decl. (Colorado), ECF No. 34; Chambers Decl. (Connecticut), ECF No. 35; Second Chambers Decl. (Connecticut), ECF No. 36; Leong Decl. (Hawaii), ECF No. 37; Blackston Decl. (Illinois), ECF No. 38; Wagner Decl. (Illinois), ECF No. 39; Conti Decl. (Maine), ECF No. 40; Meeks Decl. (Maryland), ECF No. 41; Smith Decl. (Maryland), ECF No. 42; Gutierrez Decl. (Massachusetts), ECF No. 43; Thoman Decl. (Massachusetts), ECF No. 44; Grove Decl. (Minnesota) ECF No. 45; Kreuger Decl. (Nevada), ECF No. 46; Melville Decl. (New Jersey), ECF No. 47; Micco Decl. (New Jersey), ECF No. 48; Filburn Decl. (New York), ECF No. 49; Hodges Decl. (New York), ECF No. 50; Woods Decl. (North Carolina), ECF No. 51; Crocker Decl. (New Mexico), ECF No. 52; Sadowski Decl. (New Mexico), ECF No. 53;

[1] The Board of Governors of the Federal Reserve System is included as Defendant for purposes of relief, rather than on the merits. The Board of Governors did not offer separate arguments or responses concerning Plaintiffs' Motion and claims.

Alvarado Decl. (Oregon), ECF No. 54; Spooner Decl. (Rhode Island), ECF No. 55; Souligny Decl. (Vermont), ECF No. 56; Lawton Decl. (Wisconsin), ECF No. 57.

## I. Establishment of the CFPB

In the wake of the 2008 financial crisis, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act, creating the CFPB as an independent financial regulator within the Federal Reserve System. "Congress charged the Bureau with enforcing consumer financial protection laws to ensure 'that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.'" *CFPB v. Cmnty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 421 (2024) ("*CFSA*") (quoting 12 U.S.C. § 5511(a)). The CFPB was vested with authority to administer eighteen existing consumer protection statutes, including the Fair Debt Collection Practices Act, the Fair Credit Reporting Act, and the Home Mortgage Disclosure Act of 1975. *Id.* at 422 (citing 12 U.S.C. §§ 5512(a), 5481(12), (14)). Congress vested the CFPB "with rulemaking and enforcement, and adjudicatory authority over the statutes it administers." *Id.*

## II. Consumer Response System

The Dodd Frank Act requires the CFPB to create and maintain a system for collecting, tracking, sharing, and facilitating responses to consumer complaints (the "Consumer Response System.") The Consumer Response System includes the establishment of a "single, toll-free telephone number, a website, and a database . . . to facilitate the centralized collection of, monitoring of, and response to consumer

complaints regarding consumer financial products or services" 12 U.S.C. § 5493(b)(3)(A); "reasonable procedures to provide a timely response to consumers," § 5534(a); and, of central importance to the present case, a system to share consumer complaint information with other regulators, including State agencies, § 5493(b)(3)(D).

The Consumer Response System includes a "Government Portal through which consumer complaint information, narratives, consumer contact information, the subject of the complaint, and documentation is shared with the States." Meyer Decl. ¶ 5. ECF No. 30. This information is not otherwise available to the States and is used by the States to assess consumer complaints and determine what, if any, action should be taken. *Id.* ¶¶ 5-8. Plaintiffs use this information to enforce their own consumer protection statutes.

## III. The Home Mortgage Disclosure Act ("HMDA")

The Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*, provides "a window to glean who is being given access to credit to purchase homes across the United States, and who is not." *Nat. Cmty. Reinvestment Coal. v. CFPB*, Civil Action No. 20-2074 (BAH), 2022 WL 4447293, at *1 (D.D.C. Sept. 23, 2022). "Without prohibiting any particular conduct, HMDA promotes transparency that enables enforcement of other laws and scrutiny of lending practices" by requiring covered lenders to "collect specified data on mortgages and mortgage applications, with mandated public release of these data to provide communities and public officials 'with sufficient information to enable to them to determine whether depository

institutions are filling their obligations to serve the housing needs of their communities and neighborhoods in which they are located.'" *Id.* (quoting 12 U.S.C. § 2801(b)). Among the purposes of the HMDA is assisting public officials "in distributing public-sector investment so as to attract private investment to areas where it is needed," and "[t]o assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes." 12 C.F.R. § 1003.1(b). Authority for administering the HMDA was vested with the CFPB. *CFSA*, 601 U.S. at 422.

## IV. The Federal Reserve System

The Federal Reserve serves as the central banking system for the United States, comprised of (1) a central Federal Reserve Board of Governors, an agency of the federal government which reports to and is directly accountable to Congress; (2) twelve Federal Reserve Banks; and (3) the Federal Open Market Committee ("FOMC"). Thompson Decl. Ex. 5, at 5. The Board of Governors and the FOMC are to "maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a.

The Federal Reserve generates earnings from interest earned on securities that it holds, fees for services provided to depository institutions by Reserve Banks, and interest charged on loans. This income is used to pay "all necessary expenses" of the Federal Reserve, 12 U.S.C. § 289(a)(1)(A), including funding for the CFPB. 12

U.S.C. § 5497(a). Any surplus funds are transferred to the U.S. Department of the Treasury for deposit in the general fund. 12 U.S.C. 289(a)(3)(B).

When a Federal Reserve Bank's expenses exceed its income, the bank stops making remittances to the Treasury and records a "deferred asset," "essentially borrowing from itself the amount that its earnings failed to cover." *Rise Economy v. Vought*, 823 F. Supp.3d 1013, 1022 (N.D. Cal. 2026). "When a Reserve Bank begins earning more money than it spends again, it pays down its deferred assets before resuming remittances to the Treasury." *Id.*; *see also* Thompson Decl. Ex. 8, at 4 ("Once the Federal Reserve net income turns positive, this deferred asset will be reduced and eventually extinguished."). Of note, "[t]he deferred asset has no effect on the ability of the Federal Reserve to implement monetary policy or meet any of its financial obligations." Thompson Decl. Ex. 8, at 4. Income "is not a policy objective" of the Federal Reserve, "but rather an outcome of conducting policy to achieve its employment and price stability objectives, which benefit all Americans." Thompson Decl. Ex. 10, at 6.

"[B]eginning in late 2022, the Federal Reserve raised interest rates to combat inflation, so the Reserve Banks' expenses began to exceed the funds generated and accruing deferred assets at that time." *Rise Economy*, 823 F. Supp.3d at 1022; Thompson Decl. Ex. 10, at 6.

