# Exhibit B

(Slip Opinion)

# Whether the Consumer Financial Protection Bureau May Continue to Draw Funds from the Federal Reserve System Under 12 U.S.C. § 5497 When the Federal Reserve System Is Operating at a Loss

Congress has authorized the Consumer Financial Protection Bureau to draw funds from the "combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1), and required the CFPB to report to Congress and the President if it determines that insufficient funds are available, *id.* § 5497(e)(1). In this context, "earnings" are profits. Because the Director of the CFPB has determined that the Federal Reserve System has no available profits from which to draw, the proper recourse is for the Director to report to Congress and the President—not to draw funds from the Federal Reserve without a congressional appropriation.

November 7, 2025

MEMORANDUM OPINION FOR THE ACTING DIRECTOR
CONSUMER FINANCIAL PROTECTION BUREAU

In 2010 legislation known as Dodd-Frank, Congress created the Consumer Financial Protection Bureau and authorized it to draw its funding from the "combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). The Federal Reserve System ("Federal Reserve") began operating in late 1914 and was profitable in every subsequent year until 2022. In every year since 2022, the Federal Reserve's costs have exceeded its revenue.

You have asked whether the Consumer Financial Protection Bureau ("CFPB" or "Bureau") can lawfully continue to draw funds from the Federal Reserve after determining that the Federal Reserve is unprofitable. The CFPB's position is that "combined earnings" are calculated by offsetting various outlays against the Federal Reserve's revenues and that because the Federal Reserve's outlays exceed its revenues, there are no funds available from the CFPB's congressionally authorized source of funding. Because the CFPB expects to exhaust its currently available funds this quarter, the question is a matter of considerable urgency.

We conclude that the "combined earnings of the Federal Reserve System" refers to the Federal Reserve's profits, calculated by subtracting its interest expenses from its revenues. If the Federal Reserve has no profits, it cannot transfer money to the CFPB. However, the CFPB is not without

recourse. Congress has empowered the Director of the CFPB to determine that the agency lacks sufficient funds to perform its statutory obligations and required him, upon such a determination, to report on the problem to Congress and the President. *Id.* § 5497(e)(1). Because the only lawful source of funding from the Federal Reserve has dried up, the proper method for obtaining additional funds is to request them from Congress pursuant to the Appropriations Clause, not to draw funds from the Federal Reserve without a congressional appropriation.

## I.

### A.

The Federal Reserve is comprised of three key entities: the Federal Reserve Board of Governors ("Board of Governors"), the Federal Open Market Committee ("FOMC"), and the Federal Reserve Banks ("Reserve Banks"). *See* United States Federal Reserve System, *The Fed Explained: What the Central Bank Does* 2–3 (11th ed. 2021) ("*The Fed Explained*"). The Board of Governors is the governing body of the Federal Reserve. The FOMC is a "body within the Federal Reserve that sets monetary policy." *Id.* at 8. The Reserve Banks are twelve separately incorporated entities, each serving a distinct geographic district. *Id.* at 3–4. Reserve Banks provide "key financial services" for private banks within their respective districts, effectively acting as a "bank for banks." *Id.* at 11.

The Federal Reserve is self-funded, primarily by "interest earned on the securities it owns" and "fees received for priced services provided to depository institutions." *Id.* at 4. The Federal Reserve prepares combined financial statements that aggregate financial information across all the Reserve Banks. *See, e.g.*, The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2024 and 2023 and Independent Auditors' Report* 3–4 (Mar. 12, 2025) ("2024 Financial Statements"). Audited financial statements are reported annually, while unaudited statements are reported on a quarterly basis.

By far, the largest line items in the Federal Reserve's financial statements are interest income and interest expense. *See id.* at 4. Interest income is primarily derived from "securities acquired in the course of the Federal Reserve's open market operations." *The Fed Explained* at 4. Interest expense primarily reflects the amounts paid to the Federal Reserve's

depositors. *See* 2024 Financial Statements at 4. When interest income exceeds interest expense, the Federal Reserve reports this amount as "net interest income." In its last annual financial statement before the passage of Dodd-Frank, for example, the Federal Reserve reported $57.9 billion in net interest income for 2009. The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2009 and 2008 and Independent Auditors' Report* 3 (Apr. 21, 2010) ("2009 Financial Statements"). When interest expense exceeds interest income, it reports this amount as "net interest expense." In its most recent annual statement, the Federal Reserve reported just over $68 billion in net interest loss. 2024 Financial Statements at 4.

Other major categories in the Federal Reserve's financial statements include "[o]ther items of income [or] (loss)" and "[o]perating expenses." *See, e.g.*, *id.* "Other items of income [or] (loss)" serves as a grab-bag category to account for nominal income from fees for services provided by the Federal Reserve as well as gains and losses on its investments. *See id.* (reporting $298 million in "other items of income" for 2024). In some years it is net positive, while in others it is net negative. *See, e.g.*, 2009 Financial Statements at 3 (reporting a total non-interest loss of $570 million for 2009 and total non-interest income of $1.9 billion for 2008). Historically, this "other," non-interest category of income is dwarfed in comparison to interest income and expense.

As the name implies, "[o]perating expenses" cover various non-interest expenses of the Reserve Banks, such as "[s]alaries and benefits," "[o]ccupancy," and "[e]quipment." *See* 2024 Financial Statements at 4. It also covers the operating expenses of the Board of Governors, which are funded by a levy on the Reserve Banks. *See id.*; *see also* 12 U.S.C. § 243 ("The Board of Governors of the Federal Reserve System shall have power to levy semiannually upon the Federal reserve banks . . . an assessment sufficient to pay its estimated expenses.").

Congress has prescribed how the Federal Reserve is to allocate any funds left over after the Reserve Banks have each paid "all [their] necessary expenses." *See id.* § 289.[1] First, dividends are paid to the Reserve

[1] The Federal Reserve's financial statements have historically treated CFPB funding as a necessary expense. *See* 2024 Financial Statements at 4. This makes sense when combined earnings are available, because in that case the expense is necessary for the Federal

Banks' stockholders. *See id.* § 289(a)(1)(A). Second, the "portion of net earnings . . . which remains after dividend claims" goes into a surplus fund. *See id.* § 289(a)(2); *see also id.* § 289(a)(3)(A) (capping the surplus fund at a cumulative total of $6.825 billion across all twelve Reserve Banks); *id.* § 289 note (reducing cap by $40 million). Finally, the statute requires the Federal Reserve to transfer any funds that would exceed the surplus-fund cap to the general fund of the Treasury. *See id.* § 289(a)(3)(B).

## B.

The CFPB is "an independent bureau" that Congress "established in the Federal Reserve System." 12 U.S.C. § 5491(a). The CFPB's financial statements are separate from and cannot be consolidated with those of the Federal Reserve, as a matter of law. *Id.* § 5497(4)(F). "Congress charged the Bureau with enforcing consumer financial protection laws to ensure 'that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.* ("*CFSA*"), 601 U.S. 416, 421 (2024) (quoting 12 U.S.C. § 5511(a)).

The Bureau is not funded through annual appropriations by Congress. Instead, Dodd-Frank directs the Board of Governors to "transfer to the Bureau from the combined earnings of the Federal Reserve System, the amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1). The statute caps transfers to the CFPB at "a fixed percentage of the total operating expenses" of the Federal Reserve as reflected in its annual report. *Id.* § 5497(a)(2)(A). It also authorizes the CFPB Director to "determine that sums available to the Bureau under this section will not be

---

Reserve to comply with section 5497(a)(1). In our view, CFPB funding is not necessary when the Federal Reserve has no combined earnings, because the statute imposes no obligation on the Federal Reserve to transfer funds other than its combined earnings. *See* 12 U.S.C. § 5497(a)(1). Thus, any inability on the part of the Federal Reserve to fund the CFPB from its combined earnings would not constitute a failure to pay "necessary expenses" that suspends the other payments described in this paragraph, provided the Federal Reserve covers the resulting negative balances from sources besides "combined earnings." *See id.* § 289(a).

sufficient" and, upon such a determination, requires the CFPB Director to report to Congress and the President. *Id.* § 5497(e)(1).

**C.**

Last year, several defendants in CFPB-initiated actions moved to dismiss on the ground that the CFPB was unlawfully funded.[2] Building upon public commentary by a professor emeritus at Harvard Law School,[3] the defendants in those cases contended that the statutorily prescribed source of funds for the CFPB—the "combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1)—had dried up because the Federal Reserve was operating at a loss. The CFPB responded by arguing that

[2] *See* Memorandum of L. in Support of Defendants' Motion for Judgment on the Pleadings, *CFPB v. MoneyLion Techs. Inc.*, No. 22-8308 (S.D.N.Y. July 21, 2025), ECF No. 139 ("MoneyLion Motion"); Defendant's Motion to Dismiss Amended Complaint, *CFPB v. Solo Funds, Inc.*, No. 24-04108 (C.D. Cal. Sep. 3, 2024), ECF No. 35 ("Solo Motion"); Defendant's Motion to Dismiss, *CFPB v. Populus Fin. Grp., Inc.*, No. 22-01494 (N.D. Tex. July 31, 2024), ECF No. 37 ("Populus Motion"); Defendant's Motion to Dismiss Plaintiff's First Amended Complaint, *CFPB v. Active Network, LLC*, No. 22-00898 (E.D. Tex. June 17, 2024), ECF No. 28; *cf.* Defendants' Motion to Dismiss Plaintiff's Amended Complaint, *Texas v. Colony Ridge, Inc.*, No. 24-00941 (S.D. Tex. June 7, 2024), ECF No. 46 (seeking dismissal of claims brought by Texas in part on the ground that CFPB could not provide pre-suit consultation provided by 12 U.S.C. § 5552(b) due to lack of lawful funding).