## V. Funding Structure of the CFPB

Most federal agencies are supplied with funding by Congress and must ask Congress for renewed funding each year. However, Congress provided the CFPB with

"a standing source of funding outside the normal annual appropriations process." *CFSA*, 601 U.S. at 422. Specifically:

> Each year (or quarter of such year), beginning on the designated transfer date, and each quarter thereafter, the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve system, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year).

12 U.S.C. § 5497(a)(1).

The CFPB cannot request more than a certain percentage of the Federal Reserve System's total operating expenses. 12 U.S.C. §§ 5497(a)(2)(A)-(B). The CFPB may also retain and invest unused funds, but the Director must take into account any surplus when requesting additional funds. 12 U.S.C. § 5497(a)(1).

The Supreme Court has upheld the constitutionality of this funding structure, holding that it did not violate the Appropriations Clause. *CFSA*, 601 U.S. at 421.

In February 2025, Jerome Powell, who was the Chair of the Federal Reserve at the time, testified before a Congressional committee that the Federal Reserve is required to fund the CFPB even when the Federal Reserve is operating at a loss, *i.e.*, when it is recording deferred assets. Thompson Decl. Ex. 13.

## VI. Acting Director Vought, the *NTEU* litigation, and the OLC Memorandum

Defendant Vought became Acting Director of the CFPB in February 2025. On February 8, 2025, Vought sent a letter to Federal Reserve Chairman Powell stating that Vought had "determined that no additional funds are necessary to carry out the

authorities of the Bureau for Fiscal Year 2025" and so, pursuant to 12 U.S.C. § 5497(a)(1), Vought was "requesting $0." Thompson Decl. Ex. 16. Vought did not, at that time, assert that the CFPB could not seek funding from the Federal Reserve, but instead asserted that the agency had sufficient cash reserves such that no additional funding was required. *Id.*

The shuttering of the CFPB emerged as an objective of the administration. Vought's initial efforts to shut down the CFPB were stymied by an injunction issued by the U.S. District Court for the District of Columbia in *National Treasury Employees Union v. Vought*, 774 F. Supp.3d 1 (D.D.C. 2025) ("*NTEU*"), *vacated and remanded*, 149 F.4th 762 (D.C. Cir. 2025), *vacated and reh'g en banc granted by* No. 25-5091, 2025 WL 3659406 (D.C. Cir. Dec. 17, 2025).

After the *NTEU* injunction was in place, Vought sought the opinion of the Office of Legal Counsel ("OLC") on the question of whether the CFPB could continue to draw funds from the Federal Reserve System under 12 U.S.C. § 5497 when the Federal Reserve System was operating at a loss. Thompson Decl. Ex. 11 (the "OLC Memo"). In a memorandum issued on November 7, 2025, the OLC stated:

> The CFPB's position is that "combined earnings" are calculated by offsetting various outlays against the Federal Reserve's revenues and that because the Federal Reserve's outlays exceed its revenues, there are no funds available from the CFPB's congressionally authorized source of funding. Because the CFPB expects to exhaust its currently available funds this quarter, the question is a matter of considerable urgency.
>
> We conclude that the "combined earnings of the Federal Reserve System" refers to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues. If the Federal Reserve has no profits, it cannot transfer money to the CFPB. However,

> the CFPB is not without recourse. Congress has empowered the Director of the CFPB to determine that the agency lack sufficient funds to perform its statutory obligations and required him, upon such a determination, to report on the problem to Congress and the President. [12 U.S.C.] § 5497(e)(1). Because the only lawful source of funding from the Federal Reserve has dried up, the proper method for obtaining additional funds is to request them from Congress pursuant to the Appropriations Clause, not to draw funds from the Federal Reserve without a congressional appropriation.

Thompson Decl. Ex. 11, at 1-2.

The CFPB and Vought took the position that, consistent with the OLC Memo, they would not request funding from the Federal Reserve any time they unilaterally determine that the Federal Reservice does not generate "profits" as defined in the OLC Memo. Thomspon Decl. Ex. 1.

On December 30, 2025, the D.C. District Court in the *NTEU* case rejected the CFPB and Vought's position, holding that the ordinary meaning of "combined earnings" is "all money earned." *National Treasury Emps. Union v. Vought*, 816 F. Supp3d 1, 16-20 (D.D.C. 2025) ("*NTEU II*"). The D.C. District Court held that

> The statutory text of the Dodd-Frank Act governs and it prescribes a process through which the CFPB is to request the funding it needs to carry out the mission it was assigned by Congress, and the Federal Reserve must provide that funding from its "combined earnings." This process has unfolded seamlessly since the Bureau was established in 2011, even in the years since 2022 when the Federal Reserve's interest expenses have exceeded its earnings.
>
> Neither the statute, the injunction, nor the Fed's willingness to pay has changed; the only new circumstance is the administration's determination to eliminate an agency created by Congress with the stroke of a pen, even while the matter is before the Court of Appeals. It appears that defendants' new understanding of "combined earnings" is an unsupported and transparent attempt to starve the CFPB of funding and yet another attempt to achieve the very end the Court's injunction was put in place to prevent. This ruling therefore construes the scope of

> the existing Order to clarify that the defendants' unilateral decision to decline to request funding, based on an unsupported interpretation of the Dodd-Frank Act, contravenes the preliminary injunction.

*NTEU II*, 816 F. Supp.3d at 20.

Vought complied with the *NTEU* court's order under protest and, on January 9, 2026, submitted a request to Chairman Powell for $145 million "as the amount necessary to carry out the Bureau's authorities for the second quarter of Fiscal Year 2026." Thompson Decl. Ex. 20, at 4.

## VII. *Rise Economy v. Vought* and Subsequent Developments

On March 13, 2026, the U.S. District Court for the Northern District of California issued its decision in *Rise Economy v. Vought*, 823 F. Supp.3d 1013 (N.D. Cal. 2026). The plaintiffs in *Rise Economy* were a group of nonprofit organizations which rely on the services provided by the CFPB. The *Rise Economy* plaintiffs challenged Vought's reliance on the OLC Memo, asserting that it was arbitrary and capricious and contrary to law pursuant to the APA. The district court ruled in the plaintiffs' favor, declaring that Vought and the CFPB's adoption of the OLC Memo interpretation of § 5497 was arbitrary and capricious and in violation of law. *Id.* at 1040. Vought and the CFPB were ordered "to continue requesting the amount determined by the Director to be reasonably necessary to carry out the authorities of the CFPB from the Federal Reserve, consistent with their obligations under § 5497." *Id.* The *Rise Economy* decision is presently on appeal before the Ninth Circuit, Case No. 26-3134.