[3] *See* Hal Scott, *The CFPB's Pyrrhic Supreme Court Victory*, Wall St. J. (May 21, 2024); *see also* Alex J. Pollock, *The Fed Has No Earnings to Send to the CFPB*, Federalist Soc'y (May 21, 2024), https://fedsoc.org/commentary/fedsoc-blog/the-fed-has-no-earnings-to-send-to-the-cfpb; Hal Scott, *Rohit Chopra Is Out. Now Shutter the CFPB*, Wall St. J. (Feb. 1, 2025); Hal S. Scott, *Understanding the CFPB's Funding Problem*, Comm. on Cap. Mkts. Regul. (Feb. 14, 2025), https://capmktsreg.org/wp-content/uploads/2025/02/Hal-Scott-Understanding-the-CFPBs-Funding-Problem-02.24.25.pdf. *But see* Jeff Sovern, *Is the CFPB Facing Still Another Challenge?*, Consumer L. & Pol'y Blog (June 9, 2024), https://clpblog.citizen.org/is-the-cfpb-facing-still-another-challenge (critiquing Professor Scott's thesis); Vikram David Amar, *Could the Consumer Protection Finance Bureau (CFPB)'s Victory in the Supreme Court Last Week Boomerang to Disempower the Bureau and Invalidate Its Regulations? Not if the Case Is Read Carefully and Properly*, Verdict (May 23, 2024), https://verdict.justia.com/2024/05/23/could-the-consumer-protection-finance-bureau-cfpbs-victory-in-the-supreme-court-last-week-boomerang-to-disempower-the-bureau-and-invalidate-its-regulations-not-if-the-case-is-read-carefull (similar); Adam Levitin, *Hal Scott's Call for a Presidential Ukase on the CFPB*, Credit Slips (Feb. 2, 2025), https://creditslips.org/2025/02/02/hal-scotts-call-for-a-presidential-ukase-on-the-cfpb (similar).

funds were still available because the Federal Reserve had substantial revenue. Thus, the interpretive question was whether "combined earnings" in section 5497 referred to revenue or required a positive balance to be left over after various outflows were offset against revenue.

The various defendants raised three basic arguments that "combined earnings" referred not to revenue, but rather to any positive balance remaining after all of the Federal Reserve's outlays prior to its final transfer of excess earnings to Treasury.

*First*, they argued that dictionary definitions and accounting authorities equate "earnings" either to profit or to net income.[4] Although they did not explore the technical meanings of "profit" and "net income" in detail, they concluded that the plain meaning of "earnings" indicated a positive balance after at least some offset against revenue.

*Second*, they argued that the structure and history of Dodd-Frank ruled out the CFPB's interpretation and reinforced the plain meaning of "combined earnings" because Congress: (1) used the term "revenues" elsewhere, when it had revenue in mind; (2) varied its wording intentionally by changing an early draft of the law to specify "combined earnings" as CFPB's funding source but providing no limitation on funding sources when it wished to allow the Federal Reserve to fund other entities from revenue; and (3) instructed each Reserve Bank to use its own revenue to pay its own necessary expenses, distribute dividends to its own shareholders, and fill its own surplus-fund account before combining any remaining funds in the hands of the Board of Governors of the Federal Reserve System.[5]

*Third*, they argued that their interpretation of "combined earnings" was implicitly supported by the Supreme Court's passing description of the CFPB's funding provision in *CFSA*.[6] Specifically, the Supreme Court referred to CFPB drawing from "surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." *CFSA*, 601 U.S. at 425 (citing 12 U.S.C. § 289(a)(3)(B)). According to the defendants' reading, this confirmed that Congress in-

---

[4] *See, e.g.*, Populus Motion, *supra* note 2, at 9–10; MoneyLion Motion, *supra* note 2, at 5–8; Solo Motion, *supra* note 2, at 3–5.

[5] *See, e.g.*, MoneyLion Motion, *supra* note 2, at 8–11.

[6] *See, e.g.*, MoneyLion Motion, *supra* note 2, at 12–13.

tended the Federal Reserve to fund the CFPB from any surplus funds remaining after it had made all other outlays except for its final transfer of excess surplus to Treasury.

The CFPB disagreed, offering four responses to show that it could draw funds from the Federal Reserve's ample revenues without accounting for any costs.[7]

*First*, the CFPB invoked different dictionary definitions to argue that the ordinary meaning of "earnings" is broad enough to include "revenue," "income," or "money earned" as possible interpretations.[8] In its view, the defendants' definition of earnings was "cramped" and "highly idiosyncratic." Populus Opposition, *supra* note 7, at 5. It observed that the defendants' definition required deducting dividends from revenue as part of the earnings calculation, even though standard accounting treatment is to pay dividends out of earnings.[9]

*Second*, the CFPB argued that the structure and purpose of Dodd-Frank supported construing "combined earnings" to mean "revenues."[10] It emphasized that Dodd-Frank was passed in the aftermath of a financial crisis and contended the legislative history showed that Congress intended to provide a stable source of funding for the CFPB. It further argued that Congress intended the generic reference to "combined earnings" in Dodd-Frank to mean something different from the more specific concept of "net earnings" in the Federal Reserve Act. Moreover, according to the CFPB, Dodd-Frank used the term "earnings" elsewhere to mean revenues—money earned without netting out costs. And, in its view, funding the CFPB was part of the "necessary expenses of a Federal reserve bank" that

---

[7] *See generally* CFPB's Opposition to Defendant's Motion to Dismiss Amended Complaint, *CFPB v. Solo Funds, Inc.*, No. 24-04108 (C.D. Cal. Sep. 16, 2024), ECF No. 37 ("Solo Opposition"); CFPB's Opposition to Defendant's Motion to Dismiss, *CFPB v. Populus Fin. Grp., Inc.*, No. 22-01494 (N.D. Tex. Aug. 30, 2024), ECF No. 41 ("Populus Opposition"); CFPB's Opposition to Defendant's Motion to Dismiss, *CFPB v. Active Network, LLC*, No. 22-00898 (E.D. Tex. July 15, 2024), ECF No. 38 ("Active Opposition").

[8] *See, e.g.*, Solo Opposition, *supra* note 7, at 4–5; Active Opposition, *supra* note 7, at 19–20; Populus Opposition, *supra* note 7, at 4–5.

[9] *See, e.g.*, Populus Opposition, *supra* note 7, at 7–9.

[10] *See, e.g.*, Active Opposition, *supra* note 7, at 20–22; Populus Opposition, *supra* note 7, at 4–5, 9–11; Solo Opposition, *supra* note 7, at 5.

Dodd-Frank requires the Federal Reserve to cover before outlays like dividends, showing that not all outlays should be offset against revenues before providing funds to the CFPB. 12 U.S.C. § 289(a)(1)(A).

*Third*, the CFPB argued that the Supreme Court's decision in *CFSA* did not decide the meaning of the term "combined earnings."[11] Because the definition of this term was not at issue, the CFPB disagreed with the defendants' attempt to read their interpretative theory into the Court's opinion. In its own enforcement action, the State of Texas[12] took the point a step further, noting that *CFSA* upheld the constitutionality of the CFPB's funding during a period in which the Federal Reserve was running at a loss.[13] It seems to have been suggesting that the Supreme Court determined not only that the CFPB's funding mechanism was constitutional but also that the Federal Reserve had "combined earnings" despite running at a loss, which could suggest an implicit determination that "earnings" means "revenues."

*Fourth*, the CFPB argued that the defendants' interpretation of "combined earnings" would be unworkable.[14] It explained that it draws funds from the Federal Reserve on a quarterly basis, *see id.* § 5497(a)(1), and that it understood the Reserve Banks remit excess earnings to the Treasury weekly, *see* Solo Opposition, *supra* note 7, at 6. According to the CFPB, it could prove difficult to do this on a weekly basis while retaining sufficient funds to fund the CFPB unless "earnings" were interpreted to mean "revenues," possibly positioning courts to serve the unenviable role of auditor to the Federal Reserve.

No court has analyzed these substantive arguments in detail. Two courts concluded that, even if the CFPB were being unlawfully funded,

---

[11] Solo Opposition, *supra* note 7, at 4–5; Populus Opposition, *supra* note 7, at 5–6; Active Opposition, *supra* note 7, at 18–19.