Consistent with the standing district court orders, Vought has continued to request the necessary sums for the operation of the CFPB from the Federal Reserve during the pendency of this action.

## DISCUSSION

Plaintiffs bring claims for (1) violation of the Administrative Procedure Act ("APA") for agency action in excess of statutory authority and contrary to law (First Cause of Action); (2) violation of the APA for arbitrary and capricious agency action (Second Cause of Action); (3) violation of the APA for unlawfully withheld action (Third Cause of Action); (4) *ultra vires* action not authorized by Congress (Fourth Cause of Action); (5) violation of the separation of powers doctrine for usurping legislative authority (Fifth Cause of Action); and (6) declaratory judgment (Sixth Cause of Action). The First through Fifth Causes of Action are alleged against Vought and the CFPB, while the Sixth Cause of Action, for declaratory relief, is alleged against all Defendants.

Plaintiffs seek summary judgment on the First, Third, Fourth, Fifth, and Sixth Causes of Action.[2] In their motion, they focus on two points: (1) Vought's determination that he cannot request funds from the Federal Reserve at any time when the Federal Reserve's interest expenses exceed its income; and (2) Vought's decision not to request funding for the CFPB from the Federal Reserve for fiscal year 2026 (the "Challenged Decisions"). Pl. Mot. 3.

[2] Plaintiffs' *ultra vires* claim is offered in the alternative to their APA claims.

## I. Justiciability and Threshold Issues

The CFPB and Vought raise challenges based on mootness and standing, as well as the effect of the *NTEU* injunction.

### A. Mootness

The CFPB and Vought argue that Plaintiffs' claims have been rendered moot by subsequent developments—namely the *NTEU* injunction, which obliged Vought to request funding from the Federal Reserve, and the Federal Reserve's apparent return to profitability.[3] Federal courts have no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (internal quotation marks and citation omitted). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal quotation marks and citations omitted, cleaned up). The central question of a mootness challenge is "not whether the precise relief sought at the time the [action] was filed is still available," but rather "there can be *any* effective relief." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 925 (9th Cir. 2000) (internal quotation marks and citations omitted, emphasis in original). Even if a case or

[3] The CFPB and Vought also argue that Plaintiffs' claims are not ripe, Def. Resp. at 7-10, but the Court concludes that these claims are properly assessed under the doctrine of mootness, rather than ripeness. "The distinction matters because the Government, not petitioners, bears the burden to establish that a once-live case has become moot." *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 719 (2022). Ripeness does not apply to events that occur after the filing of the case. "Claims do not deripen; they become moot." *Santillan v. Gonzales*¸388 F. Supp.2d 1065, 1075 (N.D. Cal. 2005); *Democratic Nat'l Comm. v. Watada*, 198 F. Supp.2d 1193, 1197 (D. Haw. 2002) ("Ripeness is not affected by events occurring after a suit is filed.").

controversy existed at the time a suit was filed, "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party" and "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Chafin v. Chafin*¸ 568 U.S. 165, 172 (2013) (internal quotation marks and citations omitted).

First, compliance with the *NTEU* injunction alone will not moot this case. "It has been long established that a temporary injunction in one case does not generally deprive courts of jurisdiction over a dispute seeking similar equitable relief." *Rise*, 823 F. Supp.3d at 1026 (citing *California v. U.S. Dep't of Health & Hum. Servs.*, 941 F.3d 410, 421 (9th Cir. 2019), *judgment vacated on other grounds* 591 U.S. 1027). The *NTEU* case challenged internal agency actions to dismantle the CFPB, and, while it addressed the OLC Memo and the funding dispute at the heart of this case in its December 30, 2025, *NTEU II* order, the differences in the actions challenged and the relief requested is sufficiently distinct from the present case that the *NTEU* injunction will not render this case moot.

Following oral argument in this case, the Northern District of California issued its decision in *Rise*, finding that the CFPB and Vought had acted arbitrarily and capriciously and so violated the APA by relying on the OLC Memo's interpretation of 12 U.S.C. § 5497 and refusing to request funding from the Federal Reserve. *Rise*, 823 F. Supp.3d at 1040. The CFPB Director was ordered to continue to request funding necessary to carry out the authorities of the CFPB from the Federal Reserve, "consistent with their obligations under § 5497." *Id.*

Because the *Rise* decision post-dates the summary judgment briefing and oral argument, Defendants have not briefed the implications of the *Rise* decision on this case. Nevertheless, the Court has considered the matter and concludes that the *Rise* decision does not render this case moot. The decisions in *NTEU* and *Rise* are both on appeal, *NTEU* to the D.C. Circuit and *Rise* to the Ninth Circuit, and so a live controversy remains in this case. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 n.7 (2005) (The Supreme Court rejected a claim of mootness where the state supreme court had issued its decision because one party continued to oppose the state court judgment and had represented that it would petition for a writ of certiorari and so the "controversy therefore remains live."); *Taylor v. United States*, 181 F.3d 1017, 1017-18 (9th Cir. 1999) (finding that an appeal was moot because the interlocutory order being appealed had been extinguished by the entry of final judgment in 1973); *see also Kleissler v. U.S. Forest Serv.*¸ 157 F.3d 964, 969 (3d Cir. 1998) (finding that an appeal was not moot because the challenged order "and any future adverse action on the remaining claim might be reversed by [the Court of Appeals] or the Supreme Court.")

The CFPB and Vought also argue that the case is moot because the Federal Reserve has returned to apparent profitability. As a preliminary matter, the present profitability of the Federal Reserve is irrelevant because a major aspect of Plaintiffs' claims in the present case concern whether Vought had the authority to unilaterally make a determination on the Federal Reserve's profitability in the first place. *See,*

*e.g.*, First Am. Compl. ("FAC") ¶¶ 122-24, 146-48, 172-74, ECF No. 68. A possible return to profitability does nothing to resolve this issue.