[12] The statutory scheme provides for enforcement actions brought by state governments. *See generally* 12 U.S.C. § 5552.

[13] Texas's Response in Opposition to Defendants' Motion to Dismiss at 6–7, *Texas v. Colony Ridge, Inc.*, No. 24-00941 (S.D. Tex. June 28, 2024), ECF No. 48; *cf. Texas v. Colony Ridge, Inc.*, 2024 WL 4553111, at *4 (S.D. Tex. Oct. 11, 2024) (noting that the Supreme Court upheld the constitutionality of CFPB's funding mechanism in 2024, without explaining any implications of this fact).

[14] *See, e.g.*, Active Opposition, *supra* note 7, at 22; Populus Opposition, *supra* note 7, at 11–12; Solo Opposition, *supra* note 7, at 5–6.

dismissal of its actions was not required.[15] One court denied the motion before it in a single sentence without providing any analysis.[16] And two cases were resolved prior to disposition of the relevant motion.[17]

**D.**

You have informed us that, upon further consideration, the CFPB now takes a different view from the one it held in 2024. The CFPB now believes its source of funding—the combined earnings of the Federal Reserve—has been exhausted. Given the importance of this question to funding the CFPB, you have asked our Office for a formal opinion on the question.

**II.**

Dodd-Frank does not define "combined earnings." *See* 12 U.S.C. §§ 5481, 5497. Nor has any court.[18] Thus, we begin by considering the term's "plain meaning at the time of enactment." *Tanzin v. Tanvir*, 592 U.S. 43, 47–48 (2020) (citation omitted). Based on (A) the definitions of the relevant terms in Dodd-Frank, (B) the structure of the statute, (C) our understanding of the Federal Reserve's accounting practices, and (D) consideration of Congress's policy aims, we conclude that "combined earnings," as used in section 5497, refers to the Federal Reserve's profits—that is, the amount remaining after deducting the Federal Reserve's interest expenses from its revenues.

---

[15] *See, e.g.*, *CFPB v. Solo Funds, Inc.*, No. 24-cv-04108, 2024 WL 4553110, at *2 (C.D. Cal. Oct. 17, 2024); *Colony Ridge, Inc.*, 2024 WL 4553111, at *4.

[16] Memorandum Op. & Ord. at 3, *CFPB v. Active Network, LLC*, No. 22-00898 (E.D. Tex. Oct. 7, 2024), ECF No. 51.

[17] *See* Notice of Dismissal, *CFPB v. Populus Fin. Grp., Inc.*, No. 22-01494 (N.D. Tex. Apr. 30, 2025), ECF No. 60 (CFPB notice dismissing the action with prejudice against the defendant); Order at 1, *CFPB v. MoneyLion Techs. Inc.*, No. 22-08308 (S.D.N.Y. Oct. 15, 2025), ECF No. 143 (explaining the parties "have reached an agreement in principle to fully resolve this action" and "are in the process of documenting that agreement").

[18] Though litigants have seized on the Supreme Court's *CFSA* opinion to make inferences about the meaning of "combined earnings" in section 5497, that issue was neither presented nor decided in that case. Nor are litigants' proposed inferences from *CFSA* persuasive, as explained more fully in Part II.E.

**A.**

Common dictionary definitions interpret "earnings" to describe "the balance of revenue after deduction of costs and expenses." *Merriam-Webster's Collegiate Dictionary* 391 (11th ed. 2005) ("*Merriam-Webster's Collegiate*") (defining "earnings"); *accord Webster's Third New International Dictionary* 714 (1993 ed.) ("*Webster's Third New International*") (defining "earnings" as "the balance of revenue . . . that remains after deducting related costs and expenses incurred"). Put more simply, earnings are "[b]usiness profits." *The American Heritage Dictionary of the English Language* 561 (5th ed. 2016); *accord Webster's Third New International* at 714 (cross-referencing the definition of "earnings" with that of "profit").

Technical dictionaries and usage both confirm and add specificity to the weight of authority indicating that "earnings" are calculated by subtracting certain expenditures from revenue. "From a corporate perspective, earnings are profits, or net income, after the company has paid income taxes and bond interest." Virginia B. Morris & Kenneth M. Morris, *Standard & Poor's Dictionary of Financial Terms* 64 (2007) ("*Standard & Poor's Dictionary*"). Thus, the Oxford Dictionary of Accounting defines "earnings" as "[t]he net income or profit of a business." *Oxford Dictionary of Accounting* 161 (4th ed. 2010) ("*Oxford Dictionary of Accounting*"). The Securities & Exchange Commission defines "earnings" as "net income."[19] And the Nasdaq defines "earnings" as "[n]et income for the company during a period."[20]

The use of "earnings" in other common financial and accounting terms further support this understanding. For example, "earnings per share," a common financial metric used for evaluating investments in private companies, is defined as "[t]he profit . . . attributable to each ordinary share in a company, based on the consolidated profit for the period." *Oxford Dictionary of Accounting* at 161. "Retained earnings," a line item on a company's balance sheet, is defined as "[t]he net profit available for distribution, less any distributions made, i.e. the amount kept within the

[19] *See* SEC, Non-GAAP Compliance & Disclosure Interpretation No. 103.01 (Dec. 13, 2022).

[20] Nasdaq, *Glossary of Stock Market Terms*, https://www.nasdaq.com/glossary/e/earnings (last visited Nov. 5, 2025).

company." *Id.* at 361. Net profit is a technical term used interchangeably with net income in the business and accounting context. *See, e.g.*, Ilias G. Basioudis, *Financial Accounting: The Basics* 4 (2019). Thus, in each instance, "earnings" refer to something other than revenue: either profit or net income.

We give particular weight to such technical definitions and usage in the business and accounting context because the Federal Reserve's income is generated by the twelve Reserve Banks and because Dodd-Frank was passed specifically to regulate the financial industry. *Cf. Edwards v. Douglas*, 269 U.S. 204, 214–15 & n.4 (1925) (relying on the definition proposed by the Committee on Accounting Terminology of the American Association of Public Accountants and usage in the business world when interpreting "undivided profits" to mean "undistributed earnings"). Congress demonstrated its understanding of accounting practices when it detailed requirements for the CFPB's budget and financial management, including instructions about financial statements and annual audits. *See* 12 U.S.C. § 5497(a)(4)–(5). And it used technical accounting terminology when it tied CFPB's funding to the Federal Reserve's "total operating expenses" as reported in its financial statements. *Id.* § 5497(a)(2)(A). It follows that, when Congress used the term "earnings" just one sentence earlier, it understood that the meaning of the term in the business and accounting context it was addressing is either "profit" or "net income."

In basic accounting, "profit" and "net income" have specific meanings that make sense in the technical context of Dodd-Frank. As explained by numerous finance and accounting authorities, the general accounting formula for reporting a company's operations is as follows:

  Revenues
– Cost of Goods Sold
= Profit
– Operating Expenses
= Net Income[21]

[21] *See, e.g.*, Robert J. Rhee, *Corporate Finance* 21 (2d ed. 2016); Christopher Nobes, *Accounting: A Very Short Introduction* 61 (2014); Charles H. Meyer, *Accounting and Finance for Lawyers in a Nutshell* 7–10 (7th ed. 2021); Stacey L. Bowers, *Accounting and*

In this formula, "Revenues" represents all the inflows to a company from its business operations. *See* Meyer, *supra* note 21, at 8; Basioudis, *supra* note 21, at 3. The term "Cost of Goods Sold" (also known as "Cost of Services") is the specific cost associated with producing or generating revenue. *See* Bowers, *supra* note 21, at 45. For a company that sells tangible products, it is the cost of producing or acquiring the product. *See id.* For a company that provides services, it is the cost of providing those services. *See id.* What follows next, "Profit" (also referred to as "gross profit" or "gross income"), is thus the difference between the revenues a company brings in and the cost of producing those revenues. *See id.* at 45–56; Meyer, *supra* note 21, at 9 ("Thus, the income statement would first show the main revenues of the business less costs of goods sold (or costs of performing services for a service business) and report the resulting amount as gross profit."); Gray, *supra* note 21, at 46 ("Gross profit is an important subtotal that calculates the difference between the revenues earned and the costs of goods sold.").

Next up, "Operating Expenses" are necessary costs a company incurs in operating a business that are not directly tied to producing the business's goods or services. *See* Bowers, *supra* note 21, at 46. For example, rent expenses, marketing expenses, legal fees, research and development expenses, corporate employee salaries, and other professional services are common operating expenses. "Profit" is reduced by "Operating Expenses" to arrive at bottom-line "Net Income" (also known as "net profit"). *See* Basioudis, *supra* note 21, at 4 ("The difference between gross profit and other expenses . . . is the net profit (or net income)."); Gray*, supra* note

---

*Corporate Finance for Lawyers* 48 (2d ed. 2023); Ilias G. Basioudis, *Financial Accounting: The Basics* 3–4 (2019); Amber K. Gray, *The Handy Accounting Answer Book* 46 (2019). Although "the labeling of these [individual] items . . . may vary significantly," the conceptual framework is the same. Rhee, *supra*, at 21.