This is also effectively an argument for mootness by voluntary cessation. "The voluntary cessation of challenged conduct does not ordinarily render a case moot" because dismissal would allow the challenged conduct to resume as soon as the case is dismissed. *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) (internal quotation marks and citations omitted). When a governmental entity ceases its challenged conduct, the court generally presumes that the government entity acts in good faith, but the governmental entity "still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Id.* Courts may find mootness more likely if the policy change is broadly and unequivocally stated; fully addresses the dispute; resulted from the litigation at issue; has long been in place; and the agency has not engaged in conduct similar to the challenged conduct. *Id.* at 972. An action is not likely moot, however, if the new policy "could easily be abandoned or altered in the future." *Id.*

Here, the assertion that the Federal Reserve has returned to profitability or that Vought has requested funding for the CFPB under protest does not resolve the underlying dispute concerning Vought's adoption of the OLC Memo's interpretation of "combined earnings" and Vought's determination to not request funding from the Federal Reserve on that basis. Determining that the case is moot would expose Plaintiffs to the same harm in the event that the Federal Reserve returned to entering deferred assets. The Court determines that the case is not moot based on

the present financial state of the Federal Reserve or on Vought's request for funding entered pursuant to the court orders requiring him to do so.

Finally, the CFPB and Vought argue that subsequent events have rendered the claims prudentially moot. The Ninth Circuit has never "adopted prudential mootness *per se*" and has applied it only once in the context of a bankruptcy case with an exhausted pot of funds. *Madonado v. Lynch*, 786 F.3d 1155, 1161 n.5 (9th Cir. 2015). The Court declines to apply prudential mootness in the present case.

In sum, the Court concludes that this case is not moot and so declines to deny the motion or dismiss on that basis.

**B. Standing**

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

Here, Plaintiffs have alleged "informational" injuries and have submitted a raft of declarations in support of that allegation. "A plaintiff sustains a cognizable informational injury in fact when agency action cuts her off from 'information which must be publicly disclosed pursuant to statute.'" *Animal Legal Def. Fund v. United States Dep't of Agric.*, 935 F.3d 858, 867 (9th Cir. 2019) (quoting *FEC v. Akins*, 524 U.S. 11, 21 (1998)).

Here, 12 U.S.C. § 5493(b)(3)(D) requires that the CFPB share consumer complaint information with the State agencies. This is done through the Consumer

Response System's Government Portal. Meyer Decl. ¶¶ 5-10. If the CFPB is not funded, the Consumer Response System will shut down and the States will lose access to information they are entitled to by statute. *Id.* ¶¶ 20-31. Similarly, the HMDA requires that the CFPB "provide staff and data processing resources" to support the publication of mortgage lending data. 12 U.S.C. § 2809(b); 12 C.F.R. § 1003.5. Some of the Plaintiff States rely on HMDA data to perform their own functions. The Court is satisfied that Plaintiffs have established informational harm sufficient to confer standing.

Vought and the CFPB argue that Plaintiffs lack standing because Vought and the CFPB have sought funding pursuant to the *NTEU* injunction, Def. Resp. 7, but the clarification of the *NTEU* injunction as encompassing the OLC Memo interpretation (December 30, 2025) and Vought's request for funding (January 9, 2026) occurred after the filing of the original Complaint (December 22, 2025). "The existence of standing turns on facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007). "Whether standing and other requirements for a live case or controversy exists throughout the entirety of a case is considered under the doctrine of mootness." *Index Newspapers LLC v. City of Portland*, 480 F. Supp.3d 1120, 1139 (D. Or. 2020). For the reasons discussed in the previous section, the Court has already concluded that this case is not moot.

Vought and the CFPB also argue that it is "unknown how the CPFB would respond to any lapse in funding," and suggest that the CPFB might apply to Congress

for funds and that, as a result, Plaintiffs' claims are not actual or imminent. Def. Resp. at 7. This will not suffice to undermine Plaintiffs' standing. "A future injury need not be 'literally certain'" to support standing, so long as there is "a 'substantial risk' that it will occur." *Nw. Requirements Utilities v. FERC*, 798 F.3d 796, 805 (9th Cir. 2015) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Nor are Plaintiffs required to negate speculative possibilities to maintain standing. *See Duke Power Co. v. Carolina Env'r Study Grp., Inc.*, 438 U.S. 59, 78 (1978) ("Nothing in our prior cases requires a party seeking to invoke federal jurisdiction to negate the kind of speculative and hypothetical possibilities suggested in order to demonstrate the likely effectiveness of judicial relief.").

The Court concludes that Plaintiffs has sufficiently demonstrated standing to maintain their claims.

## II. The Court Declines to Dismiss or Transfer the Case Based on Parallel Litigation

Vought and the CFPB urge the Court to dismiss this case because the issue raised is "identical" to the litigation in *NTEU* and *Rise*. "A court may even in its discretion dismiss a declaratory judgment or injunctive suit if the same issue is pending in litigation elsewhere." *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967). In exercising its discretion, courts consider "the identify of the issues, the stage of the litigation in the other jurisdiction, avoidance of conflicting decisions such that the parties could not comply with both, and broad principles of convenience, expediency

and efficiency." *Am. Fed. Gov't Emps., AFL-CIO v. Weinberger*, No. C86-242T, 1986 WL 15495, at *1 (W.D. Wash. Aug. 5, 1986) (internal citations omitted).

First, the issues in the present case are not identical to *NTEU*, although the implementation of the OLC Memo interpretation was found to be covered by the *NTEU* injunction after the filing of this case. Although *Rise* is a more similar case, there are distinctions—for example, the present case involves a claim under 5 U.S.C. § 706(1) and has named the Federal Reserve as a Defendant—which sufficiently set the two cases apart. Furthermore, none of the Plaintiffs in this case are among the plaintiffs in either *Rise* or *NTEU*.

The *Rise* decision was issued shortly after oral argument in the present case, and so is in an at least somewhat more advanced stage than the present case. The *NTEU* case was at the preliminary injunction stage, and so not as far advanced.

The possibility of conflicting decisions seems remote and, given that both *NTEU* and *Rise* are presently on appeal, could be expeditiously addressed in the event the appellate decisions were inconsistent with the determination of this Court. The Court has also considered the "broad principles of convenience, expediency and efficiency" and concludes that they do not favor dismissal of this action as duplicative.

Vought and the CFPB also request that this case be transferred to the D.C. District Court in the interests of justice pursuant to 28 U.S.C. § 1404(a). Here, the Court concludes that the issues in *NTEU* and the present case are sufficiently distinct that the interests of justice do not weigh in favor of transfer.