We note that some examples break the accounting formula down further into "operating profit" and "net profit" by separating out debt costs and taxes from other operating expenses. *See, e.g.*, Rhee, *supra*, at 21; Bowers, *supra*, at 48; Gray, *supra*, at 46. In the context of the Federal Reserve, however, such a further delineation makes little sense. As we explain in Part II.B, debt costs, or interest expense, are the equivalent of a bank's "Cost of Goods Sold" or "Cost of Services." And the Federal Reserve is exempt from taxation. *See* 12 U.S.C. § 531. Thus, for purposes of this opinion, and for ease in explaining the various accounting concepts, we present the simpler version of the basic accounting formula.

21, at 46 ("Net income is the bottom-line-realized profitability measure for the business.").

In short, in the business and accounting context, saying that "earnings" refers to either profit or net income means that earnings are calculated either by subtracting the cost of goods sold from revenues or by performing that calculation and then further subtracting operating expenses. This technical usage confirms the non-technical dictionary definitions given above, all of which shed light on the ordinary meaning of "earnings" as reflecting at least some offset against revenues.

Accordingly, we conclude that Congress did not mean "revenues" when it used the term "earnings" to refer to the CFPB's funding source. But we must look beyond dictionaries to determine whether "earnings" in section 5497 refers to the Federal Reserve's profits or to its net income.

**B.**

We therefore turn next to the structure of the statute and the interpretive canons. These familiar rules of construction demonstrate that, although "earnings" may have multiple shades of meaning in the abstract, only one meaning makes sense in the context of the CFPB's funding mechanism. In section 5497, "combined earnings" refers to the profits of the Federal Reserve as a whole, calculated by subtracting interest costs—a bank's analogue to Cost of Goods Sold—from its revenues.

*First*, we start with statutory context. Congress has explicitly mandated a sequential order of priority—a cascading waterfall—for virtually all the Federal Reserve's expenditures, culminating in the transfer of any "surplus funds" in excess of $6.785 billion to the general fund of the U.S. Treasury. *See* 12 U.S.C. § 289(a)(3) (setting cap at $6.825 billion and directing transfer of any additional surplus to Treasury); *id.* § 289 note (reducing cap by $40 million). Surplus funds are "[t]hat portion of net earnings . . . which remains after dividend claims . . . have been fully met." *Id.* § 289(a)(2). In other words, dividends are paid out of "net earnings." "Net earnings," under the plain meaning of "net" in the accounting context, are what remains of earnings after some other portion has been deducted. *See Oxford Dictionary of Accounting* at 293 (defining "net" as "[d]enoting an amount remaining after specific deductions have been made"). And Congress specified what must be deducted from earnings to

calculate the net earnings from which dividend claims are paid, stating that dividends shall be paid only "[a]fter all necessary expenses . . . have been paid or provided for." 12 U.S.C. § 289(a)(1)(A). In other words, "net earnings" here are the Federal Reserve's earnings minus its operating expenses—its equivalent of the accounting concept "net income."

"Earnings" in section 5497 should be distinguished from "net earnings" in section 289. And the only interpretation available that gives each term an independent meaning is that "earnings" means "profits." In the corporate context, of course, "earnings" can generally refer to either "profit" or "net income." *See supra* Part II.A. But because Congress used the term "net earnings" to refer to the concept of net income, 12 U.S.C. § 289(a)(2), a different referent is required for the broader term "earnings." For one, the plain meaning of "net" and the canon against surplusage differentiate "earnings" from "net earnings." *See, e.g.*, *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) (explaining "[t]he canon against surplusage can be meaningful when a competing interpretation would avoid superfluity" (citation omitted)). For another, the meaningful-variation canon confirms that "earnings" would be expected to have a different meaning from "net earnings." *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022) ("'Where [Congress] has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'" (cleaned up) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012))). And because "net earnings" is the Federal Reserve's equivalent of "net income," "profit" is the only permissible remaining referent for "earnings" after "net income" is ruled out.

*Second*, "earnings" must similarly be distinguished from the use of the term "revenues" elsewhere in Dodd-Frank, and the only interpretation that accomplishes this is that "earnings" means "profits." It is unlikely that Congress would have used "combined earnings" in section 5497(a)(1) if it meant to refer to the "combined revenues" of the Reserve Banks that comprise the Federal Reserve. Not only could Congress have used "revenues" instead of "earnings" in section 5497, it did so elsewhere in the Act.[22] Under the meaningful-variation canon, we should not lightly pre-

[22] *See, e.g.*, Pub. L. No. 111-203, § 167(b)(2), 124 Stat. 1376, 1433 (codified at 12 U.S.C. § 5367(b)(2)) (referring to "revenues generated from [a specific] activity"); *id.*

sume Congress used different words to mean the same thing. And the Federal Reserve has no expenses other than interest expenses that could be deducted from revenues to calculate earnings. Were there no deduction from revenues, there would be no difference between the Federal Reserve's "revenue" and the earnings from which its necessary expenses are deducted to calculate its "net earnings" under section 289(a)(1)(A). But as explained above, *see supra* Part II.A, "earnings" has a well-accepted technical meaning that is distinct from "revenues": profits. In short, conflating revenue and earnings would be contrary to the plain meaning of "earnings," the plain meaning of "net" in the accounting context, and the meaningful-variation canon.

*Third*, treating earnings as profits, calculated by subtracting interest expenses from revenue, comports with standard accounting practice for banks. Under general accounting principles, profits are often described as revenue minus the cost of goods sold. *See supra* Part II.A. However, the cost of interest is a bank's analogue to cost of goods sold. After all, the primary business activity of a bank is not to sell goods but to generate returns by arbitraging the difference between the interest it pays to depositors and the money it earns on its investments and on the loans that it issues. *See* John Goddard & John O.S. Wilson, *Banking: A Very Short Introduction* 10–11 (2016). Thus, it is standard practice for banks to calculate profit as the sum of interest and non-interest income, net of interest expense. *See, e.g.*, Wells Fargo & Co., *2024 Annual Report* at 79 (Mar. 7, 2025); Goldman Sachs Group, Inc., *Annual Report 2024* at 131 (Feb. 26, 2025); JPMorgan Chase & Co., *Resolute Annual Report 2024* at 172 (Apr. 7, 2025); Bank of America, *Annual Report 2024* at 133 (Mar. 1, 2025). Although the labels used vary, each of these banks records a line item that corresponds with our understanding of the term "earnings": the profit earned by the bank—before the deduction of operating expenses.

Under these standard accounting practices, the calculation of earnings and their subsequent flow through the section 289 waterfall is as follows:

§ 201(b), 124 Stat. at 1444 (codified at 12 U.S.C. § 5381(b)) (referring to "the consolidated revenues of such company from such activities" in relation to the definition of "financial company"); *id.* § 527(5)(C)(i)(II), 124 Stat. at 1592 (codified at 12 U.S.C. § 8206(5)(C)(i)(II)) (referring to the generation of "annual revenues"); *id.* § 1473(h)(2), 124 Stat. at 2195 (referring to "[i]ncremental revenues").

Revenues
– Interest Expenses (a bank's analogue to cost of goods sold)
= Earnings (profit)
– Operating Expenses (section 289(a)(1)(A))
= Net Earnings (section 289(a)(2))
– Dividends (section 289(a)(1)(A))
– Retained Surplus Funds (sections 289(a)(2)–(3))
= Excess Surplus Funds Transferred to Treasury (section 289(a)(3)(B))

At bottom, the standard calculation of profit accords with the plain meaning of "earnings" and gives the term a different meaning from "revenue" and "net income." As further discussed in Part II.E, no other construction of "earnings" fits the plain meaning of the word into the structure of the statute in a way that comports with the meaningful-variation canon.

### C.

The conclusion that Congress used the term "earnings" to describe "profit" is further supported by the legislative context of Dodd-Frank. Congress legislated against the background of the Federal Reserve's accounting practices. *See* 12 U.S.C. § 5497(a)(2)(A) (keying a cap on CFPB funding directly to the Federal Reserve's financial statements). And the Federal Reserve's financial statements—both today and in 2009, immediately before the enactment of Dodd-Frank—confirm our statutory construction.

The Federal Reserve's most noteworthy use of the term "earnings" in its financial statements appears in its description of the waterfall mandated by section 289. As the Federal Reserve describes it, "the Reserve Banks . . . transfer excess earnings to the Treasury . . . after providing for the costs of operations, payment of dividends, and reservation of" surplus funds. 2009 Financial Statements at 20.[23] Each of the three items in the

[23] The statutory surplus requirements have changed since 2009, but the general waterfall in 12 U.S.C. § 289 has remained the same. At that time, excess payments to the Treasury were mandated by the Board of Governors's requirements, *see* 2009 Financial

waterfall is tracked in the Federal Reserve's financial statements. There is a line for (1) "[t]otal operating expenses," which the Federal Reserve treats as its "necessary expenses" under section 289(a)(1)(A); (2) "[d]ividends paid to member banks" as required by the same section; and (3) "[t]ransfer[s] to surplus," which is the line item to account for surplus funds that may be reserved by individual Reserve Banks under section 289(a)(2)–(3). *See id.* at 3.