## III. APA Review Generally

Judicial review of agency action is governed by the Administrative Procedure Act. 5 U.S.C. § 706. A court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). Reviewing courts may also "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

### A. Final Agency Action

The CFPB and Vought assert that Plaintiffs have failed to challenge a final agency action. The APA limits judicial review to "final agency action." 5 U.S.C. § 704. An agency action is final when it (1) marks the "consummation of the agency's decision-making process"; is not merely a "tentative or interlocutory" decision; and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations and quotation marks omitted). In assessing whether there is a final agency action, courts in the Ninth Circuit consider factors such as "whether the action 'amounts to a definitive statement of the agency's position,'" whether the action had a direct and immediate effect on the subject party's daily operations, and whether the agency expects immediate compliance with the terms of the action. *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *NLRB v. Siren Retail Corp.*, 99 F4th 1118, 1123 (9th Cir. 2024). This standard is applied in a "pragmatic and flexible manner." *NLRB*, 99 F.4th at 1123.

The Ninth Circuit has cautioned that "an agency's characterization of its action as being provisional or advisory is not necessarily dispositive." *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094 (9th Cir. 2014). Instead, "[i]t is the effect of the action, and not its label that must be considered." *Oregon Nat. Desert Ass'n*, 465 F.3d at 986 (internal quotation marks and citation omitted). "Thus, an agency's interpretive rule, such as its interpretation of a statute, may qualify as a final action." *State of New York v. Rollins*, Case No. 6:25-cv-02186-MTK, 2026 WL 2767009, at *6 (D. Or. Sept. 17, 2026) (citing *Waterkeeper Alliance v. U.S. Env't Prot. Agency*, 140 F.4th 1193, 1206-07 (9th Cir. 2025); *Cal. Comtys. Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 635 (D.C. Cir. 2019)).

Vought and the CFPB contend that their November 2025 statement indicating that they would not request funding for the CFPB from the Federal Reserve was not the consummation of a decision-making process and that, because Vought subsequently requested funding, it had no concrete impact on Plaintiffs. Def. Resp. 12-13.

A final agency action includes "the whole or a part of an agency rule," and "rule" means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Here, Vought sent letters to the President and to Congress on November 20, 2025, in which he stated:

> I have determined that the sums available to the Bureau under 12 U.S.C. § 5497(a) will not be sufficient to carry out the authorities of the

> Bureau under Federal consumer financial law for Fiscal Year 2026. I make this determination on the basis of the conclusion of the Office of Legal Counsel (OLC) within the Department of Justice that there are no funds legally available for the Bureau to request from the Federal Reserve System under 12 U.S.C. § 5497 . . . OLC has determined that the term "combined earnings" refers to the profits of the Federal Reserve System. Because the Federal Reserve System currently has no profits, OLC has concluded that the Federal Reserve System has no combined earnings from which the Bureau can legally request funds at this time.
>
> Any funding needs of the Bureau will necessarily exceed the amount currently available for the Bureau to request under 12 U.S.C. § 5497, which is legally $0. The Bureau estimates that it will run out of funds at some point in the first quarter of Fiscal Year 2026.

Thompson Decl. Ex. 1, at 4, 6, 8, 10, 12.

This is not a tentative statement, an abstract plan, a mental process of the agency head, or an interlocutory decision. Vought, as Acting Director of the CFPB, told the President and Congress in plain terms that he and the CFPB were relying on the OLC's Memo's interpretation of § 5497 and requesting $0 on that basis. The OLC Memo determination became the "working law" of the CFPB, which "includes 'opinions and interpretations which embody the agency's effective law and policy,'" and so constitutes a final agency decision. *Rise Economy*, 823 F. Supp.3d at 1032 (quoting *100Reporters v. United States Dep't of State*, 602 F. Supp.3d 41, 61 (D.D.C. 2022)). The fact that Vought and the CFPB were subsequently enjoined from enacting that determination does not render this determination any less final, especially given the fact that Vought and the CFPB have evinced an intention to continue relying on the OLC Memo's interpretation if the injunction is dissolved.

### B. The Merits of the Claims

#### 1. The APA claims

Plaintiffs have brought challenges for both agency action unlawfully withheld under 5 U.S.C. § 706(1) and for actions not in accordance with law under § 706(2).[4] These claims may be broadly divided into three parts: (1) whether Plaintiffs seek to challenge a discrete agency action unlawfully withheld under § 706(1); (2) whether the CFPB Director has a duty to request funds from the Federal Reserve; (3) the definition of "combined earnings."[5]

##### a. Plaintiffs challenge a discrete agency action under § 706(1)

Vought and the CFPB contend that Plaintiffs do not challenge a discrete action but instead seek "ongoing court oversight." Def. Resp. 17. A claim under § 706(1) "can only proceed where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004) (emphasis in original). This rules out "broad programmatic attacks." *Id.*

Here, Plaintiffs challenge Vought's decision, as Acting Director of the CFPB, not to request funding for fiscal year 2026 in reliance on the OLC Memo interpretation of § 5497(a).[6] This decision was expressed by Vought in letters to the

[4] Plaintiffs have also brought a claim for arbitrary and capricious agency action under 5 U.S.C. 706(2), but Plaintiffs do not seek summary judgment on that claim in the present motion.
[5] Vought and the CFPB argue that Plaintiffs have failed to state a claim under 5 U.S.C. § 706(2) on the basis that Plaintiffs have failed to challenge a final agency action. Def. Resp. at 13-16. As discussed in the previous section, Plaintiffs have challenged a final agency action. Vought and the CFPB also challenge Plaintiffs' § 706(2) claim based on the definition of "combined earnings," Def. Resp. 16 n.7, which Court will address in the following sections.
[6] The Director of the CFPB is permitted to make his funding request either for the entire fiscal year or by quarter. 12 U.S.C. § 5497(a)(1).

President and Congress. This is not a programmatic attack, but a challenge to a specific and discrete decision by Vought and the CFPB. It does not lose its discrete status because Vought eventually did request funding once an injunction compelled him to do so. The Court concludes that Plaintiffs have challenged a discrete agency action.

**b. The CFPB Director has a duty to request funds from the Federal Reserve**

The second half of the § 706(1) claim is that the discrete agency action withheld be one that the agency is "required to take." *SUWA*, 542 U.S. at 64. A court's ability to "compel agency action" is "carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010). Here, Vought and the CFPB contend that there is no requirement that the CFPB Director affirmatively request the amount needed to the Federal Reserve. Rather, they assert, the statute requires the Federal Reserve to "transfer to the Bureau" certain sums of money and the Director is only required to determine the amount "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(a)(1). Vought and the CFPB suggest that there are multiple routes by which the Federal Reserve might learn of such a determination, such as by submitting an information request. Def. Resp. 19.