By using the term "excess earnings" to describe the funds that remain after all three deductions in the statutorily mandated waterfall have been made, the Federal Reserve implicitly recognized that "earnings" represents the funds flowing into the waterfall before these deductions.[24] Because the flow of funds once earnings reach the waterfall is statutorily mandated and exhausts all funds with a final transfer to Treasury, all items on the Federal Reserve's statement of operations that are not accounted for in the waterfall itself must necessarily be accounted for upstream. In other words, all items other than "total operating expenses," "dividends paid to member banks," and "transfers to surplus" must be factored into the calculation of the "earnings" that flow into the waterfall. These items are "total interest income," "total interest expense," and the sum of non-interest income or losses (reflected in the line item of "total non-interest (loss) [or] income"). *See* 2009 Financial Statements at 3.

In short, the financial statements of the Federal Reserve indicate that, at the time when Congress directed it to fund the CFPB from its "earnings," the Federal Reserve understood the components of its earnings to be interest revenue, interest expenses, and the sum of non-interest income or losses. It should be no surprise that this understanding of "earnings"

---

Statements at 20, but not by statute. In 2015, Congress amended section 289 to codify the transfer requirement. *See* Pub. L. No. 114-94, § 32202, 129 Stat. 1312, 1739 (adding paragraph (3) to 12 U.S.C. § 289(a)). The surplus fund was originally capped at $10 billion. *See id.* That cap has changed over time as well, and the current cap on surplus funds is $6.785 billion. *See* 12 U.S.C. §§ 289(a)(3)(A), 289 note.

[24] Similarly, when Congress enacted the Federal Reserve Act in 1913, the original version of the waterfall was contained in section 7 under the heading "Division of Earnings." *See* Federal Reserve Act of 1913, Pub. L. No. 63-43, § 7, 38 Stat. 251, 258. This heading makes sense, as the waterfall sets out the process for dividing the Federal Reserve's "earnings" into various categories. *See id.* This heading further reinforces our understanding that Congress used the term "earnings" to refer to the Federal Reserve's *profits* before the application of the waterfall.

comports with the accounting practices of other banks and the standard accounting definition of "profit," as discussed above.

The Federal Reserve's financial statements have remained steady on this point. In its most recent annual financial statements, it reported that "[t]he Reserve Banks remit excess earnings to the Treasury after providing for the cost of operations, payment of dividends, and reservation of an amount necessary to maintain surplus at the aggregate surplus limitation." 2024 Financial Statements at 21. Thus, the statements' description of the section 289 waterfall, as well as their implication that the funds flowing into the waterfall are best described as "earnings," has remained the same and supports our reading of that term today.[25]

The Federal Reserve's accounting treatment of the transfer of funds to the CFPB also supports our conclusion. The Federal Reserve is required to transfer funds from the "combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). Since it began making transfer payments to the CFPB, it has accounted for that payment as a line item under "operating expenses." *Compare* The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2010 and 2009 and Independent Auditors' Report* 5 (Mar. 22, 2011), *with* 2024 Financial Statements at 4. As explained above, operating expenses are the first category in the waterfall that is deducted from the Federal Reserve's "earnings." In this way, the Federal Reserve's accounting practices support our conclusion that "earnings" represent profits, which are upstream from operating expenses, and not net income, which is downstream.

We conclude that "earnings" in the phrase "combined earnings of the Federal Reserve System" has the same meaning indicated by the Federal Reserve's public financial statements both at the time Dodd-Frank was passed and to the present day.

---

[25] Additional clues to the meaning of "earnings" can be found in the financial statements. Immediately following the description of the waterfall, the statements explain what happens when the Federal Reserve suffers a net loss: "[I]f earnings become less than the costs of operations, payment of dividends, and reservation of an amount necessary to maintain the [surplus], the Reserve Banks suspend weekly remittances to the Treasury." 2024 Financial Statements at 21. In this sentence, it is plainly implied that "earnings" is something separate from the three categories that follow. That is the only way it is capable of being "less than" those three categories. This further supports the conclusion that "earnings" represents profits as they stand before the section 289 waterfall's deductions.

**D.**

Congress was intentional in specifying the source of funds for the CFPB. Unlike the expenses of the Board of Governors, which are provided for without limitation, *see* 12 U.S.C. § 243, Congress provided that the CFPB's funds must be paid out of a specified source: the "combined earnings of the Federal Reserve System," *id.* § 5497(a)(1). And the drafting history of Dodd-Frank supports the inference that this difference in funding schemes was no accident. The original proposal would have provided the CFPB with a mandatory payment of a fixed portion of the Federal Reserve's "total system expenses" without limiting this payment to any particular source of funds. H.R. 4173, 111th Cong. § 4109(a)(1). That proposal would have ensured that, much like the Board of Governors, the CFPB would receive funding regardless of the Federal Reserve's financial performance.

Congress opted for a different structure, however, which specified "combined earnings" as the source from which the Federal Reserve should transfer the funds. We accord significance to this decision to structure CFPB's funding differently from that of the Board of Governors. And we believe Congress could reasonably have chosen the structure it did for at least two reasons.

*First*, the Federal Reserve's profits were an attractive source from which to draw when Dodd-Frank was enacted. The Federal Reserve had over $39 billion of profits in 2008 and nearly $57.4 billion in 2009. 2009 Financial Statements at 3. Taking the lower of those figures, the Federal Reserve's profits at the height of a global financial crisis were sufficient to cover the $242 million budget for the CFPB's first full year of operations more than 160 times over. *See* The Federal Reserve Banks, *Combined Financial Statements as of and for the Years Ended December 31, 2011 and 2010 and Independent Auditors' Report* 5 (Mar. 20, 2012). Taken together with the Federal Reserve's century-long record of profitability, this made Federal Reserve profits appear to be a reliable source of plentiful funds.[26] Such a reliable source of funds would have been espe-

---

[26] The CFPB previously argued that Congress "would surely have been aware, particularly in the immediate wake of the 2008 financial meltdown, of the possibility of [Federal Reserve] shortfalls." Populus Opposition at 10 n.2 (citing U.S. Gov't Accountability Off., GAO-02-939, *Federal Reserve System: The Surplus Account* 11 (Sep. 2002) ("GAO

cially attractive given unsteady global markets after the financial turmoil of 2008 and continued high unemployment despite unprecedented congressional spending in the form of the 2009 American Recovery and Reinvestment Act.

At the same time, limiting the transfer of funds to profits ensured that the Federal Reserve would never have to create or increase a deferred asset to fund the CFPB in the never-before-seen event that Federal Reserve became unprofitable (i.e., the exact scenario in which the Federal Reserve finds itself today). This stands in sharp contrast to Congress's treatment of the Board of Governors's expenses, which the Federal Reserve must pay regardless of its financial performance. *See* 12 U.S.C. § 243. In this way, the funding source Congress chose for the CFPB's funding was stable and anchored by a generous outer limit, but did not go so far as to require creating or increasing the Federal Reserve's deferred asset to fund the CFPB.

*Second*, limiting the funds to the Federal Reserve's profits helped preserve the central bank's independence, which would have been a natural priority for the Dodd-Frank Congress, given the banking crash of the prior year. In fact, Congress traded on the Federal Reserve's independence to support the CFPB's independence by funding the CFPB through the Federal Reserve. *See CFSA*, 601 U.S. at 422 (noting that Congress employed "novel structural features" to "shield[] the [CFPB] from the influence of the political branches"). Yet, maximizing independence for the CFPB at all costs could have damaged the independence of the Federal Reserve. *See Stanley v. City of Sanford, Fla.*, 145 S. Ct. 2058, 2067 (2025) ("[N]o statute yet known pursues its stated purpose at all costs." (internal quotation marks omitted)). Because the Federal Reserve has continued to fund the CFPB in the intervening years on the strength of the CFPB's prior interpretation of "combined earnings," it has been forced to recognize greater losses than if it did not have this funding obligation. This was not the result Congress intended when it limited CFPB funds to

---

Report")). The report upon which the CFPB relied, however, stated that *individual* Reserve Banks had experienced unprofitable *weeks*. GAO Report at 11–12. This report does not provide compelling evidence that Congress anticipated the entire Federal Reserve System would be unprofitable over a sufficient period of time to disrupt quarterly funding to the CFPB. Such a scenario was then unprecedented and had not occurred even in the Great Depression.

the Federal Reserve's profits, striking a balance between providing stable CFPB funding and preserving the Federal Reserve's operational independence.

**E.**

We next address the alternative views that have been advanced—but never resolved—in prior litigation over the meaning of "combined earnings." In past litigation, the parties have treated consideration of the Federal Reserve's outlays as a binary proposition: Either "earnings" refers to "revenues" and no outlays can be subtracted, or "earnings" have to be calculated by subtracting all the Federal Reserve's outlays prior to its final transfer of excess earnings to Treasury. *See supra* Part I.C.