In *Rise*, the court found that the "best reading" of § 5497 would put the requirement to request funding on the CFPB Director, because it is the Director, and

not the Federal Reserve, "that has a duty to ensure the Bureau is thriving and able to carry out its statutory functions," which "necessarily and inherently includes a duty to ensure the CFPB is funded." *Rise Economy*, 823 F. Supp3d at 1033. The *Rise* court noted that

> [E]ven if the statute did not contemplate a scheme whereby the Director affirmatively informs the Federal Reserve of the CFPB's funding needs, it certainly did not contemplate the Director going directly to Congress before giving the Federal Reserve an opportunity to determine whether the amount requested exceeds the statutory cap. Such a practice explicitly contradicts the procedures outlined in § 5497(e)(1). There is also no support for Defendants' alternative argument that Vought fulfilled his duty to request CFPB funding by publicizing his funding determination in letters to the President and Congress. This would not only contradict § 5497(e)(1), but would invite chaos—the Federal Reserve and Congress may act simultaneously, issue conflicting funding amounts, or await decisions from the other creating uncertainty in the critical work of the CFPB . . . such a disordered system is irreconcilable with Congress's intent to create a stable source of funding for the CFPB.

*Rise*, 823 F. Supp.3d at 1033-34.

The Court generally concurs with the *Rise* court's interpretation of the statute. On the narrower question of whether the statute imposes a specific command on the CFPB Director to communicate the funding needs of the CFPB to the Federal Reserve, the Court concludes that it does. Section 5497(a)(1) uses the mandatory term "shall" to compel the transfer funds from the Federal Reserve to the CFPB in the amount determined by the Director, which necessarily includes a requirement that the amount "determined" be communicated to the Federal Reserve. The Supreme Court, in interpreting § 5497(a)(1), has characterized the CFPB as the active party in this funding arrangement: "The Bureau *draws money* from the Federal Reserve System." *CFSA*, 601 U.S. at 425 (citing 12 U.S.C. § 5497(a)(1)) (emphasis

added); *see also Seila Law LLC v. CFPB*, 591 U.S. 197, 207-08 (2020) ("Each year, the CFPB *requests an amount* the Director deems 'reasonably necessary to carry out' the agency's duties and the Federal Reserve grants that request[.] (emphasis added)).[7] It is clear from the statutory context that the determination of the CFPB's funding needs, which is mandatory, must be communicated to the Federal Reserve by the Director so that the transfer of funds, which is also mandatory, can take place. Vought and the CFPB's arguments to contrary would, if carried to their logical conclusions, produce absurd results—for example, the CFPB Director might "determine" the funding needs without ever documenting them at all, or might simply refuse to communicate that determination, and thereby prevent the Federal Reserve from fulfilling its mandatory duty to transfer the necessary funds, which is obviously contrary to the purpose of the statute. *See Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 71 (1982) ("Statutes should be interpreted to avoid untenable distinctions and unreasonable results whenever possible.").

The Court concludes that § 5497(a)(1) includes a duty for the CFPB Director to communicate the funding needs of the CFPB to the Federal Reserve so that the Federal Reserve can transfer the necessary funds to the CFPB. Plaintiffs' § 706(1) claim does not fail on that basis.

[7] As recently as November 20, 2025, Vought and the CFPB also interpreted their obligations as including an affirmative requirement that they request funding from the Federal Reserve. *See* Thompson Decl. Ex. 1, at 4 (In his letter to the President, Vought wrote "Any funding needs of the Bureau will necessarily exceed the amount currently available *for the Bureau to request* under 12 U.S.C. § 5497, which is legally $0." (emphasis added)).

**c. The definition of "combined earnings"**

The dispute over the term "combined earnings" in § 5497(a)(1) is at the heart of this case. The Dodd-Frank Act does not define "combined earnings." As noted, Vought and the CFPB rely on a definition of "combined earnings" set out in the OLC Memo as "the Federal Reserve's profits—that is, the amount remaining after deducting the Federal Reserve's interest expenses from its revenues." Thompson Decl. Ex. 11, at 9. Plaintiffs advance a simpler, more straightforward definition of "combined earnings" as "everything the Federal Reserve earns before expenses are subtracted." Pls. Mot. 21.

At the outset, the Court notes that the OLC Memo's definition of "combined earnings" has been rejected twice by reviewing courts. It was first rejected by the D.C. District Court in *NTEU II*, which found that "combined earnings" should be given its ordinary meaning as "everything that an individual or entity earns, before expenses are subtracted." *NTEU II*, 816 F. Supp.3d at 17. The OLC Memo interpretation was subsequently rejected by the District Court for the Northern District of California, which, like the court in *NTEU II*, found that the term "combined earnings" should be understood as meaning "revenue." *Rise Economy*, 823 F. Supp.4d at 1040. The Court finds the reasoning of the district courts in *Rise* and *NTEU II* compelling and, for the reasons set forth below, joins those courts in concluding that "combined earnings" refers to revenue before the subtraction of expenses.

In construing the provisions of a statute, courts "first look to the language of the statute to determine whether it has a plain meaning." *Satterfield v Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir. 2009). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). "Another 'fundamental canon of statutory construction [is] that the words of the statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Satterfield*, 569 F.3d at 953 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Courts "may also read statutory terms in light of the purpose of the statute." *Id.*

"To determine ordinary meaning, [courts] consider dictionary definitions." *Tomczyk v. Garland*, 25 F.4th 638, 644 (9th Cir. 2022) (en banc) (internal quotation marks and citation omitted). In the specific context of the Dodd-Frank Act, the Ninth Circuit has had repeated recourse to dictionary definitions in defining statutory terms. *See CFPB v. CashCall, Inc.* 35 F.4th 734, 746 (9th Cir. 2022) (relying on dictionary definition of the word "deceptive"); *CFPB v. Aria*, 54 F.4th 1168, 1172 (9th Cir. 2022) (relying on the dictionary definition of "financial").