Neither side appears to have considered the more practical but intermediate interpretation that "earnings" are calculated by subtracting only interest expenses from revenue, which is consistent with the standard calculation of profits by banks and corporations. Thus, many of the respective arguments highlight weaknesses in the extreme positions, while strengthening our interpretation. Some of these arguments have been discussed in the analysis above, but we catalogue six points that warrant further consideration here. Ultimately, each fails to persuade us that "earnings" does not mean profit as calculated by subtracting interest expenses from revenue.

*First*, the interpretive question at issue here was not resolved by the Supreme Court in *CFSA*. Both sides have argued that decision implicitly supports their views, but we disagree. Advocates of the first view, that "combined earnings" are funds remaining at the bottom of the waterfall just before excess earnings are transferred to Treasury, point to the Supreme Court's observation that the CFPB's funding is subject to the Appropriations Clause because, "[w]hatever the scope of the term 'Treasury' in the Appropriations Clause, money otherwise destined for the general fund of the Treasury qualifies." *CFSA*, 601 U.S. at 425.[27] But

[27] Notably, "the parties agree[d] that the Bureau's funding must comply with the Appropriations Clause," making the precise source of CFPB's funding immaterial. *CFSA*, 601 U.S. at 425. This helps explain why—although Justice Alito's dissent states that "[t]he Federal Reserve Banks' earnings represent interest on and gains derived from the purchase and sale of securities, as well as fees they receive for services provided to

every dollar that goes to the CFPB reduces the amount of money that would otherwise go into the general fund of the Treasury, regardless of how high in the waterfall it is taken out of the Federal Reserve's "earnings." Because every dollar that goes to the CFPB would be otherwise destined for the Treasury at some point, regardless of the CFPB's place in the waterfall, the Supreme Court's observation does not support any one reading of "earnings" over the others.

We are similarly unpersuaded by the second view, the counterargument that the Court implicitly determined "combined earnings" means revenues simply by upholding the constitutionality of the CFPB's funding at a time when the Federal Reserve was operating at a loss. In determining that it was constitutional for Congress to fund the CFPB from the "combined earnings of the Federal Reserve System," the Court did not evaluate whether the Federal Reserve had sufficient earnings to satisfy the CFPB's budget. Simply put, the meaning of "combined earnings" was neither litigated nor decided in *CFSA*.

*Second*, we disagree that certain dictionary definitions of "earnings" support reading "combined earnings" in section 5497(a)(1) to mean "revenue." As already explained in Part II.A, the weight of authority indicates that "earnings" require offsetting at least some costs against revenue. Moreover, this interpretation comports with the use of the term in the business and accounting context—which is the relevant context for interpreting Dodd-Frank.

That means alternative uses of "earnings" outside the corporate context are inapposite. Naturally, an individual's earnings typically have different components than a corporation's earnings. "In the case of an individual, earnings include salary and other compensation for work you do, as well as interest, dividends, and capital gains from your investments." *Standard & Poor's Dictionary* at 64. This definition accords with ones offered by Black's Law Dictionary and the Oxford English Dictionary that arguably equate individuals' earnings with revenue. *See* 3 *Oxford English Dictionary* E-10 (1933 ed.) (offering several meanings of "earnings," including "[t]he amount of money which a person acquires or becomes entitled to

---

depository institutions, 'such as check clearing, funds transfers, and automated clearinghouse operations'"—no opinion has treated this as a material issue or a point of disagreement. *Id.* at 450 (Alito, J., dissenting) (citation omitted).

by his labour" and "[t]he income produced by invested capital"); *Black's Law Dictionary* 642 (12th ed. 2024) (defining "earnings" as "[r]evenue gained from labor or services, from the investment of capital, or from assets" among other definitions). Although the CFPB once treated these alternative definitions as controlling, *see, e.g.*, Populus Opposition, *supra* note 7, at 3–5; Active Opposition, *supra* note 7, at 19–20, we agree with the CFPB's new determination. The colloquial meaning of "earnings" in the individual context is not controlling in the context of section 5497 and should not guide our statutory construction.

Moreover, even individual earnings account for the costs associated with an income-generating activity. True, some definitions of individual earnings do not expressly call for a deduction of costs from revenue, as in the corporate context. But because an individual's "salary and other compensation *for work*" is attributable to work and is not compensation for a capital outlay, an individual does not have the type of offsetting costs that a corporation would deduct from revenue. As for "interest, dividends, and capital gains from your investments," these earnings exclude the initial capital outlay by which they were generated. For example, someone who purchased stock for $900 and sold it for $1,000 would deduct the cost of the investment from the revenue it generated to determine that there were $100 in capital gains. Only that $100 in capital gains would fall within the definition of individual "earnings." Because the $1,000 influx of cash is offset by the $900 cost of the investment—the individual's equivalent of a corporation's cost of goods sold—that $100 would also be comfortably described as profit. Although individual "earnings" may have different components than "earnings" in the corporate sense, the definition of "earnings" in the individual context makes it a more natural analogue to the Federal Reserve's profits than to its revenues.

*Third*, we are unpersuaded that other provisions of Dodd-Frank use "earnings" to mean "revenues." To begin, nothing about these other uses of the term "earnings" compels the view that Congress had revenues in mind. For example, in several places the Act refers to "earnings from investments" or "earnings on investments." *E.g.*, Pub. L. No. 111-203, § 210(n)(2), 124 Stat. at 1506 (codified at 12 U.S.C. § 5390(n)(2)); *id.* § 748, 124 Stat. at 1743 (codified at 7 U.S.C. § 26(g)(5)(E)); *cf. id.* § 619, 124 Stat. at 1627 (codified at 12 U.S.C. § 1851) (using the term "retained

earnings," which, as described in Part II.A, is an accounting term with a distinct meaning from "revenue"). Similarly, the Act authorizes a Reserve Bank to "pay earnings on balances maintained by or on behalf of a designated financial market utility in the same manner and to the same extent as the Federal Reserve Bank may pay earnings to a depository institution under the Federal Reserve Act." *Id.* § 806(c), 124 Stat. at 1812 (codified at 12 U.S.C. § 5465(c)). These "earnings" are most naturally understood as the difference between the value of an initial outlay against a later inflow that it was intended to yield—that is, that "earnings" account for costs and are not the equivalent of "revenues." Even if these uses of the term "earnings" were ambiguous, they could reasonably be interpreted harmoniously with our interpretation of "earnings" to mean "profits" in section 5497. That is the only interpretation that gives the term "earnings" a consistent meaning that differs from the terms "revenue" and "net earnings." *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings." (citation omitted)).

*Fourth*, the argument that interpreting "earnings" to mean anything less than revenues would thwart Congress's intent to insulate CFPB from the annual appropriations process ignores the fact that all legislation represents a balance or compromise of interests. *See Stanley*, 145 S. Ct. at 2067 ("[N]o statute yet known pursues its stated purpose at all costs." (internal quotation marks omitted)). Thus, our analysis is not disturbed by portions of the legislative history that indicate some members of Congress intended to provide the CFPB "the assurance of adequate funding." S. Rep. No. 111-176, at 163 (2010); *see also* 156 Cong. Rec. S5928 (daily ed. July 15, 2010) (statement of Sen. Chris Dodd) (explaining that the requirement for the Federal Reserve to automatically fund the CFPB was intended to "ensure that the CFPB has the resources it needs to perform its functions"). Congress could certainly have intended to provide the CFPB a reliable source of funds and designated the Federal Reserve's profits, which had always been more than adequate even in times of financial crisis, to be that source.

The contrary view ignores the fact that the CFPB could at some point have inadequate funding even if "earnings" did refer to revenues, relies almost entirely on conjecture and hindsight, mistakenly assumes that Congress could not have accommodated any countervailing policy con-

siderations, and is at odds with the statutory scheme. As already noted, Congress designed a peculiar funding mechanism for the CFPB that insulates it from the ordinary appropriations process. And its design plainly reflects policy tradeoffs. On the one hand, the CFPB can draw from the combined earnings of the Federal Reserve as of right, without scrutiny from the Board of Governors or Congress. *See* 12 U.S.C. § 5497(a)(1) (providing that the "Board of Governors *shall* transfer to the Bureau from the combined earnings of the Federal Reserve System" an "amount determined by the [CFPB] Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law" (emphasis added)). On the other hand, the CFPB can draw only from a statutorily defined source—the "combined earnings of the Federal Reserve System"—and is subject to a statutorily defined cap. *Id.* § 5497(a)(1)–(2).

Congress also provided a safety mechanism should the CFPB experience funding shortfalls. *See id.* § 5497(e). To the extent that the Director of the CFPB determines that the "sums available to the Bureau under [section 5497] will not be sufficient," Congress instructed the Director to prepare a report regarding the CFPB's funding and submit it "to the President and to the [Senate and House] Committee[s] on Appropriations." *Id.* § 5497(e)(1)(B).[28] In other words, Congress anticipated the political branches serving as the ultimate backstop for CFPB funding in the (unlikely) event of a shortfall.