Here, the statute does not define "combined earnings." In *Rise*, the court observed that the OLC Memo engaged in "cherry-picking" from dictionary definitions to reach its desired definition of the term, 823 F. Supp.3d at 1035, and the court in *NTEU II* noted that the "primary dictionary definitions match the meaning advanced by plaintiffs," while OLC Memo "skip[ped] over the first definitions available in the

dictionaries they consulted" in order to "seize instead upon secondary definitions." *NTEU II*, 816 F. Supp.3d at 16. The Court concurs. The primary dictionary definitions, which offer insight into the "ordinary, contemporary, common meaning" of the term "earnings" are far more consonant with the definition advanced by Plaintiffs that that claimed by Vought, the CFPB, and in the OLC Memo. *See, e.g., Earnings*, MERRIAM -WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003) ("something (as wages) earned"); *Earnings*, NEW OXFORD AMERICAN DICTIONARY (3d ed. 2010) ("money obtained in return for labor or services"; "income derived from an investment or product"); *Earnings*, BLACK'S LAW DICTIONARY (9th ed. 2009) ("Revenue gained from labor or services, from the investment of capital, or from assets.").

The OLC Memo asserts that technical financial definitions and usage "in the business and accounting context" should be given additional weight "because the Federal Reserve's income is generated by the twelve Reserve Banks and because Dodd-Frank was passed specifically to regulate the financial industry." Thompson Decl. Ex. 11, at 11. This argument is undercut by the unique role of the Federal Reserve, however, which, unlike an ordinary financial institution, is not to generate profit but to "maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a. The Court joins the district courts in *NTEU II* and *Rise* in rejecting this argument as well. *Rise Economy*, 823 F. Supp.3d

at 1036 (finding that definitions used by private financial institutions are given little, if any, weight in light of the Federal Reserve's unique purpose and function); *NTEU II*, 816 F. Supp.3d at 16-17 (rejecting technical financial definitions as inapt in light of the Federal Reserve's mission and purpose).

The *NTEU* court made an additional observation on this point, with which the Court concurs:

> [T]he contradiction inherent in defendants' interpretation undercuts any attempt to maintain that it is textually based. The OLC and defendants do not propose that "combined earnings" means *all* income minus *all* expenses; they contend only a certain subset of expenses—interest payments—should be subtracted from the Fed's income to calculate its "combined earnings." This cannot be squared with any definition or common understanding of the term; defendants do not point to a single dictionary entry, accounting principle, or business practice that supports this unusual hybrid approach. Even the secondary definitions of "earnings" set forth in the OLC Memo . . . define the term as the balance of revenue after *all* expenses are subtracted.

*NTEU II*, 816 F. Supp.3d at 17 (internal citations omitted, emphasis in original).

As noted, statutes are to be interpreted according to their "ordinary, contemporary, common meaning" determined with reference to dictionary definitions, and the Court finds no reason to depart from the simplest and most common definition of the term "earnings" which is that it is everything an entity earns, *i.e.*, its revenue, before expenses are subtracted.

The purpose of the Dodd-Frank Act also supports Plaintiffs' interpretation. As the Supreme Court observed, the Act created the CFPB to act as an "independent financial regulator within the Federal Reserve System," vested with "potent

enforcement powers," coupled with "extensive adjudicatory authority." *Seila Law*, 591 U.S. at 206-07.

In the Act, Congress ensured that the CFPB would be funded outside of the normal appropriation process. *Seila Law*, 591 U.S. at 207-08. Congressional appropriations function only as a backstop if the Director determines that the funding needs of the Bureau are anticipated to exceed the statutory cap. 12 U.S.C. § 5497(e)(1). As the district court observed in *Rise*, it is clear "that Congress, in creating the CFPB and recognizing the critical importance of its continued uninterrupted work, intended to create a steady stream of funding to the CFPB, insulated from partisan politics in Congress." *Rise Economy*, 823 F. Supp.3d at 1038. Adopting the OLC's Memo's definition of "combined earnings" would "undermine that objective because the Bureau's funding could fluctuate significantly based on interest rates, putting the Fed in the untenable position of choosing between controlling inflation by adjusting interest rates or ensuring there was a 'profit' in place to fund the CFPB." *NTEU II*, 816 F. Supp.3d at 20; *see also Rise Economy*, 823 F. Supp.3d at 1038-39 ("Adopting Defendants' new definition of 'combined earnings' would not only destroy the CFPB's independence from the appropriations process by forcing it back to Congress to request funding, but would also subject the CFPB to intermittent defunding based on unpredictable fluctuations in the Federal Reserve's balance sheet—where the CFPB would likely be deprived of its funding in times of nationwide economic upheaval, exactly when the need for its regulatory and consumer-protections functions is most urgent.").

Based on both the plain language of the statute, given its common, contemporary, and ordinary meaning, and on the purpose of the statute, the Court joins the other district courts in concluding the "combined earnings" of the Federal Reserve refers to the Federal Reserve's revenue before expenses are subtracted.

As a consequence, the Court concludes that Plaintiffs are entitled to summary judgment on their APA claims and, as both sides point out, it is not necessary for the Court to address Plaintiffs' alternative *ultra vires* claims.

**2. Separation of Powers**

Plaintiffs have also brought a claim that Vought and the CFPB have violated the constitutional separation of powers by refusing to request funding for the CFPB and, in doing, have "impermissibly arroggate[d] to the executive power that is reserved to Congress." FAC ¶¶ 166, 169.

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Congress also has the power to legislate. U.S. Const. art. I, § 1; *see also* art. I, § 8, cl. 18 (Necessary and Proper Clause). "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Instead, the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3 (Take Care Clause). "The Separation of Powers was an integral part of the Founders' design." *City & Cnty. of S.F.*, 897 F.3d at 1232.

The President's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Courts generally look to the "tripartite" test stated in Justice Jackson's *Youngstown* concurrence when considering a Separation of Powers claim. *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015). This test provides that the President's authority is at its maximum when acting pursuant to an express or implied authorization of Congress. *Id.* The second level of power is a "zone of twilight" in the absence of either an express grant or denial of authority, where the President and Congress may have concurrent authority and "where congressional inertia, indifference or quiescence may invite the exercise of executive power." *Id.* (internal quotation marks and citation omitted). "Finally, when the President takes measures inconsistent with the expressed or implied will of Congress he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* (cleaned up). "'Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.'" *City & Cnty. of S.F.*, 897 F.3d at 1233 (quoting *Youngstown*, 343 U.S. at 637-38 (Jackson, J., concurring)).

"[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of S.F.*, at 1233-34 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). "Aside from the power of veto, the President is without authority to thwart congressional will by cancelling appropriations passed by Congress." *Id.* at 1232. As then-Circuit Judge Kavanaugh explained

> [A] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the recission of funds, and Congress then may decide whether to approve a recission bill.

*In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

"Absent congressional authorization, [an] Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals" and an attempt to do so "violates the constitutional principle of the Separation of Powers." *City & Cnty. of S.F.*, 897 F.3d at 1235.