Other funding schemes show that Congress could have instructed the Board of Governors to fund the CFPB from any source at its disposal, including borrowing if other funds were not available. *See, e.g.*, *id.* § 5345(c) (requiring the Board of Governors to provide interim funding for the Office of Financial Research, "sufficient to cover the expenses of the Office," without defining the source of funds); *id.* § 5345(d) (provid-

---

[28] To be sure, Dodd-Frank's non-exhaustive list of subjects to be addressed in the reports includes "the extent to which the funding needs of the Bureau are anticipated to exceed the level of the amount set forth in subsection (a)(2)" and does not include the extent to which funding needs are anticipated to exceed the source of funds provided in subsection (a)(1). 12 U.S.C. § 5497(e)(1)(B). Thus, the reporting requirement does not necessarily show that Congress anticipated the "combined earnings" of the Federal Reserve would be exhausted. But it does show that Congress understood the funding mechanism it created might not always be sufficient to fund CFPB's operations, and that the backstop Congress provided was the ordinary appropriations process.

ing permanent self-funding for the Office of Financial Research through assessments on certain bank holding companies and nonbank financial companies supervised by the Board of Governors). And an early draft of Dodd-Frank itself did not limit CFPB funding to a particular funding source. *See* H.R. 4173, 111th Cong. § 4109(a)(1) (as introduced in the House, Dec. 2, 2009) (instructing the Board of Governors to "transfer funds in an amount equaling 10 percent of the Federal Reserve System's total system expenses" without requiring those funds come from "combined earnings"). But such a funding mandate would have undermined the independence of the Federal Reserve, as discussed in Part II.D. Ultimately, Congress opted to limit the source of funds to "the combined earnings of the Federal Reserve System." 12 U.S.C. § 5497(a)(1). Our interpretation of the statute must honor that policy choice.

*Fifth*, we are not swayed by the CFPB's former view that "earnings" must be construed to mean "revenues" because this would be more workable given the CFPB's understanding that the Federal Reserve settles the statutory waterfall on a weekly basis. As we understand it, the CFPB was worried that weekly settlements might mean the Federal Reserve would not have sufficient "earnings" on hand to fund the CFPB unless "earnings" meant "revenues." We need not determine whether the CFPB rightly understood the Federal Reserve's accounting practices or properly estimated the practical challenges that would result. Weekly settlements are not required by statute. *See id.* § 289(a) (setting no schedule for operation of statutory waterfall except that dividends are annual). Thus, any alleged impracticality does not require a saving interpretation of "earnings" as "revenues" to allow the statute to function. Rather, the Federal Reserve may change its settlement schedule if it determines that this is necessary.

We pause to note that we do not believe any shortfall caused by a practice of weekly settlement could be overcome simply by drawing on *future* earnings. Some scholars have argued that the absence of an express mandate to fund the CFPB from "combined earnings" over any particular timeframe makes it possible for the Federal Reserve to draw from its future earnings to fund the CFPB.[29] But the text of section 5497(a)(1)

---

[29] *See, e.g.*, Sovern, *supra* note 3 (arguing that the text of section 5497(a)(1) might allow the CFPB to draw from the Federal Reserve's past or future combined earnings); Amar, *supra* note 3 (observing "that 'earnings' is a term that, even if it refers to

directs the Board of Governors to "transfer" funds "from the combined earnings of the Federal Reserve System" on a quarterly basis. *Id.* § 5497(a)(1). And future earnings are not available for "transfer" because they have not yet materialized. To fund the CFPB from future earnings would effectively circumvent the balancing of policy interests described in Part II.D, and would be contrary to the commonsense idea that something which does not exist cannot be transferred from one place to another. Thus, we interpret section 5497(a)(1) to fund the CFPB only from earnings that the Federal Reserve has in hand at the time of funding.

Under the present circumstances, it would also be impermissible to fund the CFPB out of the Federal Reserve's surplus fund. Although the Federal Reserve's last annual statement reported a balance of $6.785 billion in its surplus fund, this balance represents a credit for future earnings rather than earnings in hand. *See* 2024 Financial Statements at 3, 5. The Federal Reserve has long since exhausted its past earnings. Since 2022, when the Federal Reserve started experiencing losses, it has accounted for them using what is now a nearly $216 billion "deferred asset," which "represents the net accumulation of all costs in excess of earnings, and represents the future net earnings the Reserve Banks will need to realize prior to resuming remittances to the Treasury." *Id.* at 3, 60–61. In other words, to account for the accumulating losses since 2022 in its current financial statements, the Federal Reserve has used a deferred asset to reflect *future* excess earnings that it will retain, rather than transferring them to the Treasury. *See id.* at 21. This accounting treatment means that the surplus fund's current positive balance is directly traceable to the use of the deferred asset, and the entire positive balance effectively represents future earnings rather than past earnings. And, as already explained, future earnings are not a permissible source of funding under the text of section 5497.

In addition, we understand that the Federal Reserve remitted excess earnings to the Treasury even before this was statutorily mandated, calculating excess by reference to the amount of capital paid into the Reserve Banks by member banks. *See* 2009 Financial Statements at 19 ("The Board of Governors requires the Reserve Banks to maintain a surplus

---

bottom rather than top lines, needn't always have to be understood by reference to a particular year").

equal to the amount of capital paid-in as of December 31 of each year."). In other words, the surplus fund has historically served to protect capital paid into the Federal Reserve and was not simply a general fund for miscellaneous expenses. This appears to be consistent with the Federal Reserve's practice of maintaining its surplus fund at the statutory maximum even in years that it is operating at a loss. *See* 2024 Financial Statements at 5 (reporting consistent $6.785 billion balance in the surplus fund year over year); *see also* 12 U.S.C. § 289(a)(3) (setting cap at $6.825 billion); *id.* § 289 note (reducing cap by $40 million). If Congress had wanted to fund the CFPB from the surplus fund, it could have easily said so. But drawing from the surplus fund would have undermined the safety of statutorily mandated investments by private banks in the Federal Reserve. *See id.* § 282. Such an interpretation would not make sense in the context of Dodd-Frank's effort to avert future financial crises.

*Sixth*, we are unpersuaded by the argument that "combined earnings" must refer to earnings that exist in a single account. This is the premise underlying the argument that "combined earnings" in section 5497(a)(1) refers to the excess funds that the Reserve Banks must "transfer[] to the Board of Governors of the Federal Reserve System for transfer to the Secretary of the Treasury for deposit in the general fund of the Treasury." *Id.* § 289(a)(3)(B). In this view, "combined earnings" is shorthand for the excess funds at the final step of the Federal Reserve's waterfall.

We think the term "combined" in section 5497(a)(1) should be given its ordinary meaning, which is "to unite into a single number or expression." *Merriam-Webster's Collegiate* at 246 (defining "combine"). Coupled with the word "earnings," the phrase "combined earnings" in section 5497(a)(1) therefore refers to the collective profits (as previously described) of the Reserve Banks. This straightforward construction accords with the fact that the "combined" financial statements of the Federal Reserve use combined figures throughout their accounting of the financial waterfall. *See* 2024 Financial Statements at 4; 2009 Financial Statements at 3.

In prior litigation, the CFPB offered an additional response to the view that "combined earnings" are the excess funds transferred by the Reserve Banks to the Board of Governors. The CFPB argued this interpretation would contradict the defendants' own accounting definitions, which treated "earnings" as net income. That is because the Reserve Banks make

the transfer to the Board of Governors after they pay dividends and retain a surplus, and net income is ordinarily calculated without deductions for dividends and surplus in the private sector. *See* Populus Opposition, *supra* note 7, at 7. In short, Congress could not have intended "combined earnings" both to mean net income and to mean the excess surplus of the Reserve Banks transferred to the Board of Governors after paying dividends and retaining a surplus. *Id.*

This argument weighs against the view that the "combined earnings" represent those earnings that are combined into a single account at the bottom of the waterfall, but it poses no difficulty for our construction of "combined earnings." In our view, Congress used "combined earnings" to mean the combined profits of the Federal Reserve (i.e., revenues minus interest expenses). As already explained above, that construction follows from the most apposite definitions and accounting authorities. At most, then, this accounting-definitions argument from the CFPB presents another reason to prefer our construction of section 5497(a)(1), which harmonizes the meaning of the various statutory terms better than any other.

* * * * *

For all these reasons, we conclude that "combined earnings" refers to profits. Therefore, we understand that the Federal Reserve currently lacks combined earnings from which the CFPB can draw. Indeed, we understand this bottom-line result—that no combined earnings currently exist—holds true under any interpretation of "combined earnings" except for the one that equates earnings with revenues.

## III.

Your question whether the CFPB may continue to draw funds from the Federal Reserve under present circumstances implicates not only the definition of "combined earnings" but also what the CFPB should do if it determines that no combined earnings are available to fund its operations under 12 U.S.C. § 5497(a)(1). When it believed the Federal Reserve had combined earnings available, the CFPB's past practice has been to communicate its budgetary needs to the Federal Reserve with what it cordially characterized as a "request" to transfer funds. Because section 5497 provides the Federal Reserve no discretion in the matter, the Supreme

Court has described that process as a "requisition" and said that CFPB "draws money from the Federal Reserve System." *CFSA*, 601 U.S. at 422, 425.