Vought and the CFPB argue that Plaintiffs have only brought a claim that they have acted in excess of statutory authority and that Plaintiffs are trying to "dress up" their statutory claim as a constitutional one, citing *Dalton v. Specter*, in which the Supreme Court held that not "every action by the President or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994).

Vought and the CFPB read *Dalton* too broadly. The holding of *Dalton* is that not *every* act in excess of authority has a constitutional dimension, but it did not hold that an act in excess of authority could not *also* be a constitutional violation. "Contemporary Ninth Circuit jurisprudence weighs in favor of justiciability by taking an expansive view of the constitutional category of claims highlighted in *Dalton*." *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023); *see also id. at* 1130 ("While an action taken by the President in excess of his statutory authority does not necessarily violate the Constitution, specific allegations regarding separation of

powers may suffice. Here, the core of [the plaintiff's] claim—that the President violated separation of powers by directing the Secretary to act in contravention of a duly enacted law—could be considered constitutional and therefore reviewable." (internal quotation marks and citation omitted, cleaned up)); *Sierra Club v. Trump*, 963 F.3d 874, 889-90 (9th Cir. 2020), *vacated and remanded on other grounds sub. nom Biden v. Sierra Club*, 142 S. Ct. 46 (2021) (holding that claims alleging the President violated the Constitution by exceeding statutory authority are justiciable constitutional claims); *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) ("The [*Dalton*] Court did not say, however, that action in excess of statutory authority can *never* violate the Constitution, or give rise to a constitutional claim. Statutory and constitutional claims are not mutually exclusive.").

Here, Plaintiffs do not simply allege that Vought and the CFPB have exceeded their statutory authority. They assert that Vought and the CFPB have acted in violation of the constitutional separation of powers by acting both without statutory authority and without a background constitutional authority over appropriations in seeking to unilaterally defund the CFPB. The Ninth Circuit has expressly approved of such claims. *Sierra Club*, 929 F.3d at 696-97; *Murphy Co.*¸ 65. F.4th at 1130.

On the substance of their constitutional claim, Plaintiffs have presented evidence that the administration, acting through Vought, has taken the dismantling and shuttering of the CFPB as a policy objective. Thompson Decl. Exs. 17, 18, 19 (Vought, appearing on "The Charlie Kirk Show," publicly stated the administration's intention to close the CFPB). The specific mechanism that Vought has chosen to

achieve this objective is the frustration of a lawful appropriations system devised by Congress for the CFPB. In doing so, Vought has arrogated to himself the "power of the purse," which belongs exclusively to Congress and so has violated the constitutional separation of powers.

Although they did not consider the specific constitutional issue raised here, the plain reality of the situation was recognized by the district courts in *Rise* and *NTEU II*. *See Rise Economy*, 823 F. Supp.3d at 1040 ("Vought's plan to 'shut down' the CFPB using this clearly erroneous interpretation of § 5497 frustrates Congress's intent to insulate the Bureau's funding stream from this exact transparent display of partisanship. The purpose of this Order is to ensure the CFPB operates as Congress intended—fully funded and able to ensure that consumers have access to 'fair, transparent, and competitive' markets for consumer financial products, 12 U.S.C. § 5511(a); not subject to ever-changing Director fiat."); *NTEU II*, 816 F. Supp.3d at 20 ("Neither the statute, the injunction, nor the Fed's willingness to pay has changed; the only new circumstance is the administration's determination to eliminate an agency created by Congress with the stroke of a pen, even while the matter is before the Court of Appeals. It appears that defendants' new understanding of 'combined earnings' is an unsupported and transparent attempt to starve the CFPB of funding and yet another attempt to achieve the very end the Court's injunction was put in place to prevent.").

The Court concludes that the actions of Vought and the CFPB constitute an attempt to arrogate to themselves the constitutional authority of Congress and so

constitute a violation of the Separation of Powers. Plaintiffs are entitled to summary judgment on this claim.

**3. Plaintiffs have not abandoned their claim for declaratory relief**

Vought and the CFPB make a perplexing argument that Plaintiffs have "abandoned" their claim for declaratory relief, apparently because they did not include a separate section addressing it in their brief. Plaintiffs' request for declaratory relief is addressed throughout their motion, however, and the Court concludes that they have not abandoned it.

## VI. Remedy

As previously noted, the Challenged Decisions in this case are (1) Vought's determination that he cannot request funds from the Federal Reserve at any time when the Federal Reserve's interest expenses exceed its income; and (2) Vought's decision not to request funding for the CFPB from the Federal Reserve for fiscal year 2026.

Plaintiffs seek declaratory relief in this case. The Court concludes that declaratory relief is appropriate here because such relief will "serve a useful purpose in clarifying and settling" the legality of the Challenged Decisions and "will terminate and afford relief from the uncertainty, insecurity, and controversy" caused by it. *See Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1470 (9th Cir. 1984) (internal quotation marks and citation omitted). For the reasons set forth above, the Court concludes that that the Challenged Decisions were contrary to law, constitute unlawfully withheld agency action, and violate the constitutional separation of powers. The

Court further declares that the term "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1) means the Federal Reserve's gross revenues without any deduction for its expenses and that the Federal Reserve is required, pursuant to 12 U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations.

Plaintiffs also seek vacatur of the Challenged Decisions. Under 5 U.S.C. § 706(2), courts are empowered to "hold unlawful and set aside" agency actions not in accordance with law. Vacatur is the ordinary remedy for unlawful agency action. *Alliance for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018). The Court concludes that vacatur is an appropriate remedy for the Challenged Decisions. In light of the pending end of fiscal year 2026, the Court declines to issue injunctive relief related to funding for the CFPB for fiscal year 2026.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Partial Summary Judgment, ECF No. 28, is GRANTED. The Court VACATES the Challenged Decisions and grants Plaintiffs declaratory relief in the form of a declaration that the Challenged Decisions were contrary to law, constitute unlawfully withheld agency action, and violate the constitutional separation of powers. The Court further declares that the term "combined earnings" of the Federal Reserve, as set forth at 12 U.S.C. § 5497(a)(1) means the Federal Reserve's gross revenues without any deduction for its expenses and that the Federal Reserve is required, pursuant to 12

U.S.C. § 5497(a)(1), to transfer to the CFPB from such "combined earnings" the amount that the Director of the CFPB has determined to be reasonably necessary to carry out the CFPB's operations.

It is so ORDERED and DATED this 25th day of September 2026.

/s/Ann Aiken
ANN AIKEN
United States District Judge