We believe that section 5497 imposes no obligation for the CFPB to continue drawing or attempting to requisition funds from the Federal Reserve after determining that no "combined earnings" are available. Further, we think doing so would raise constitutional concerns. The Appropriations Clause prohibits any withdrawal of Treasury funds except by "Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7; *see also CFSA*, 601 U.S. at 425 (noting that "money otherwise destined for the general fund of the Treasury," including any earnings that remain after application of the section 289 waterfall, qualify as Treasury funds). The Oath or Affirmation Clause, in turn, arguably prevents the CFPB Director from instructing other federal officers to violate what he knows to be the dictates of the Constitution. *See* U.S. Const. art. VI, cl. 3.

Together, these clauses may preclude the Director from requesting, drawing, or requisitioning funds from the Federal Reserve if the CFPB has determined that there are no available funds to disperse under the sole congressional appropriation for the CFPB—section 5497(a)(1). We need not and do not definitively resolve that issue here, though, because the CFPB Director has no statutory obligation to requisition funds from the Federal Reserve under such circumstances. Instead of attempting to requisition unappropriated funds from the Federal Reserve, the Director should direct any requests for additional appropriations beyond those under section 5497(a) to Congress.

**A.**

We understand the CFPB has determined that the congressional appropriation for the CFPB is insufficient because the Federal Reserve has no combined earnings. *See* 12 U.S.C. § 5497(e)(1)(A). Although the CFPB's past practice has been to draw or requisition funds from the Federal Reserve under section 5497(a)(1) when it believed those funds were available, we see no statutory mandate for the CFPB Director to draw or requisition nonexistent funds from the Federal Reserve.

On its face, Congress's instruction that "the Board of Governors shall transfer to the Bureau from the combined earnings of the Federal Reserve

System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law" is not directed at the CFPB. *Id.* § 5497(a)(1). And an attempted requisition would serve no purpose under the statutory funding mechanism if the funds are not available. We thus do not interpret section 5497 as requiring an attempted requisition where such a requisition is not expressly called for by statute and would serve no purpose under the statutory funding scheme. *See CFSA*, 601 U.S. at 422–23 (explaining that the CFPB "*may* requisition" funds under section 5497(a)(1) (emphasis added)).

Congress's instruction to the CFPB Director appears not in section 5497(a)(1) but in section 5497(e)(1). When the CFPB Director "determine[s] that sums available to the Bureau under this section will not be sufficient," he must submit "a report regarding the funding of the Bureau" to the President and to the House and Senate Committees on Appropriation. 12 U.S.C. § 5497(e)(1)(B). In other words, if the CFPB needs money other than what Congress has authorized the Federal Reserve to transfer, it is not required to ask the Federal Reserve for that money. Instead, it must report to Congress and the President.

**B.**

Constitutional avoidance further counsels against interpreting section 5497(a)(1) to mandate an attempt to requisition funds when the CFPB has determined that no funds are legally available because this construction would raise serious constitutional questions and is not the only plausible construction of the statute. *See, e.g.*, *Clark v. Martinez*, 543 U.S. 371, 380–82 (2005). An agency may draw funds from the Treasury only "pursuant to a duly enacted statute in accordance with Article I, Section 9 of the Constitution, which provides that '[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by law.'" *Funding for the Critical Technologies Institute*, 16 Op. O.L.C. 77, 79 (1992) (quoting U.S. Const. art. I, § 9, cl. 7); *see also Expiration of Authorizations of Appropriations for Social Security Grant Programs*, 37 Op. O.L.C. 9, 16 (2013). Put simply, only Congress may appropriate federal funds. *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937).

Congress typically funds agencies through annual appropriations. *CFSA*, 601 U.S. at 420. But it chose to fund the CFPB through a novel

statutory mechanism—a continual authorization permitting the CFPB to draw from the Federal Reserve's combined earnings "the amount [the CFPB] Director deems 'reasonably necessary to carry out' the Bureau's duties, subject only to an inflation-adjusted cap." *Id.* at 421 (quoting 12 U.S.C. § 5497(a)(1), (2)). The Supreme Court determined that this statute constituted an appropriation from the Treasury because it designated "particular funds for specified ends" that would otherwise have gone into the Treasury. *Id.* at 424–25, 427.

The "particular funds" designated by Congress are the Federal Reserve's "combined earnings." 12 U.S.C. § 5497(a)(1). If there are no combined earnings available, no funds may be disbursed under that provision. That is because the Appropriations Clause "does not permit an agency . . . to authorize the expenditure of funds beyond what Congress has approved." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (internal quotation marks and citation omitted). Absent an additional appropriation by Congress, the CFPB may not be funded in excess of the source provided by section 5497(a)(1) any more than it could be funded in excess of the statutory cap that Congress set under section 5497(a)(2). Thus, where the funding provided in section 5497 is insufficient for the needs of the CFPB, Congress has pointed to the solution: report the problem to the political branches. 12 U.S.C. § 5497(e)(1); *see also CFPB v. Law Offs. of Crystal Moroney, P.C.*, 63 F.4th 174, 178 (2d Cir. 2023) ("Congress also authorized the CFPB to seek additional funding through the annual appropriations process.").

To be clear, the Appropriations Clause, standing alone, might not prohibit the CFPB from *requesting* unappropriated Treasury funds from the Federal Reserve. But the line between requesting, requisitioning, and drawing funds is ambiguous in this context. *See CFSA*, 601 U.S. at 422, 425. And the Appropriations Clause does prohibit *drawing on* Treasury funds without a congressional appropriation. Even if the CFPB were not directly drawing on Treasury funds, we think that a CFPB instruction for the Federal Reserve to do so—if the CFPB Director has determined that the Federal Reserve has no available funds under the CFPB's sole source of congressional appropriations—may implicate a distinct constitutional provision, the Oath or Affirmation Clause, which may bar funding requests by the CFPB Director to the Federal Reserve when the CFPB Director knows that the Federal Reserve could not provide funds consistent with the Constitution.

The Oath or Affirmation Clause provides that "all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution." U.S. Const. art. VI, cl. 3. The CFPB Director, whose past practice has been to request, draw, or requisition the funds made available under section 5497 from the Federal Reserve, is an executive officer subject to the Oath or Affirmation Clause and thus charged with "support[ing]" the Constitution. *See Seila Law LLC v. CFPB*, 591 U.S. 197, 203–05, 213–14, 224–25 (2020); *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (holding a constitutional "officer" is one who "occup[ies] a 'continuing' position established by law" and "exercis[es] significant authority pursuant to the laws of the United States").

The Oath or Affirmation Clause may not "create specific responsibilities," but "the connotatively active word 'support'" means "a commitment to abide by our constitutional system." *Cole v. Richardson*, 405 U.S. 676, 684 (1972). The Clause's purpose was "to assure that those in positions of public trust were willing to commit themselves to live by the constitutional processes of our system." *Id.* at 684. As one early leading treatise explained, officers under the oath are "conscientiously bound to abstain from all acts[] which are inconsistent with" the Constitution. Joseph Story, 1 *Commentaries on the Constitution* § 374, at 255; *see also* Story, 2 *Commentaries* § 1624, at 408–09. An officer's request or instruction that another federal officer violate a constitutional provision is thus arguably inconsistent with the Constitution. We have previously suggested that both direct violations of the Constitution and support to those who violate the Constitution may offend the Oath or Affirmation Clause. *See Religious Objections to the Postal Service Oath of Office*, 29 Op. O.L.C. 37, 52 (2005).

The Oath or Affirmation Clause effectively charges each covered official with considering the constitutionality of their actions. After all, the political branches are tasked with interpreting the Constitution themselves, absent relevant precedent. *See, e.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 274 (1990). The Office of Legal Counsel ("OLC") exercises the Attorney General's delegated authority to interpret the Constitution and laws for the Executive Branch. *See Campaign for Accountability v. DOJ*, No. 24-5163, 2025 WL 2942433, at *3 (D.C. Cir. Oct. 17, 2025) ("Executive Branch officials consider final OLC opinions

to be 'controlling legal advice.'" (quoting Memorandum from David J. Barron, Acting Assistant Attorney General, to Attorneys of the Office of Legal Counsel 1 (July 16, 2010))). When either a published OLC opinion or binding court precedent determines that a course of conduct is unconstitutional, an executive officer's instruction that another agency engage in that conduct at the very least raises constitutional concerns.

Here, it follows from our interpretation of section 5497 and the Appropriations Clause that the CFPB may not be funded from any source other than the Federal Reserve's profits or a new congressional appropriation. Thus, an instruction to transfer funds after determining that none could be transferred without a violation of the Constitution would raise Oath or Affirmation Clause concerns even if it were not a direct drawing of unappropriated funds in violation of the Appropriations Clause. However, such constitutional concerns may be avoided by our determination that there is no statutory obligation for the CFPB Director to attempt a requisition from the Federal Reserve of combined earnings that the CFPB has determined do not exist.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*